UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Christine Peabody; Michael Griggs;
Lauren Griggs; and C. Monica Griggs

Plaintiffs

CA 08 243 ML

VS. C.A.

Carol Rita Kimberly Griggs, Alias;
David Heal, Alias, individually and
in his capacity as purported Trustee of
the Irrevocable Trust estate of the late Glenn E. Griggs;
Deborah Griggs, Alias; Dan A. Griggs, Alias;
Edward L. Gerstein, Alias; Richard Bicki, Alias;
Edward Brayton, Alias; the Griggs & Browne Co, Incorporated;
Griggs & Browne Home Inspection Service, Inc.;
Griggs & Browne Services, Inc.;
Griggs & Browne Termite Control, Inc; John Does 1
through 10; Jane Roes 1 through 10; XYZ Corporations,
Partnerships, Limited Liability Companies, Trusts and/or
Enterprises 1 through 10

Defendants

**VERIFIED COMPLAINT**

**PARTIES**

***Parties Plaintiff***

1. Plaintiff, Christine Peabody ("Christine") is a resident of Coventry, Rhode Island and a daughter of the late Glenn E. Griggs ("Glenn) through his first marriage, to Nancy Griggs.

2. Plaintiff, Michael Griggs ("Michael") is a resident of Bourne, Massachusetts and a son of the late Glenn E. Griggs ("Glenn) through his first marriage, to Nancy Griggs.

3. Plaintiff, Lauren Griggs ("Lauren") is a resident of East Greenwich, Rhode Island and a daughter of the late Glenn E. Griggs ("Glenn) through his second marriage, to Patrizia Griggs.

4. Plaintiff, C. Monica Griggs ("Monica") is a resident of Jamestown, Rhode Island and a daughter of the late Glenn E. Griggs ("Glenn) through his second marriage, to Patrizia Griggs.

5. Christine, Michael, Lauren, and Monica are four (4) of the six (6) natural children and heirs at law of their late father, Glenn E. Griggs (hereinafter, "Glenn" or "their father").

## ***Parties Defendant***

6. Upon information and belief, defendant, Carol Rita Kimberly Griggs ("Carol") is a resident of the City of Cranston, Rhode Island 02920.

7. Upon information and belief, defendant, David Heal ("Heal") is a resident of Smithfield, Rhode Island and is the purported Trustee of a so-called "Irrevocable Trust" and/or other representative of Glenn's estate.

8. Upon information and belief, defendant, Deborah Griggs ("Deborah") is a resident of West Greenwich, Rhode Island.

9. Upon information and belief, defendant, Dan A (Anthony) Griggs ("Dan") is a resident Providence, Rhode Island.

10. Deborah and Dan are two (2) of the six (6) children and heirs at law of Glenn.

11. Upon information and belief, defendant, Edward L. Gerstein ("Gerstein"), is a resident of Rhode Island.

12. Upon information and belief, defendant, Gerstein, has at all times maintained an office or place of business in Little Compton, Rhode Island.

13. Upon information and belief, defendant, Richard Bicki ("Bicki"), is a resident of Rhode Island.

14. Upon information and belief, defendant, Bicki, has at all times maintained an office or place of business in Providence, Rhode Island.

15. Upon information and belief, Edward Brayton ("Brayton") is a resident of Rhode Island.

16. Upon information and belief, Heal and Brayton have at various times within the past several years been employed by and acted as managers, officers and/or directors of one or more of the Griggs businesses described below.

17. Upon information and belief, the **Griggs & Browne Co., Incorporated** is a Rhode Island business corporation (hereinafter referred to by its name and/or as "the first company") having its principal offices and place of business in Providence, Rhode Island and has since 1990 been authorized to transact and has, in fact, conducted business in the state of Connecticut.

18. Upon information and belief, **Griggs & Browne Home Inspection Service, Inc**. is a Rhode Island business corporation having its principal offices and place of business in Providence, Rhode Island.

19. Upon information and belief, **Griggs & Browne Services, Inc**. is a Rhode Island business corporation having its principal offices and place of business in Providence, Rhode and has since 2003 been authorized to transact and has, in fact, conducted business as a foreign corporation in the Commonwealth of Massachusetts.

20. Upon information and belief, **Griggs & Browne Termite Control Co., Inc**. is a Rhode Island business corporation having its principal offices and place of business in Providence, Rhode Island. In 1985 it was authorized to transact and has, in fact, conducted business as a foreign corporation in the Commonwealth of Massachusetts but ceased filing

annual reports in 2000 and received an order of dissolution on that ground on or about May 31, 2007.

21. The **Griggs & Browne** business corporations shall hereinafter sometimes be individually and collectively referred to as "the Griggs & Browne businesses", as the "corporate defendants", as "the corporations" and/or as "the enterprise".

22. Defendants John Doe 1 through 10 are a person or persons whose identity and/or culpability is currently unknown to the plaintiffs but, upon information and belief, may be or are responsible and/or liable toward plaintiffs under one or more of the following claims or counts.

23. Defendants Jane Doe 1 through 10 are a person or persons whose identity and/or culpability is currently unknown to the plaintiffs but, upon information and belief, may be or are responsible and/or liable toward plaintiffs under one or more of the following claims or counts.

24. Defendants XYZ Corporations, Partnerships, Limited Liability Companies, Trusts and/or Enterprises 1 through 10 are an entity or entities whose identity, utilization by other defendants, and/or culpability is currently unknown to the plaintiffs but, upon information and belief, may be holding or have held assets and/or may be responsible and/or liable toward plaintiffs under one or more of the following claims or counts.

## JURISDICTION

25. Jurisdiction is vested in this court pursuant to the provisions of 18 U.S.C. § 1961 and 1962, *et seq.* (the Racketeer Influenced Corrupt Organizations Act).

26. This court also has jurisdiction under the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*

27. Jurisdiction also exists pursuant to 18 U.S.C. 2511 (providing for punitive damages for unauthorized interception and disclosure of certain wire, oral, or electronic communications).

28. In furtherance of its federal jurisdictional, this court has jurisdiction to allow declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

29. In furtherance of its pendant jurisdiction over the state causes of action made herein, this court has further jurisdiction to allow declaratory relief pursuant to Title IX, Chapter 30 of the General Laws of Rhode Island 1956, as amended (known as the "Uniform Declaratory Judgments Act"), in that Plaintiffs request that the court declare rights, status, and other relations of and among the parties.

## VENUE

30. Venue of this action is founded and appropriate in this Court and judicial district pursuant to 28 U.S.C. Section 1391(b), in that most of the plaintiffs and (upon information and belief) all of the defendants reside in this judicial district; the events or omissions giving rise to the claims that are the subject of this action occurred in this judicial district and the property which is the subject of this action is for the most part located in this judicial district.

## FACTUAL PREDICATES AND BACKGROUND

### *Glenn Griggs*

31. Upon information and belief, Glenn was active in the aforementioned Griggs & Browne business during the 1960s, 1970s, 1980s and into the 1990s, although he generally relied upon trusted managers and others to assist and (in many instances) run things on his behalf.

32. On or about April 17, 1996, Glenn married his third and final wife, Carol; no children were born or adopted during this marriage.

33. Upon information and belief, following a "honeymoon" of approximately three (3) weeks, the newlyweds returned to Carol's home in Cranston, Rhode Island.

34. Upon information and belief, following less than a week of living together, Carol demanded that Glenn move out of her home and the couple separated.

35. On or about November 6, 1996, Carol filed a petition seeking the dissolution of her marriage to Glenn, alleging that they had separated in June, 1996.

36. On or about January 21, 1997, Carol and Glenn were divorced and a final judgment of divorce was entered on April 22, 1997.

37. Pursuant to the final judgment of divorce, Carol specifically asked for and received permission to resume the use of the surname "Kimberly", but nevertheless utilized the name "Griggs" freely and often following the divorce.

## ***Early Relevant Years and Events***

38. Upon information and belief, at about the same time that Glenn's father initially brought Glenn into the first Griggs & Browne business, David J. Aubin, Jr. ("Aubin") was also hired to work at the company.

39. Upon information and belief, Mr. Aubin became a manager of the first Griggs & Browne Company and had a lengthy, uninterrupted career with the first company of approximately thirty (30) years' duration, retiring in December 1985.

40. The written agreement of December 30, 1985 included reciprocal promises by the first Griggs & Browne company that it would continue to pay Aubin's health insurance, provide

Aubin a lifetime gas allowance, give Aubin the company car he (Aubin) was then using, and pay for Aubin's life insurance policy until Aubin attained the age of sixty-five (65) years.

41. Upon information and belief, Aubin provided consulting services to Glenn and the Griggs & Browne companies until approximately 1999.

***Enter Lady Macbeth***

42. Upon information and belief, Carol was hired as a receptionist at the first Griggs & Browne company.

43. Upon information and belief, in an effort to obtain leverage and/or personal gain in the first company (and later in the other Griggs & Browne companies) she used and employed her feminine "charms" and/or "wiles" or other methods to obtain one goal after another.

44. In either July, 1993 or July 1998 Carol's father tape recorded another discussion with his daughter. In this conversation, Carol stated that she had gotten a "five dollar" raise and that this was better than anyone else had received. She also stated, ***"(m)y boss (Glenn) is so stupid ...I gotta control myself ... he was an adopted child who walked into the money....Dave (Aubin) ran the business....(Glenn) doesn't have a clue ....(Glenn) makes no decisions ... we (the managers) make all the decisions".***

45. On or about April 10, 1996, Michael received an anonymous telephone call from an unknown female caller who claimed to know Carol very well and indicated that Carol and Glenn were going to be married, that the marriage was to be kept "secret" and that Carol was "out to take the business and assets from the children without anyone finding out".

46. Michael contacted Glenn's accountant, Vincent Vinci ("Vinci"), Daniel and others with this "news" and a form of pre-nuptial agreement was hastily drawn.

47. Glenn questioned the need for a pre-nuptial agreement, claiming that Carol had told him many, many times that he (Glenn) was "broke", that Carol had more money than him, and thus he questioned the need for a pre-nuptial agreement.

48. Glenn was not "broke" as Carol told him, but, upon information and belief, could not comprehend or understand the value of his businesses, real estate and estate.

49. Upon information and belief, having apparently convinced Glenn over time that he (Glenn) was "broke" and that she (Carol) possessed greater financial assets, Carol had no choice but to sign the pre-nuptial agreement and thus did so.

50. The only material benefit that the pre-nuptial agreement between Glenn and Carol provided Carol was Glenn's promise to maintain a $300,000.00 life insurance policy on himself with Carol as irrevocable beneficiary for a period of ten (10) years.

51. Glen and Carol were married on April 17, 1996, announcing to all that he and Carol intended to have a honeymoon in St. Martin at a condominium that Glenn owned.

52. In May, 1996, about three (3) weeks after the wedding (at a time when Glenn and Carol were supposedly still on their "honeymoon") Patrizia was suddenly and unexpectedly visited by Glenn who advised Patrizia that Carol wanted a divorce, although he did not know why.

53. There followed telephone calls to Patrizia from Glenn wherein he advised that over the next five (5) days Carol had never come home in the evening until she thought Glenn was asleep and that Carol repeatedly told him that he (Glenn) made her "sick" when she saw him.

54. Upon information and belief, Carol found an apartment for Glenn in Cranston, furnished it with Glenn's money, forced him to move there and then visited him daily despite being "sick" whenever she saw him.

55. On or about November 6, 1996, Carol filed a petition for divorce from Glenn, falsely asserting under oath in her petition that the couple separated on June 16, 1996 when, in fact, this had actually occurred during May, 1996.

56. On or about January 21, 1997, Carol's divorce petition was heard and a preliminary decree of divorce was entered.

57. On or about January 27, 1997, Carol and her father had a telephone conversation (tape recorded by her father) in which Carol told her father that the divorce ***"doesn't change anything" and that she "just got rid of the idiot, that's all."***

58. At about this time, Glenn was relocated from his apartment to a condominium on Post Road in Warwick, Rhode Island.

59. On or about May 9, 1997, Carol's father taped another conversation between him and Carol in which Carol complained that she had to do ***"everything" for Glenn's new residence, including getting the mortgage and attorney***. She complained that she has to make all calls and arrangements and that all Glenn does is ***"sit there and say ugh ugh ugh ugh."***

60. At about this time, Michael saw that Carol was conducting an extensive study of the divorce agreements for Glenn's prior marriages and told Glenn (in Michael's presence) what Glenn would and what Glenn would not give to his daughters with respect to college, clothes, and gifts. She told Glenn that he was responsible for their tuition and that was all.

61. At about this time, Griggs & Browne was changing its group life insurance company and a sales representative named Susan arrived to meet with Glenn and Michael, but

Carol closed the door, barring Michael's entry so that only Susan, Carol and Glenn were present for the important discussion.

62. After a 20-30 minute meeting, Susan emerged from the room and told Michael and others (in the parking lot) that "you have some trouble on your hands", explaining that Carol was "overpowering" during this meeting and how Glenn "gave in" to whatever Carol had to say.

63. Susan further advised that eventually, when Glenn wasn't sure what to do, Susan indicated that Carol said, ***"I'll tell you what you're going to do … you're going to keep this policy and make me the beneficiary***" and Glenn agreed and made her beneficiary.

64. In the summer of 1997, Carol began manipulating Deborah, telling her not to worry because she (Debby) would get 52% of "everything" (apparently with the exception of whatever Carol could "get" first).

65. By December, 1997, Glenn told Monica that he could not visit her because "Carol's coming" and he also stated that Carol was telling him bad things about how his children were only interested in his money, not in him.

66. Upon information and belief, Carol (having previously experienced that she could make all arrangements for Glenn) connived her way to become a joint tenant on the deed to a new house with Glenn and Glenn's money and/or corporate funds were used to pay for major upgrades estimated to have cost as much as $200,000.00.

67. In September, 1999, Glenn advised Lauren and her mother that he "*could not trust anyone who works at Griggs & Browne*" so he suggested that Lauren begin working there.

68. Lauren followed Glenn's instructions and met with Heal whereupon it was decided that Lauren would begin working with the advertising aspect of the business, but the

following day Heal called and told her that she could not be employed at Griggs & Browne because it was "not the type of instution where one can be mentored".

69. Lauren called her father and told her about this, asking if he could hire her anyway but this head of the businesses (later described to a court by Gerstein and Bicki as making all the daily decisions of the companies, including hiring and firing) told Lauren, "I can't ... I can't."

70. Throughout the time after their divorce, Glenn told Patrizia and some or all of the plaintiffs that Carol continually told him that he was "broke", that his family was "evil", that they were only interested in his money, that she was the only one who could "save" him, and he believed her.

71. Upon information and belief, the Griggs & Browne companies grossed about seven million five hundred thousand ($7,500,000) dollars during Michael's last year with the companies (1999) and Glenn was by far the major shareholder.

72. Upon information and belief, Carol was aware or became aware that the value of the businesses and real estate was significant but continually lied to Glenn to the end of his life about his financial condition in order to exert undue influence over him and manipulate him to her advantage.

73. Upon information and belief, Carol has "retired" from the Griggs & Browne businesses, obtaining a company car and other benefits (the exact type and extent currently unknown) as part of her termination compensation.

74. Upon information and belief, following Glenn's death, the Nausauket property passed to Carol as a surviving joint tenant and she presently owns it in fee and derives rental income or other benefits from it at the time of this complaint.

***Isolating Glenn – Out Goes Aubin***

75. Upon information and belief, Aubin's yearly golfing sojourns with Glenn and others provided Aubin opportunities to observe his friend, Glenn's, physical and mental condition.

76. Upon information and belief, Aubin is of the opinion that each year Glenn's memory became worse and toward the end of these New Hampshire trips, Glenn attended but stopped playing golf.

77. Upon information and belief, after Glenn's divorce from Carol another New Hampshire trip was planned and Glenn met Aubin on a Friday for lunch or dinner in East Greenwich a day or so they were to make their trip.

78. Upon information and belief, Tierney accompanied Glenn to the luncheon and Aubin's impression was that Tierney was acting as some sort of "bodyguard". A company underling had never accompanied Glenn to previous meetings of this social type.

79. Upon information and belief, at the end of the meal the check arrived and Aubin observed that Glenn's mental abilities had deteriorated so badly that he could not add or calculate the tip.

80. Upon information and belief, the New Hampshire trip was scheduled to depart on the following Monday morning, but Tierney advised Aubin that Glenn could not go and when Aubin inquired "why?" he was told that Aubin "did not need to know that stuff".

81. Upon information and belief, upon hearing this, Aubin went to company headquarters and asked to see Glenn but was told that he could not do so, whereupon Aubin became so disgusted that he removed his own picture from the "wall of fame" and left.

82. In a letter to Aubin dated April 20, 1999, Aubin was unceremoniously advised by

"Claudette" (a bookkeeper) that Michael Griggs was "no longer here (with the businesses)", that "Carol and Glenn" asked her to revoke Aubin's telephone bill payments, and that "Carol and Glenn" had "appointed David Heal to replace Michael".

83. On May 14, 1999, "Claudette" sent another letter to Aubin, claiming that Aubin's longtime (over 40 year) friend, Glenn, wanted to have Aubin's health premiums and gas credit card payments stopped immediately. If Aubin had any questions he was to "call Glenn or Carol".

84. Upon information and belief, Aubin attempted to call Glenn several times but was never allowed to speak with Glenn. Therefore, Aubin sent a copy of his December 30, 1985 agreement to the Griggs & Browne business offices so as to have his promises honored.

***Isolating Glenn – A Corporate Lawyer Replaced***

85. Attorney Maryann Patalano ("Patalano") is a Rhode Island lawyer who as a corporate counsel represented Glenn and his businesses for nearly a decade with apparent competence and without apparent difficulties.

86. During a meeting or "closing" Patalano asked Glenn several times whether he (Glenn) understood the terms of the transaction but Glenn was not able to reply whereupon Patalano recessed the meeting and asked Michael to meet with her privately.

87. In their "sidebar" session, Patalano told Michael that she was uncomfortable with the transaction because Glenn did not seem to understand what was happening.

88. Michael assured Patalano that he (Michael) was also an officer of the company or companies that they were following a recommendation by Vinci, and that Glenn was merely present to sign the documents as President, thus the "closing" was resumed and completed.

89. Michael reported the scenario and Patalano's concerns to others at the Griggs &

Browne companies.

90. Upon information and belief, Carol was or became aware of Patalano's concerns about Glenn's ability to understand this relatively simple financial transaction.

91. On or about July 1, 1999, Patalano was suddenly, unceremoniously and unexpectedly replaced as corporate attorney and registered agent for service of three (3) of the Griggs & Browne companies by another Attorney.

92. Following the change of corporate counsel Carol became a Director of the Griggs & Browne companies.

***Isolating Glenn – Replacing Family Physician/Medical Issues***

93. G. Alan Kurose, M.D. was Glenn's family physician in the 1990s, sometimes assisted by Charles J. Brex, M.D., an internist.

94. After or in connection with Carol's surge to power and influence over Glenn and with respect to the Griggs & Browne businesses, Dr. Kurose was discharged as Glenn's physician.

95. Dr. Kurose advised family members that "Carol Kimberly" fired him after a visit by Glenn in which Dr. Kurose offered to get Glenn help and questioned the advisability of Glenn being allowed or able to continue driving motor vehicles.

96. At some unknown point in time thereafter, Aman Nanda, M.D., an internal medicine physician first licensed in Rhode Island in June 2000, became Glenn's physician and, upon information and belief, Carol was involved in the selection of Dr. Nanda.

97. Defendants have subsequently resisted any and all efforts by or on behalf of Plaintiffs to obtain copies of Glenn's medical history and charts and have not furnished Plaintiffs

any health care release that would permit Plaintiffs or their agents to access such records and/or discuss recollections of Glenn with Dr. Kurose or other physicians.

98. On or about September 13, 2000, Glenn was visited at home by Sharon Murray (accompanied by Kathy Herron of the Rhode Island Department of Elderly Affairs) and Ms. Murray spoke with Glenn and entered his answers and her observations on a so-called Decision-Making Assessment Tool form ("DMAT").

99. During her visit Ms. Murray (a trained, professional observer) noted that Glenn seemed to have severe memory, *judgment* and language impairment, could not subtract 3 from 20, and stated that he did not know what his assets were. Further, he could not draw the face of a clock and could not dial 911.

100. Ms. Murray's written assessment was reviewed by John Stoukides, M.D. and Dr. Stoukides briefly met with Glenn on or about September 27, 2000, at which point he concluded that he agreed with Ms. Murray's notes and signed the D.M.A.T. form.

101. Before the end of September, 2000, Christine confided in Dan that Glenn had been evaluated by Ms. Murray and Dr. Stoukides.

102. Upon information and belief, Dan passed that information along to Carol and Heal.

103. In October, 2000, Gerstein suddenly appeared and proclaimed that he was representing Glenn as Glenn's lawyer.

104. Upon information and belief, Gerstein also represented Carol personally.

105. Deborah stated that in October 2000, Gerstein ordered her to take Glenn to Carlo Brogna, M.D. and an M.R.I. of the brain was performed on Glenn at the Westerly Hospital at the request of Dr. Brogna. Deborah claims that she was never told of the results of the 2000 M.R.I.

106. Upon information and belief, the M.R.I. revealed that Glenn had severe frontal lobe brain deterioration.

107. None of the Plaintiffs learned of the October 2000 Westerly Hospital M.R.I. until much later but, upon information and belief, the MRI and its results were made available to and known by Dr. Brogna.

108. Dr. Brogna signed a sworn affidavit on or about February 8, 2001, wherein he diagnosed Glenn as suffering from "Primary Progressive Aphasia" which he claimed was a degenerative condition that "affects a patient's communicative abilities". His affidavit did not mention a 2000 M.R.I. or its findings.

109. Dr. Brogna's affidavit proclaims that he reviewed "historical information provided (to Dr. Brogna) that is a generally accepted element of the process", but none of this information came from and no contact was made with Plaintiffs or Glenn's former wives, former physician, friend Mr. Aubin, or others.

110. Upon information and belief, the "historical information" cited by Dr. Brogna was provided by Carol and/or Gerstein.

111. Dr. Brogna's affidavit also indicated that Glenn had "provided for adequate assistance" that was "in place to assist him in dealing with financial matters".

112. Upon information and belief, Dr. Brogna's information concerning adequate assistance in dealing with financial matters was provided by Carol and/or Gerstein and did not mention (nor did Dr. Brogna consider) that such "adequate assistance" was created to assist Defendants (and particularly Carol) with exerting improper and undue influence over those decisions so as to exploit Glenn's condition for her or their benefit.

113. In October 2002, Glenn was transported to the Kent Hospital, an M.R.I. of Glenn's brain or head was taken and family members learned from neurologists (including Dr. Nieto) that Glenn was suffering from a form of dementia that would get worse, severe brain atrophy (the atrophy of a 90-year-old) and that this latest M.R.I. was essentially the same as an M.R.I. done in 2000.

114. The October 2002 Kent Hospital visit was the first time that the plaintiffs learned there had been a previous M.R.I. in 2000, and that it had apparently been administered at Dr. Brogna's request at the Westerly Hospital.

***Isolating Glenn – Accountant Vinci***

115. Vincent J. Vinci, CPA ("Vinci") first began performing accounting services for Glenn and the Griggs & Browne businesses in about 1977, while employed at David Allen & Associates, CPA. The firm had worked for Glenn and Glenn's company since the 1950s.

116. Upon information and belief, Vinci observed that the day-to-day operations were run by David Aubin and (after Aubin's retirement) by George Cardoza and Michael Griggs.

117. Upon information and belief, Vinci observed Carol to be a receptionist/dispatcher when she first worked for the Griggs & Browne companies. In early April 1996, Vinci was contacted by Michael and advised that Carol and Glenn were planning a "secret marriage."

118. Vinci and Michael become aware that Glenn was spending thousands upon thousands of dollars on his corporate American Express credit card.

119. Michael and Vinci urged upon Glenn that this type of spending was fiscally irresponsible and must be stopped, but he refused and neither Vinci nor Michael realized that this money was being used (at Carol's urging) to extensively renovate the fortress property in which Carol had a fifty (50%) percent ownership interest.

120. Upon information and belief, Vinci had no idea about the allegations or issues concerning Michael that resulted in Michael being forced to leave the company and being offered no opportunity to reconcile with his father in April - May, 1999.

121. Upon information and belief, within approximately one week of Michael's ouster, Heal, Carol, "Claudette" and an attorney asked Vinci to work with them on a plan for the redemption of Michael's stock in any and all Griggs & Browne business.

122. Upon information and belief, Vinci was present at another meeting where Dan, Glenn and Debbie were present at Vinci's office arguing over who best should run the business. Both children were standing and arguing across the table at one another while Glenn simply sat there, smiling during the heated confrontation.

123. Upon information and belief, Vinci had less and less communication with Glenn as time proceeded. In further meetings, Glenn was always accompanied by Carol, Ed Brayton ("Brayton") and Heal. Glenn usually came alone in the past.

124. Upon information and belief, during his last six months as Glenn's accountant, Vinci was never allowed to meet with Glenn. Calls or contact were always filtered through or screened by Carol and/or Brayton (asking "what do you need to talk to him about?").

125. Upon information and belief, an estate plan had been created for Glen by a lawyer but Glenn had not appeared to execute the documents. Carol became involved and advised Vinci that a different lawyer was now going to be doing the estate plan.

126. Upon information and belief, in March 2000, Brayton advised Vinci that he (Brayton) would "be down to see you," and when Brayton arrived, Vinci was advised that he was discharged as accountant for Glenn and the Griggs & Browne businesses.

127. Upon information and belief, after receiving notice from Brayton that he had been

terminated as company accountant, Vinci learned that he was being replaced by Carol's accountant. Vinci attempted to call Glenn on more than one occasion to discuss this, but was never allowed to speak with Glenn.

***Isolating Glenn – Financial Planner Veasey***

128. Robert E. Veasey, Jr. ("Veasey") has since 1988 been a certified financial planner and advisor. He was formally affiliated with the Sowa Financial Group but currently does business under the name "Veasey Financial Advisors" in Providence, Rhode Island.

129. Upon information and belief, Veasey first met Glenn in about 1981 – 1982 while working for Mutual of New York and began working with Glenn concerning financial planning and related matters.

130. Upon information and belief, Veasey's early impressions of Glenn were that he was amiable, liked to talk about golf, business and his family and made quick decisions.

131. Upon information and belief, Veasey first met Carol when he visited Glenn at Griggs & Browne since Carol was greeting visitors at the window at that time.

132. Upon information and belief, in about 1982 – 1983, Veasey met Patrizia and recalls that Glenn explained to he and another financial planner that Patrizia and her children (Lauren and Monica) were to receive the benefits of an insurance policy on his life. Glenn had Patrizia listed as the "irrevocable beneficiary" of an annuity or policy.

133. Upon information and belief, in about 1997, Veasey had a visit with Glenn and Reviewed an annuity that had been procured in 1987. Glenn indicated that the policy should be rounded up to $1,000,000.00 and instructed that the new, revised policy should have Patrizia

named as irrevocable beneficiary and Lauren and Monica named as contingent beneficiaries. This could not be done due to Glenn's health problems.

134. Upon information and belief, Veasey recalls a 1997-1998 meeting about Glenn reevaluating risk. Carol interjected that this was "not a big problem" because Glenn was a "big boy" with "lots of holdings, lots of money, plenty of cash and real estate all over the place."

135. Upon information and belief, about a month later, Carol and Glenn walked into Veasey's office and dropped a copy of a Trust on the conference table. Carol asked Veasey to turn to the first page and he found out that he (Veasey) and Debbie were listed as co-trustees. Carol was doing most of the talking and Glenn was merely smiling.

136. Upon information and belief, Veasey called Mr. Mignanelli and was told that Glenn had insisted that Veasey be listed as a trustee.

137. Upon information and belief, Veasey had a subsequent meeting when certain certificates of deposit were coming due and asked about Glenn's total financial picture as is required of a certified financial planner. Carol was the one who responded, always in vague terms and without giving any specifics.

138. Upon information and belief, Veasey became nervous as to whether Glenn was doing well at this point.

139. Upon information and belief, Veasey had a further meeting at which Glenn arrived with annuities that he had with the Midland National Bank. Glenn threw these on the desk and Carol (also present) indicated that Glenn wanted these to be in variable instruments, not fixed ones.

140. Upon information and belief, Veasey indicated that he would investigate the surrender charge for doing this and Carol stated that this was okay but that they wanted him to

proceed and handle it. Veasey began to believe that Glenn was being manipulated and feared that he was being used as part of that manipulation.

141. Upon information and belief, Veasey formed the opinion that Carol postured herself as Glenn's only friend, repeatedly stating that she was "protecting Glenn."

142. Upon information and belief, Carol thereafter made appointments to come in alone and gave Veasey specific information concerning her sickly father who was not well but had made a "late in the game" reconciliation with Carol. She explained that her father had annuities that he wanted to change to name her as the beneficiary since he had "abused" her in the past.

143. Upon information and belief, there followed a meeting at which Carol asked whether "ramifications" might occur if her father put annuities in Carol's name immediately. She was advised that she might be better off waiting until he died due to tax ramifications. She asked whether she could transfer these to her name and avoid taxes but Veasey told her to go speak to an expert. The topic was never again brought up.

144. Upon information and belief, Carol called and told Veasey that Glenn's "lawyer" (Mr. Gerstein) wanted to talk with Veasey.

145. Upon information and belief, shortly after that, Carol and Gerstein arrived and a 15 – 20 minute meeting took place. During the meeting, Gerstein asked whether Veasey thought Glenn was competent, why he had raised questions about who would be Glenn's beneficiaries, what he understood about the situation and what he thought was "going on." Veasey responded.

146. Upon information and belief, within three months, the annuities were surrendered, the 1035 Plan was exchanged to Midland National Life (other assets went there too), and Veasey was advised that Mr. McGuirl was from that point forward Glenn's financial advisor and

planner.

147. Upon information and belief, Veasey attempted to contact Glenn to discuss this, but Carol intercepted the communication and told Veasey that Glenn wanted his funds with his "friend", Mr. McGuirl and would not let Glenn speak with Veasey.

***Isolating Glenn – Michael Griggs***

148. Michael began working for Griggs & Browne as a laborer in May 1979. This was the same year that Carol began working for the company.

149. In approximately 1983 – 1984, Michael was promoted to assistant manager. In approximately 1985, Michael was further promoted to manager.

150. In 1988 through 1989, Michael was placed in charge of the then new Cape Cod office of the Griggs & Browne companies, in the capacity as manager.

151. In 1992 – 1993, Michael was selected to run the Griggs & Browne companies as executive vice president.

152. Throughout this time, Glenn was the titular president, director and/or head of the Griggs & Browne companies, but never knew how to actually run the companies and deferred decision making (including hiring, firing, and day-to-day operations) to his managers.

153. Throughout the time that Mr. Aubin was a manager, he (Aubin) and other managers received certain rebates that came to the Griggs & Browne companies as a result of purchases it had made.

154. Glenn received rebates from Yellow Pages advertising done by the company, sometimes amounting to as much as $30,000 per year.

155. Michael was required to handle vehicle acquisitions for the Griggs & Browne companies and to sign personal guarantees for each of the vehicles.

156. Due to the number of personal guarantees that he signed, Michael's credit rating was downgraded and he was unable to obtain certain financing.

157. As a result of the practice of having him responsible for personally guaranteeing company vehicles and his resultant loss of credit, Michael took vehicle rebates for over a period of approximately four (4) years to assist with financing projects that he was otherwise unable to undertake.

158. During this time Michael also gave his brother Dan some of the rebate funds from automobiles when Dan was short of cash.

159. Dan was aware of the source of the funds and, [upon information and belief], Glenn was aware this was taking place.

160. Carol was not properly performing her marketing work, thus Sharon Gilstein had to be hired to do her job. Carol disliked Ms. Gilstein.

161. From 1994 through 1995, Michael noted that Glenn was having trouble finishing sentences and had become limited in engaging in "small talk."

162. During approximately 1996 through 1997, Glenn blurted things out when he was angry but could not talk about important things.

163. In 1997, a broker came to the company to discuss a group life disability policy. Michael was not allowed to join Carol and the broker when they saw Glenn.

164. The broker subsequently told Michael that there was "trouble," that Glenn seemed to have no clue and that Carol put her name on the policy.

165. Carol was heard commenting to another person that "*this was great, I can get everything I want and I don't have to sleep with him anymore*."

166. In the fall of 1998, Brayton was set up as a "liaison" between Michael and Glenn.

Michael was told Glenn did not like the "direction" the company was heading and from now on if Glenn tells Ed he wants something changed, Ed would have to tell Michael and Michael would have to comply.

167. This went on for a month or two until Michael refused to take orders in this way, telling Brayton that the orders were not coming from Glenn but were coming directly from Carol. Brayton agreed and said "*what are you going to do, she calls the shots*."

168. Although he gave no reason(s), Brayton told Michael that Carol wanted Michael to quit so that they did not have to fire him.

169. In January 1999, Michael and Vincent Vinci had told Glenn that he must slow down and/or stop spending so much money on his corporate credit card. Carol stopped Michael in the office hallway telling him she just came from Glenn's office and that Michael was to "butt out" of his father's business (per Glenn) and that if he continued to question Glenn's spending he (Michael) would be fired.

170. Carol continued this threat, indicating that this is "Glenn's company" and he "will spend his money any way he wants." She added, "he doesn't have to answer to you."

171. Carol, Brayton and Heal took over all Griggs & Browne business decisions on or about April 2, 1999 (the Friday before Easter) and this included advising Michael that he had been "caught" keeping automotive rebates and must resign or be fired.

172. Almost immediately after being advised of his firing, Michael encountered his father in the corporate parking lot and his father exchanged greetings as if nothing had happened. tried to make small talk as if Michael would be back to work on Monday, giving Michael the impression that Glenn didn't even know Michael was being terminated.

173. Later, Michael learned that Carol told many people that he (Michael) was

"choking" Carol the day he was fired and that his father had to pull Michael off Carol to "save" her, but this was entirely false.

174. About a week after this parking lot encounter, Michael called Glenn and told him he wanted to return a deposit for an apartment near the Cape Cod office. Glenn stated that this was fine and that he would be home when Michael arrived.

175. Michael made the lengthy journey to Rhode Island, arrived at about 9:00 P.M. and when entered Glenn's residence, there were four or five Griggs & Browne managers (Brayton, Tierney, Heal, Brunetti, and perhaps one other) there to "protect " Glenn (the same Glenn who had recently allegedly overpowered Michael while Michael was allegedly choking Carol).

176. The managers informed Michael that they were advised by "a lawyer" to go to Glenn's residence, await Michael's arrival, witness the return of the deposit, and then make sure that Michael was sent on his way. Michael was also advised that under no circumstance was there to be any conversation between Glenn and Michael regarding Michael's firing, the business, or any employees of the company.

177. Michael had hoped to try to use this occasion to reconcile things with his father, but was followed closely by one or two managers the entire time he was there (approximately 10 minutes.), and they advised Glenn to hurry up and finish his conversation.

178. Upon leaving Michael was told by the managers that he was "no longer welcome" at his father's house and that phone calls were out of the question. If Michael violated these directions, the managers warned that negotiations concerning the value of his stock buy-out would be decreased and/or that they would "press charges" for keeping the previously mentioned authorized rebates.

179. Subsequent to this, Heal and Brayton told Michael that he was never to call his

father again.

180. In mid September, 1999, Michael was made an offer by Heal for the forced stock buy-out (at approximately .05 cents on the dollar). Michael was not happy with the offer and expressed his displeasure. Heal told Michael "if you don't take this deal we will come after your house!" Michael had to take the deal as he did not have $70,000.00 to pay back and he had made a loan for startup cost for Griggs and Browne Services (carpet cleaning).

181. Both the Stock Redemption Agreement and its Addendum were entered into on the basis of the extortion and threats described above and are thus voidable.

182. In 2001, Michael went to see his father on three occasions. He jumped the fence each time and they exchanged some pleasantries.

183. In 2002, Michael again saw his father and noted that his father had deteriorated so much that he could not communicate.

184. At Christmastime 2002, Michael tried to visit his father but housekeepers or caregivers told him that he could not visit his father, upon information and belief this reflected directions they received from Carol, Heal and/or Gerstein.

185. At Christmastime 2004, Michael tried to visit again but was told by two housekeepers or caregivers that he needed to get permission to do so. They called Heal who told Michael that he (Michael) was not allowed to be there and that he had to leave.

186. Within two or three minutes of Heal's call, there was another telephone call to the residence on December 24, 2004, from a person who identified himself as Gerstein. This person (Gerstein) was yelling at Michael, claiming that Glenn was "under protective custody" and that "nobody is allowed to see him." Gerstein further threatened that Michael would have to leave or he would "call the police" and that "if you do not leave in two minutes I will call the police."

187. At the time that Heal and Gerstein spoke to Michael they knew that there was no restraining order against Michael visiting his father and Gerstein was well aware that the statements and threats he made to Michael were under the color of legal authority or compulsion yet were false and outright lies.

188. Michael was never served with a restraining order against visiting his father and wanted throughout this time to attempt to reconcile his relationship with his father (just as Carol claimed to have been able to reconcile herself both with her mother and with a father who she claimed had raped her two thousand times as a child).

189. At Christmastime 2005, Michael tried to visit his father once again and deliver a bucket of cookies, but the housekeepers or caregivers told him that Carol said he was an "evil person" and should not be allowed to see his own father.

190. In September 2007, Michael was finally allowed to see his father and the housekeepers or caregivers again told him that they had been instructed by Carol not to allow him to see his father nor to accept any presents for Glenn from Michael.

## ***Isolating Glenn – Deborah's Participation***

191. In October 2000, Carol advised Deborah that her sisters (Christine and Lauren) had filed for a guardianship for their father, Glenn.

192. Carol told Deborah that the reason they did this was to take possession of his company and place him in a nursing home.

193. Carol told Deborah that she had "found" a lawyer for Glenn and that this would be Gerstein.

194. Carol told Deborah that Gerstein was representing her in a lawsuit against her brothers and some friends of her late father who were accusing her of changing their father's will

and taking the money and all the assets for herself.

195. Deborah was aware that her father was having speech difficulties and confused thinking at the time and had nothing to do with retaining Gerstein to represent him.

196. Gerstein and Carol told Deborah that she also needed a lawyer and that they had found one (Bicki) to represent her.

197. Deborah was told that she had no say in the matter, was told to do what they told her, and since she was working for Griggs & Browne at the time and did not want to lose her salary, vehicle and/or health coverage, she consented to this arrangement.

198. Deborah heard Carol telling Tierney to lie to Glenn about Danny (her brother), saying that Dan had ruined a job when he had not done so. Tierney apparently refused.

199. Dan told Christine that he overheard Tierney saying that he (Tierney) would not lie to Glenn and that later he (Dan) immediately talked to Tierney and Tierney told Dan that Carol had asked Tierney to lie to Glenn by telling Glenn that Dan was not doing a good job.

200. Carol was continually heard to tell Glenn that he (Glenn) had no money. At the same time, she bragged about how much money she had and that she had no need for his money. Deborah was instructed that if Glenn ever got into an automobile accident or was lost, she was never to call the police but only call Carol or David Heal.

201. Carol and Gerstein kept Glenn under their supervision, and when he was alone they made sure he was locked behind a stockade fence at his own home.

202. The lawyers (Gerstein and Bicki) told Deborah to be careful to keep Glenn away from her sisters and his ex-wives, saying "it's all about the case, Deb."

203. Carol eventually told Deborah that she had to keep Glenn at her (Deborah's) house and that Deborah would care for him and no one else could have access.

204. Carol visited often and acted as if Deborah's house was her own. She ordered Deborah around, came without telling Deborah and took Glenn out whenever she wanted to do so. Deborah observed that when Glenn would return, he was upset and agitated.

205. Carol and Heal allowed for or assisted Glenn in buying a new car and told Deborah that this was done to make it seem as if he was still "normal."

206. When it became clear that Glenn could no longer drive, Carol took his car and used it as if it was her own.

207. On Christmas day, December 25, 2002, Monica called Deborah's house, asking to talk to her father to wish him a merry Christmas, but was told that he did not want to talk with her. Deborah added that Monica was "suing" her father, but Monica denied this whereupon Deborah said "get rid of the lawyers and you can talk to him" and "drop the suit and you can talk to him". So Monica was unable to make her simple Christmas wish to her father and the call was terminated.

208. Deborah has stated that on several occasions she observed Carol show Glenn photographs of his ex- wives and children, point to them and say "bad" or "good" so as to influence how he recognized and felt toward them.

209. On or about March 2, 2005, Deborah signed a three-page statement (copy attached as Exhibit "A" and incorporated herein, by reference).

210. This statement was furnished to the Warwick Probate Court but Deborah never gave testimony before that Court and it was apparently one of the many things ignored under and during the avalanche of obfuscation heaped upon that Court by Glenn's supposed lawyers.

***Corroboration of Deborah's Account by David Laliberte***

211. David F. Laliberte ("Laliberte") was Deborah's companion, residing with her at

207 Robin Hollow Road, West Greenwich, Rhode Island for many years.

212. Laliberte knew Glenn, Carol, and most members of the Griggs family.

213. On or about July 26, 2004, Laliberte furnished an affidavit outlining his observations of Glenn, Carol, and other matters including the lawyers supposedly representing Glenn and Carol.

214. A copy of Mr. Laliberte's Affidavit is attached as Exhibit "B" and is incorporated herein, by reference.

215. Laliberte corroborates many things described by Deborah, including particularly that Gerstein and Bicki refused to allow Gerstein's supposed client (Glenn) into a room when they were discussing matters pertaining to him.

216. Although Laliberte's Affidavit was also presented to the Probate Court, it, too, appears to have been obfuscated by the concerted efforts Gerstein, Bicki and others to use that Court as a vehicle of retribution against plaintiffs.

***Isolating Glenn -The House of Usher***

217. On or about October 29, 1998, the purchase of a home at 500 Nausauket Road, Warwick ("the fortress") was completed with Glenn and Carol holding the deed as *joint tenants.*

218. From the time that Glenn moved in until approximately early 2000, Lauren, Monica, Christine, Debbie, Dan, and the ex-wives had access to Glenn at the fortress.

219. Upon information and belief, Carol (or someone at her direction) had listening devices and video surveillance cameras installed at the Nausauket Avenue fortress.

220. In the fall of 2000, Christine and Lauren filed a Petition that Glenn be placed under Guardianship (discussed in greater detail below).

221. After the filing of the Petition for Guardianship, the fortress was encircled by a tall, solid fence with electrically operated gate, warning signs and other means of restricting access to Glenn by those who Carol thought should not have access to her emotional and financial prey.

222. During this period of time, Gerstein appeared as Glenn's supposed lawyer and with "apparent authority" instructed Christine, Lauren, and Monica that they were not to visit their own father.

223. Carol was generally present at the fortress during weekday work hours, but there was no court order prohibiting visits and after hours Lauren, Christine and Monica would try to visit their father.

224. Glenn expressed fear that Carol would hear or learn of these visits and communicated to Lauren, Christine and Monica that he did not want to "disappoint" Carol by seeing them or having them visit him.

225. Upon information and belief, Carol had Glenn's telephone number changed to a non-published number in an effort to limit Plaintiffs' ability to contact Glenn.

226. Over the Columbus Day weekend in October, 2002, Christine, Lauren and Monica hopped the fence at the fortress, found Glenn's doors unlocked, and found him sitting on his bed with 3 televisions blaring. He appeared ashen, confused, had urinated on himself, and so Lauren called 9-1-1 for assistance.

227. The Rescue squad arrived, examined him, determined that it was an emergency and transported him to the Kent County Hospital.

228. Up to this point the individual defendants had consistently but falsely claimed that Glenn was "fine", was "operating the company", made "hiring and firing" decisions, and needed

no assistance dealing with the business or his own finances.

229. Upon information and belief, there was no acute event or cause for Glenn's presentation or condition at Kent Hospital; rather, plaintiffs were advised that this was part of an ongoing process or disease.

230. The doctors at Kent Hospital advised Lauren, Monica and Christine that Glenn needed a power of attorney but that he was not (in their medical opinion) mentally capable of making health care decisions.

231. Christine and Lauren went to the fortress to get Glenn some personal belongings for his hospital stay. They discovered "post-it" notes over all the walls containing names and phone numbers of Carol, Carol's son, Gerstein, Heal, Brayton, and Rodney Sexton ("Sexton") but no family members. There were also notes in his car showing him how to use it.

232. Bicki, Carol, and Gerstein arrived at the Kent Hospital, told Monica and Christine to leave the room in which their father was resting.

233. Upon information and belief, Bicki, Carol and Gerstein presented a "power of attorney" after which Lauren, Monica and Christine were no longer allowed to be privy to any medical health care information.

234. Later that week Glenn had to go back to the Hospital, but Plaintiffs were not informed. Debbie told Plaintiffs that Carol and Gerstein told her (Debbie) that Glenn had to be "guarded 24-7" to prevent Plaintiffs from seeing Glenn and that as a result of such instructions, Carol, Debbie, Carol's boyfriend and another person took shifts staying with Glenn at the hospital so that plaintiffs could not see Glenn.

235. After this second October, 2002 hospitalization, Glenn was sent to live with Debbie and Plaintiffs were not given the opportunity to visit with their father.

236. In about March, 2003, Debbie brought Glenn to her mother's house for a "secret visit" and this was followed by another "secret visit" at which Christine, Patrizia, and Lauren went to Debbie's mother's house and saw Glenn.

237. When Carol learned that Glenn had contact with Christine, Patrizia and Lauren while under Deborah's "custody", Carol had Tierney (under false pretenses) take Glenn from Debbie's home and secrete him at the Hillsgrove Nursing Home (an assisted living facility). Dan was the only family member who knew of his whereabouts.

238. Upon information and belief, Glenn's stay at the assisted living facility was of short duration because they did not feel able to care for his needs, thus Carol hired a home care agency to visit and assist Glenn. Upon information and belief, this was known as the "Comfort Keepers Agency".

239. One of the persons employed by the "Comfort Keepers Agency" was named Beverly Forte ("Forte") and as described below she gave a false and misleading affidavit concerning material events that occurred at this fortress.

240. Beginning in late 2006, Sally Mello ("Mello") and her sisters were among several persons who had been or were hired by Carol to perform companion/homemaker work with Glenn at the fortress.

241. Carol visited the fortress frequently, usually wearing low-cut, revealing blouses, and on several visits was observed to bend over Glenn, essentially putting her breasts in Glenn's face and talk to him in a "sweet" way.

242. Glenn seemed genuinely happy to see her arrive and would watch her every move. She was observed to have great influence over Glenn; for example, being able to feed him quite easily when others were having difficulty doing so.

243. During the time that Carol was a frequent visitor to the fortress, Glenn was often in an "agitated" state when she was not present. Eventually, Carol indicated that she had "retired" from "Griggs & Browne", after which her visits were less frequent and Glenn seemed to have fewer "agitated" episodes.

244. Carol repeatedly told the fortress helpers that Glenn's children and his ex-wives were "evil and greedy", that they just used him for his money, and that all of the children (except Dan) and both ex-wives had "restraining orders" against them and that only Dan could have free access to the fortress. Carol further indicated that Lauren and Monica could visit, but only after they made an appointment through a Probate guardian, Attorney Michael St. Pierre ("St. Pierre").

245. Carol did not allow visits by Lauren and Monica to take place unless Lori Myers ("Myers") was the caregiver on duty.

246. Myers eventually left her employment at the fortress for a maternity leave and Mello supervised a very uneventful visit from Lauren and Monica, observing that it was obvious that they loved their father (Glenn) and that he (Glenn) seemed very happy to see his daughters.

247. After the visit, Carol asked Mello if Glenn was "agitated" by this visit by his daughters. Mello advised Carol that, to the contrary, the visit had gone well.

248. Carol insisted that Glenn "must have been agitated and combative" as a result of the visit by Lauren and Monica, but Mello again denied that such was the case.

249. Carol told Mello that she (Mello) should tell St. Pierre that after the visit Glenn became agitated and combative and struck the companions/homemakers. Mello disagreed and voiced the opinion that family visits were wonderful for Glenn.

250. Upon information and belief, Myers had apparently previously complied with Carol's wishes, telling St. Pierre or someone at his office that visits from Glenn's daughters "agitated" him, and Mello heard Carol remark that passing this false information to St. Pierre "will keep them away for another several months.

251. On September 23, 2004, Lauren wrote to St. Pierre, reminding him that he had never met with Glenn's estranged daughters, but St. Pierre apparently disregarded the continuing pleas of Glenn's family and seems to have failed to conduct a detailed investigation of the situation and conditions at the fortress.

252. St. Pierre was evidently misled about plaintiffs from the first moment of his appointment, and with these repeated misrepresentations directed to him, failed to investigate or to properly investigate these allegations and caused plaintiffs much unwarranted and unnecessary anguish and grief, by evidently believing in the honesty of Gerstein, Carol and Myers and that these strangers with so many conniving persons among their ranks were better able to care for Glenn than his own family.

253. In September 2007, Mello encountered Gerstein and told him about her observations of the successful visits between Glenn and his two youngest daughters but Gerstein did not respond.

254. Mello also discussed these visits with St. Pierre's secretary and told her that they went very well. St. Pierre apparently never spoke with Mello about the quality of these visits or the discrepancy in accounts of post-visit "agitation".

255. During the time that Mello was employed at the fortress, Carol showed her a sheet of paper upon which were mounted photographs of Michael, Christine, Deborah, Lauren and Monica and advised that if any of these people showed up they were not to be allowed to enter

the house.

256. Mello was employed from the end of 2006 until Glenn's death in December 2007, and during this time Carol told her that Debbie and Danny were going to get the Griggs & Browne businesses since Glenn "hated" "Chrissy" and Michael and that Lauren and Monica had gotten $100,000 "educations" and did not need his money. Carol also stated that "everyone" would have been in Glenn's will if they had not "gone with Pat(rizia)"(Glenn's second wife).

257. During Mello's employment, Carol also bragged that she had "made up" with her own mother and that a couple of days later she took her mother to change her will so that Carol became the beneficiary.

258. The fortress house or "House of Usher" with its restricted access was one way that Carol could keep Glenn isolated so that none of the Griggs children could "make up" with their father and undo Carol's nefarious schemes.

259. During this same period of time Mello accompanied Glenn and Carol on an ambulance trip to see Carlo Brogna, M.D. Carol insisted that Mello remain in the ambulance and after Glenn got back in following this visit Mello saw a slip in which Dr. Brogna concluded that Glenn's diagnosis of Parkinson's disease was inaccurate, thus he should be weaned off his Parkinson's medication.

260. Upon information and belief, during this same trip, Mello learned that Dr. Brogna diagnosed Glenn as being in the "end stages of Pick's Syndrome".

261. After Glenn was weaned from his improperly diagnosed and prescribed medication, Glenn fell and hurt himself. He was taken to the Kent County Memorial Hospital and diagnosed with fractures of the neck and leg but transferred to Rhode Island Hospital where further diagnostic studies revealed a malignant tumor.

262. Mello noticed that the fortress had what appeared to be video cameras or camcorders over the sliding glass doors and at the foot of Glenn's bed. She did not consent to being observed or recorded while on duty and has no knowledge that Lauren, Monica or Michael had any knowledge of these devices during their visits. When she asked Carol about these devices Mello was told that the camera at the foot of the bed was an "air filter" or "air purifier".

263. In the fall of 2007, Mello and other housekeepers or caregivers at the fortress told plaintiffs and Patrizia that they saw and heard Carol playing a tape recording of one of the visits that Lauren and Monica had with their father. The caretakers denied making the tape, Carol was not present and Glenn was incapable of doing so.

264. During Glenn's 2007 hospitalization, the plaintiffs learned for the first time that their father had been diagnosed with lung cancer six (6) months earlier but that this information (as well as all other health care information) was kept from them at the direction of Gerstein and Carol.

265. During this time the family also learned that Glenn had needed dental work but Carol refused to allow this to occur.

266. During Glenn's September 2007 hospitalization, plaintiffs learned that Carol required the housekeepers to keep a notebook about Glenn's daily activities, who came to see him, how long they stayed, etc. These were given to Carol on a periodic basis.

267. During or after Glenn's hospitalization in September 2007, Carol informed Mello that she was going to "clean up" or "clean out" the fortress.

268. When Mello observed the "clean up" all that she saw was that the cabling was disconnected from the cameras and recorders and that the sheet with photographs had disappeared from the drawer in the caretaker bedroom where it had previously been located.

269. On or about December 9, 2007, Heal told Mello that Carol had told him she was "done with the Griggs family" and after this does not recall Carol ever visiting again.

***The Probate Court Guardianship Cunnard***

270. As previously indicated, Christine and Lauren petitioned the Warwick Probate Court in October, 2000, that Glenn be placed under a Guardianship. The Guardianship petition followed several incidents of dramatically altered behavior being exhibited by Glenn.

271. In May, 2000, Dan told Patrizia that Heal was now co-signing Glenn's checks because his spending was "out of control"; furthermore, he claimed that Carol "walks around like she owns (Griggs & Browne).

272. Dan told Christine that all he cared about was his position in the business and not about his father's alleged condition.

273. On May 31, 2000, Deborah complained that Carol was in control of Glenn and the businesses and that that Carol had the power to determine Deborah's fate at the company despite Glenn's presence. Deborah was promised 52% of the business for "playing along" and so eventually allowed Carol, Heal and Gerstein to hire Bicki to be her lawyer at no cost to her.

274. Upon information and belief, since Griggs & Browne money and/or Glenn's funds would be available, Gerstein added not only Bicki but two or three other lawyers to Glenn's defense "team".

275. Among other things, this team argued at the Probate Court level that the D.M.A.T. had not been administered by Glenn's "treating physician" – a convenient thing to argue since Carol had previously fired his longtime "treating physician".

276. At a hearing before the Warwick Probate Court on November 30, 2000, the Court indicated its desire to appoint Glenn's "treating physician" to perform a "DMAT" and Gerstein

asserted that Glenn's "treating physician" was Carlo Brogna, M.D., but upon information and belief this was not correct and Dr. Brogna was specially engaged to assess Glenn for the defense team.

277. At the same hearing on November 30, 2000, both Gerstein and Bicki falsely advised the court that Glenn was making business decisions of the Griggs & Browne companies and was going to the business office on a daily basis.

278. Karl Kilguss was appointed guardian ad litem for Glenn by the Warwick Probate Court. His June, 2001 report concluded that Glenn had trouble remembering the names of his children and of his doctor, thus Mr. Kilguss could not say for certain whether or not Glenn needed a guardian.

279. On or about June 26, 2003, Forte signed an affidavit that, upon information and belief, was prepared by the law firm of Lepizera and Laprocina (hereinafter, "Lepizera") in Cranston, Rhode Island ("the Forte affidavit").This contained numerous inaccuracies and was used by Gerstein to persuade a judge to issue an order for the appointment of Dan and Heal as emergency guardians.

280. On or about the same 26th day of June, 2003, Dan also signed an affidavit at Lepizera ("Dan's Affidavit"). This also contained numerous material omissions, including but not limited to the fact that Carol, he, Debbie and others had recently engaged in the same type activity that he now proclaimed was improper.

281. On or about that same 26th day of June, 2003, Dan signed a Petition for Limited Guardianship or Guardianship of his father with the knowledge that it would be filed with the Probate Court ("Dan's Petition").

282. In Dan's Petition it was alleged (and Dan duly swore under the pains and penalties of perjury) that Glenn lacked decision-making ability because he was "physically taken away by third parties who upon information and belief are unlawfully making all decisions for the respondent".

283. Dan's Petition included the false assertion that he and Heal had no conflict of interest that would interfere with their guardianship duties if so appointed.

284. Dan's Petition evidenced the desire that he and Heal had to control the Griggs & Browne businesses and Glenn's financial affairs by further proclaiming that they had the "capacity to manage financial resources involved".

285. Upon information and belief, Dan was present with Gerstein, Lepizerra, Bicki, and/or others when the Probate Court considered Dan's Petition, *ex parte*, that none of the assembled array mentioned having secreted Glenn at Deborah's house or an assisted living facility within recent weeks without contact of or by plaintiffs, and apparently remained silent about Glenn's equitable net worth, their true intent or motivation and/or Carol's actions.

286. From that point forward, Carol, Gerstein, and/or others made numerous additional material misrepresentations and withheld material information from the Probate Court, thereby using it as another enterprise of and for their illicit purposes.

287. On August 7, 2003, St. Pierre wrote to Gerstein, requesting that he be able to meet and confer with Glenn's treating physician or physicians, for the "purpose of exploring Mr. Griggs' past and present medical condition, and also the directive to obtain a Decision Making Assessment Tool".

288. On or about August 12, 2003, Gerstein replied that St. Pierre's request "presents some rather complex issues that involve the relationships between the Confidentiality of Health

Care Information Act … the Guardianship statute… and the nuances that are particular to this case" (the translation of this gibberish being that under no circumstances would he readily agree to these disclosures).

289. On August 20, 2003, another attorney from the team sent a facsimile communication to the Probate Court Judge with copies to all attorneys, indicating that as Glenn's lawyers "(w)e are unable at this time to provide a waiver or consent by Mr. Griggs to the preparation of a DMAT".

290. Dr. Brogna apparently prepared another DMAT, reviewed by the Probate Court Judge on or about October 10, 2003, and promptly "sealed" at the request of Gerstein and others on his team.

291. Upon information and belief, at all times that Glenn was under the care or evaluation of Dr. Brogna and at all times that the defendants sought to seal and conceal Glenn's medical records and true condition, Glenn was receiving health care insurance coverage pursuant to a health care benefit program sponsored by the Griggs & Browne companies.

292. On several occasions during the time the Probate proceeds were pending and after surveillance cameras and listening devices were installed in the fortress by or at the direction of Carol and/or another of her co-defendants, Lauren and Monica had visits with their father during which the housekeepers left their presence (often going outside) and they were alone with their father.

293. Despite these being intended as private, unsupervised visits and conversations, the content of any discussions or happenings was invariably promptly discussed by others and even became the subject of written complaints by St. Pierre.

294. For example, on May 31, 2006, St. Pierre wrote to lawyers then representing

Lauren and Monica (Courtney), admonishing that they had taken pictures of their father and tried to discuss "possible visits of ex-wives". St. Pierre's letter also indicated that he was "informed" that the visit to which he was referring began at 5:20 p.m. (a whopping "20 minutes late"), that this interfered with Glenn's daily routine and that henceforth these plaintiffs must visit no later than 4:00 p.m. (regardless of whatever work schedule they might have).

295. Upon information and belief, St. Pierre was misled and unable to properly evaluate the situation that continued to develop during his stewardship of the situation and this further enabled Carol and Gerstein to carry out and accomplish their devious schemes.

***Glenn'sTestamentary and Related Documents***

296. On December 20, 1990, Glenn executed a document entitled "The Glenn E. Griggs Irrevocable Trust" at the offices of Licht & Semonoff, Attorneys, One Park Row, Providence, Rhode Island.

297. The December 20, 1990 Trust appointed or designated Aubin and Alec B. Sinel ("Sinel") as "Trustees", each of whom accepted their appointment and agreed to faithfully execute the duties of Trustee.

298. On or about June 24, 1998, Glenn executed a Durable Power of Attorney, appointing Deborah to certain powers therein described.

299. On or about July 28, 1999, Glenn executed a "Last Will and Testament", prepared by Attorney Anthony Mignanelli ("Mignanelli") in which "my friend" Robert E. Veasey, Jr. ("Veasey") and Deborah were to be co-executors. Under the terms of this document Carol was to receive the fortress house in Warwick described above.

300. On or about May 19,2000, Glenn executed a Rhode Island Statutory Form

Durable Power of Attorney for Health Care, appointing Carol as his Agent and Deborah as First Alternate Agent for such purposes. John M. Roney and Hubert A. McGuirl, Jr witnessed the execution of this document but, upon information and belief, had neither knowledge of nor opportunity to investigate the undue influence Carol had continuously and maliciously exercised over Glenn.

301. On or about October 25, 2000, a "First Codicil" to Glenn's July, 1999 Last Will and Testament was apparently executed. Veasey was no longer a Trustee, being replaced by Glenn's "associate, David Heal". Monica and Lauren were included by name whereas they had not been directly mentioned in the July 1999 testamentary instrument.

302. On or about October 25, 2000, Glenn executed a General Durable Power of Attorney, appointing Deborah and Heal to certain powers therein described.

303. Upon information and belief, following several meetings at the offices of Attorney Roney (on at least one such occasion Carol having been present), Glenn's Trust was also amended on October 25, 2000 with the draftsmanship of Attorney David Riedel of Tillinghast, Licht, LLP (successor firm to Licht & Semonoff) in Providence, Rhode Island.

***Legal Fee Looting***

304. Upon information and belief, Gerstein, Bicki and/or other members of the team engaged to "represent" Glenn, his Estate, the Guardians appointed by the Probate Court, Dan, Debbie and Carol in matters relating to the Griggs & Browne businesses, Glenn, Glenn's ex-wives and Plaintiffs from 1997 to the present have been paid for by funds improperly and/or fraudulently taken from Glenn, his estate and/or one or more of the Griggs & Brown companies in furtherance of Carol's undue influence and malicious scheming.

305. Gerstein, Bicki and/or (upon information and belief) other members of the team (sometimes numbering five or more in number) have actively and materially participated in Carol's illicit plans and have aided and abetted her efforts by making false representations to courts and other third parties, covering up material information, and (in some instances) empowering Carol and/or encouaging their alleged "clients" or other witnesses to remain silent or give false reports to courts and/or guardians concerning the matters described herein.

306. During several of the years in question, Gerstein represented Carol in unrelated Superior Court and United States District Court proceedings related to allegations that Carol had used undue influence to induce her own father into changing beneficiaries on numerous insurance policies or annuities from his other children and many good friends to Carol.

307. The allegations against Carol in these companion cases were strikingly similar to those raised by the plaintiffs in this action.

308. On or about August 24, 2007, Bicki signed affidavits for use in the Superior Court, indicating that he had reviewed the Affidavits of Gerstein and another member of the team, their "redacted" statements of billing charges, and that "given the time and labor involved in (the Superior Court) matter, the novelty and difficulty of the legal questions involved, the results obtained, and the nature and length of the professional relationship with the client" their claims for reimbursement of fees were "fair and reasonable".

309. Mr. Bicki's affidavits did not make reference to his involvement with Gerstein in the Beatrice S. Demers matter in which they sought to "seal" Probate records in a matter investigated by the Rhode Island Department of Attorney General to determine whether she was exploited, abused and/or neglected, nor did it make reference to the role he played in the Probate proceedings described above.

310. Mr. Bicki's affidavits did not indicate how he could determine the "novelty and difficulty" of the legal questions involved without reviewing unredacted billing records or other related documents.

311. Mr. Bicki's affidavits did not reveal the compensation he had received and the source of such compensaton for his purported representation of Deborah and consultations with Gerstein and others in connection with matters occurring prior to August, 2007.

**INCORPORATION OF FACTS, BY REFERNCE**

**312. Paragraphs one (1) through five (5) (entitled, "parties plaintiff"), six (6) through twenty-four (24)(entitled, "parties defendant"), twenty-five (25) through thirty (30)(relating to jurisdiction and venue), thirty-one (31) (entitled, "Glenn Griggs and his businesses") and thirty-two (32) through thirty-seven (37)(entitled, "Glenn Griggs' Marriages and Children") are restated and incorporated, by reference, in each count of this verified complaint that follows as if fully set forth therein.**

## COUNT I
## (FEDERAL R.I.C.O. VIOLATIONS)
## (18 U.S.C. § 1962(c))

313. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 45-73, 103-114, 167-180, 185-190, 207, 256, 271-274, 280-286, 296-303, 304-311 of the Complaint as if fully stated herein.

314. At all relevant times, the named individual Defendants, and the named Corporate Defendants constituted an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4) and 1962(c), in that —they were a group of individuals "associated in fact."

315. The Griggs & Browne corporations comprised and comprise an "enterprise" that is engaged in, and the activities of which affect, interstate commerce.

316. Carol is an individual "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise.

317. Heal is an individual "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise.

318. Deborah is an individual "person" within the meaning of 18 U.S.C. §1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise.

319. Dan is an individual "person" within the meaning of 18 U.S.C. § 1961(3) and 1962 (c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise.

320. Gerstein is an individual "person" within the meaning of 18 U.S.C. §1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise.

321. Bicki is an individual "person" within the meaning of 18 U.S.C. §1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise.

322. Brayton is an individual "person" within the meaning of 18 U.S.C. §1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise.

323. The Griggs & Browne corporations, individually and collectively were and are "persons" within the meaning of 18 U.S.C.§ 1961(3) and 1962 (c) that associated in fact with and/or participated in the conduct of the affairs of the enterprise.

324. The Griggs & Browne corporations or several of them have at all material times routinely and continuously operated and/or conducted business in interstate commerce (Rhode Island, Massachusetts, and Connecticut) as part of their their day to day activities, business and affairs.

325. Defendants' unlawful activities through some or all of the Griggs & Brown corporations affected interstate commerce.

326. During most of the years from about 1999 through the present, the Individual Defendants each personally and separately participated in, engaged in, conspired to engage in, and/or aided and abetted, the conduct of the affairs of the enterprise though a pattern of racketeering activity within the meaning of 18 U.S.C.§1961(1), 1961(5) and 1962(c). The Individual Defendants' pattern of racketeering activity consisted of: *extortion, bank fraud, mail fraud, and wire fraud* (hereinafter referred to as "predicate acts")

327. These predicate acts all occurred after the effective (enactment) date of RICO and more than two (2) of such acts occurred within ten (10) years of one another.

328. The enterprise or enterprises described herein were at all times distinct from the pattern of racketeering activity alleged herein in that the enterprise or enterprises engaged in legitimate business activities beyond those necessary to carry out the alleged acts of racketeering.

329. The predicate acts described in paragraph 409 and below were related so as to establish a pattern of racketeering activity within the meaning of 18 U.S.C. §1962 (c), in that the common purpose of the Individual Defendants and the corporations, each personally or through

their agent or agents, directly or indirectly, participated in all the acts and employed the same or similar methods of commission, was to defraud and defeat the opportunity of the Plaintiffs of and to the enjoyment of their property opportunities, expectations and/or rights in and to the legitimate business of the Griggs & Browne companies.

330. The Plaintiffs were the victims of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

331. All of these predicate acts described in paragraph 409 and below were continuous so as to form a pattern of racketeering activity in that:

(a) The Individual Defendants and the Corporate Defendants engaged in the predicate acts over a substantial time; and/or

(b) The patterns of racketeering activity engaged in by the Individual Defendants and the Corporate Defendants continues or threatens to continue because such conduct has become a regular way of on-going business activities.

332. As a direct and proximate result of, and by reason of, the activities of the Defendants, individual and corporate, and their conduct in violation of 18 U.S.C. § 1962(c), each of the Plaintiffs have been injured in their property opportunities, expectation and/or rights, within the meaning of 18 U.S.C. §1964 (c) and are, therefore, entitled to recover *threefold* the damages each Plaintiff has sustained plus interest, their costs of the suit, and reasonable attorney fees.

**(Predicate Acts - Extortion)**

333. Paragraphs 168 and 169(relating to threats against Michael by Brayton and Carol in about 1999), 167-175, and 176 (relating to threats against Michael by Heal, Brayton and

others at the direction of "a lawyer") in 1999), 182-187 (relating to threats against Michael in December, 2004 by Heal and Gerstein) and 207 (relating to extortionate conduct by Deborah toward Monica in December, 2002), are restated and incorporated herein, by reference.

334. Section 11-42-2 of the General Laws of Rhode Island, 1956, as amended (hereinafter, the "R.I.G.L.") provides that **"(w)hoever, in verbal or written communications, maliciously threatens to accuse another of a crime or offense, or maliciously threatens injury to the person, reputation, property or financial condition of another or threatens to engage in criminal conduct with the intent to extort money or any unlawful pecuniary advantage, or with the intent to compel any person to do any act against her or her will or prohibit any person from carrying out any duty imposed by law, commits extortion.**

335. As described in the claims and allegations above and (upon information and belief) on numerous other occasions, defendants Carol, Heal, Brayton, Deborah, Gerstein and others known and unknown to Plaintiffs, made oral and and/or written threats to harm the persons and property of some or all of the plaintiffs.

336. Defendants issued their threats with the intent to compel the Plaintiffs to accede to Defendants' demands against Plaintiffs' will in violation of Rhode Island law.

337. Specifically, the Defendants threatened the rights of the Plaintiffs to share the society of their father (Glenn) with the intent to compel the Plaintffs to accede to their demands.

338. The Defendants have threatened some and all of the Plaintiffs with "calling the police" with arrest, with contempt proceedings, with only being able to see their father if they did not resist the actions taken by the individual defendants to sequester, unduly influence and cause Glenn to be used as a means of gaining control of the Griggs & Browne corporations, in the process deceiving and abusing the lawful processes of law enforcement and the courts to enable,