UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Christine Peabody; Michael
Griggs; Lauren Griggs; and C.
Monica Griggs

Plaintiffs

VS. C.A. No.: 08-243 ML

Carol Rita Kimberly Griggs, Alias;
David Heal, Alias, individually and
in his capacity as purported Trustee of
the Irrevocable Trust estate of the late Glenn E. Griggs;
Deborah Griggs, Alias; Dan A. Griggs, Alias;
Edward L. Gerstein, Alias; Richard Bicki, Alias;
Edward Brayton, Alias; the Griggs & Browne Co, Incorporated;
Griggs & Browne Home Inspection Service, Inc.;
Griggs & Browne Services, Inc.;
Griggs & Browne Termite Control, Inc; John Does 1
through 10; Jane Roes 1 through 10; XYZ Corporations,
Partnerships, Limited Liability Companies, Trusts and/or
Enterprises 1 through 10

Defendants

**DEFENDANTS EDWARD L. GERSTEIN'S, RICHARD C. BICKI'S AND DAVID HEAL'S ABBREVIATED[1] MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' REVISED EXPARTE EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

[1]Counsel for the Defendants Gerstein and Bicki advises the Court that he has entered for the limited purpose of the TRO Conference and both counsel have submitted this abbreviated consolidated Memorandum because of the short notice on which this matter has been brought. None of these defendants waives any rights they may have to raise other and additional grounds of defense, and each of them reserves all rights to raise, offer and argue any and all other facts, law or other support in defense of their positions, either at the TRO conference or at any other time.

## I. Introduction

In an attempt to re-litigate a host of issues which have been previously raised and adjudicated in state and probate court proceedings, the Plaintiffs improperly attempt to invoke the jurisdiction of this Court to again try to gain control of assets to which they simply have no right or entitlement . Frustrated with the results of lengthy and extensive state court litigation, which includes two separate Probate proceedings, two appeals to the Superior Court, and two appeals to the Supreme Court,[2] the Plaintiffs essentially ignore those prior court rulings by littering their eighty-four page "Verified Complaint" with references to the Racketeer Influenced Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961 et seq.), the Hobbs Act (18 U.S.C. § 1951), and the Electronic Communications Privacy Act (18 U.S.C. § 2510 et seq.) in order to avoid the results of prior state court litigation and interfere with state court resolution of any issues that may or may not be left to adjudicate between the parties. Despite the creative references to federal law, a transparent review of Plaintiffs' Complaint demonstrates that the thrust of this action sounds in three areas: (i) loss of society between the Plaintiffs and their father, the late Glenn E. Griggs ("Glenn"); (ii) interference or frustration with Plaintiffs' "expectation" of an inheritance; and (iii) invalidating Glenn's so-called estate planning documents. Plaintiffs fall woefully short of demonstrating a likelihood of success on the merits or establishing that they will suffer irreparable harm if injunctive relief is not granted them.

## II. Prior Proceedings

### A. The October 10, 2000 Limited Guardianship Proceedings.

On October 10, 2000, Plaintiffs Lauren Griggs ("Lauren") and Christine Griggs

[2] In essence, plaintiffs allege that defendants have corrupted three Probate Judges (Judge Evangelista, Judge Earle and Judge Isherwood), two Superior Court Judges (Judge Vogel and Judge Thompson) and at least five Justices of the Rhode Island Supreme Court on two separate occasions.

("Christine") filed a Petition in the Warwick Probate Court asking the Court to appoint Lauren and Christine as co-guardians over Glenn's financial and personal affairs pursuant to R.I.G.L. § 33-15-1 et seq.[3] (This initial guardianship filing is sometimes referred to as "Griggs I"). Glenn hired Defendant Edward L. Gerstein ("Mr. Gerstein") to represent his interests in contesting the guardianship proceedings.[4] Defendant Deborah Griggs ("Deborah"), a daughter and heir-at-law of Glenn, intervened in the guardianship proceedings as an interested party under the guardianship statute. Deborah hired Defendant Richard Bicki ("Mr. Bicki") to challenge, as her father did, the need for the appointment of a guardian or limited guardian.[5]

On or about July 3, 2001, the Warwick Probate Court ultimately ruled in favor of Glenn and Deborah concluding that Glenn was not in need of a guardian. Noting that the issue of Glenn's "competency" was contested, the Probate Court ruled that, as less restrictive means were available, i.e. the existence of Glenn's financial planning documents to address Glenn's needs, including the inter vivos trust which was funded at the time and which plaintiffs' now seek to challenge, a guardianship was prohibited as a matter of law.[6] On or about August 2,

---

[3]In conjunction with their Petition for Guardianship over their father, Lauren and Christine submitted a Decision Making Assessment Tool (DMAT) of Glenn which was prepared by a medical doctor who had no prior doctor-patient relationship with Glenn, was exclusively hired by Lauren, Christine and others in their group (Patricia, Monica, Nancy), and who literally performed a surreptitious fifteen (15) minute roadside assessment of Glenn while Glenn was sitting in a car in the doctor's parking lot. Glenn was taken to the parking lot under the ruse that Christine had to make a quick stop before taking her father to lunch.

[4]Despite the specious allegation that Mr. Gerstein suddenly appeared and proclaimed himself counsel for Glenn, it is a matter of public record, and the plaintiff's have been aware since 2000, that Glenn was referred to Mr. Gerstein not by Carol Griggs, as is alleged, but by a life-long friend of Glenn who was also a client of Mr. Gerstein. Moreover, as noted below, the Probate Court found that Glenn was capable of, and did make plain his desire that Mr. Gerstein represent him.

[5]Mr. Bicki's involvement in these matters ended on July 18, 2003, when he turned over his file, at Deborah's request, to Attorney Jeffrey Pine.

[6]Then extant Rhode Island law prohibited the appointment of a guardian or limited guardian

2001, Lauren and Christine filed a timely de novo appeal to the Kent County Superior Court pursuant to R.I.G.L. § 33-23-1 et seq. (See **Exhibit A,** a copy of the *"Reasons of Appeal"* filed by certain of the plaintiffs in conjunction with their Superior Court appeal in *Griggs vs. Estate of Glenn E. Griggs*, C.A.No.: KP01-0664 ["Griggs I"].) As appears from the "*Reasons of Appeal"*, many of the issues raised in this Complaint are simply a rehash of the issues raised in the appeal from the Probate Court denying the guardianship petition.

The Superior Court later dismissed the probate appeal, triggering an appeal by Lauren and Christine to the Rhode Island Supreme Court. While their appeal in "Griggs I" was pending in there, Lauren, Christine, Monica[7], Nancy and Patricia (hereinafter referred to as the "group"), apparently dissatisfied with the pace of justice in the Supreme Court, decided to take matters into their own hands. In June of 2003, the group embarked upon a concerted plan to remove Glenn from the sanctuary of his home at 500 Nausauket Road, Warwick, Rhode Island, to unilaterally fire Glenn's attorney (Mr. Gerstein) and to otherwise gain control of Glenn's financial and business records, as well as his companies and assets.

**B. Glenn is removed from his home on June 21, 2003.**

On or about June 21, 2003, Glenn was taken from his home by the group. At the time, Glenn was being cared for by a medical caregiver (Beverly Forte). After appearing at Glenn's home,[8] members of the group told Ms. Forte they wanted to take Glenn out to lunch. Ms. Forte

---

when less restrictive alternatives are available to address the proposed ward's alleged needs. R.I.G.L. §33-15-4.

[7]For the Court's clarity, "Monica", a Plaintiff in this litigation, is the daughter born of Glenn and his second wife, Patricia who is (for unknown reasons) referred to as "Patrizia" in the Complaint. Glenn bore two (2) children with Patricia, the other being Lauren. Until recently, and in all prior state court litigation, "Monica" was known (by her given first name) as "Courtney" Griggs. Nancy was Glenn's first wife and the mother of Glenn's remaining four children (Christine, Deborah, Michael and Dan).

[8]The home Plaintiff's euphemistically refer to in their Complaint as the "fortress".

agreed, but with the condition that she accompany Mr. Griggs as she was responsible for his medical condition and overall well-being. The group seemingly acquiesced to Ms. Forte's request to accompany Mr. Griggs to lunch. As Ms. Forte was readying herself to move into the automobile to go to lunch with Glenn and members of the group, the car which Glenn occupied sped off without Ms. Forte. Ms. Forte was told by members of the group that her services were no longer needed as Glenn would not be coming home. The remaining members left Glenn's home leaving Ms. Forte behind not knowing what to do.

As the group professed to Ms. Forte, Glenn did not return home and went missing for a total of eleven (11) days. During this eleven (11) day hiatus, members of the group tried to effectuate the second prong of their plan which was to take control of Glenn's businesses and financial affairs. The group drafted and sent a letter to Mr. Gerstein, Glenn's attorney, purportedly terminating Mr. Gerstein's services as Glenn's counsel.[9] The group caused their own attorney to draft a power of attorney for Glenn to sign appointing individual members of the group to act as Glenn's attorney-in-fact. The group drafted a demand letter purportedly under Glenn's signature whereby Glenn demanded production all of his financial and business records to be delivered to a courier. Finally, members of the group, including Patricia, and plaintiffs Christine and Lauren, caused Glenn to sign over to Patricia ownership of a $700,000.00 life insurance policy. At the time, the policy had a cash surrender value of approximately $41,000.00. The group caused Glenn to execute the change in ownership of the policy despite the fact that it was the group who maintained that Glenn was incompetent at the time of signing the documents.

[9]The group thought nothing of trying to fire Glenn's attorney although Glenn was an adversarial party in the pending guardianship proceedings with Lauren and Christine. Although Lauren and Christine were the petitioner/appellants in Griggs I, it is acknowledged by the individual members of the group under oath during the taking of their depositions that they were acting in concert with one another from the inception of Griggs I forward.

**C. The June 26, 2003 Guardianship Proceedings.**

On June 26, 2003, Mr. Heal and Dan Griggs caused a Petition for Temporary Limited Guardianship to be filed in the Warwick Probate as Glenn had not returned home nor had he appeared at, or been in communication with his businesses or Dan for almost a week (This guardianship proceeding has come to be known as "Griggs II").[10] As mentioned above, letters demanding the production of business and financial records and a letter purportedly terminating Glenn's attorney unexpectedly appeared during Glenn's absence.[11] The Warwick Probate Court (Judge John Earle) granted the Petition naming Mr. Heal and Dan Griggs as Glenn's temporary limited guardians over the person, and ordered Glenn to be turned over to Mr. Heal and Dan forthwith. The Court also ordered a review date of July 3, 2003 to notify interested parties and to afford Glenn his rights under the guardianship statute.

The group refused to turn Glenn over despite the mandate of the June 26, 2003 Order. After a failed attempt to overturn the Probate Order by a Motion to Vacate heard in the Kent County Superior Court (and denied by Judge Nugent), the group appeared before Warwick Probate Court Judge Earle on July 3, 2008 without Glenn. The group and their lawyers refused to turn Glenn over in direct violation of the court order. Even more disturbing, the group hired a lawyer (Frank Orabona) to "represent" Glenn in the Warwick Probate Court.[12]

Judge Earle immediately suspended the July 3, 2003 proceedings and ordered the group

---

[10]Contrary to the allegations of the Complaint, the June 26, 2003 Probate Court petition was filed by counsel for Mr. Heal and Dan Griggs.

[11]Glenn only had to appear at the corporate offices to gain access to his business records. The group later admitted under oath that they were responsible for drafting the various letters

[12]The group thought it appropriate to hire counsel of their choice for Glenn in the Warwick Probate Court proceedings demanding that the June 26, 2003 Temporary Limited Guardianship Order be vacated although members of the group were adversaries in Griggs I which was still pending in the Supreme Court at the time. Glenn's "new attorney" was in fact specifically selected and paid by the attorneys representing the group.

and their counsel to physically produce Glenn forthwith at the Warwick Probate Court. During the recess and before returning Glenn to the Court, members of the group caused Glenn to execute a number of documents including what is now infamously referred to as the "marriage contract".[13] The marriage contract incredulously purported to memorialize in writing Glenn's intent to re-marry Patricia, granted Patricia control over his assets, and stated his intentions to leave his estate to Patricia's children in the event he should die before Patricia and Glenn formally tied the knot.[14]

At hearing on July 3, 2003, Probate Judge Earle conducted a personal interview of Glenn and concluded that Glenn was then in need of some assistance with respect to his person. The Court appointed Attorney Michael St. Pierre as the temporary limited guardian over Glenn's "person" with the authority, inter alia, to determine who could visit and/or associate with Glenn. Attorney St. Pierre retained this power over visitation/association until Glenn's death. At hearing on July 3, 2003, the Court also ordered Glenn to be returned to his home at 500 Nausauket Road in Warwick, where he remained until his death.

**D. The Supreme Court affirms the dismissal of the appeal in Griggs I.**

Although on different grounds, the Rhode Island Supreme Court in a written decision issued April 9, 2004 upheld the dismissal of Lauren and Christine's Superior Court appeal in

---

[13]The signing of additional documents during the court recess was done surreptitiously as none of this was, at the time, known or disclosed to the Court, Glenn's attorney (Mr. Gerstein), the Temporary Limited Guardians or their counsel. These facts did not emerge until discovery ensued and the group was required to acknowledge their wrongdoings when confronted with the documents. At subsequent depositions in connection with discovery and contempt proceedings brought against them, the members of the group have since testified to the falsity of the documents and the circumstances under which they were prepared and executed.

[14]Patricia, Lauren and Christine subsequently admitted that this document was fraudulent.

Griggs I. Griggs vs. Estate of Griggs, 845 A.2d 1006 R.I. 2004)[15] (the Superior Court appeal was taken from the Warwick Probate Court finding that the private financial planning documents prepared for and executed by Glenn were effective less restrictive means, obviating the need for the appointment of a guardian.)[16]

**E. The Warwick Probate Court finds certain members of the group in contempt of the Court's June 26, 2003 Order.**

On or about February 11, 2005, Warwick Probate Judge Earle found Lauren, Christine, Nancy and Patricia in contempt of the Court's June 26, 2003 Order for, *inter alia*, not returning Glenn as previously ordered, causing false documents to be executed by Glenn during his unexplained absence and submitting false documents to the Court, and embroiling the Court and the parties in unnecessary litigation over which counsel (Mr. Gerstein or Orabona) should represent Glenn's interests in Griggs II.[17] At the time, Judge Earle deferred to a later date reducing his contempt findings to a monetary award.[18]

**F. The Warwick Probate Court finds Lauren and Christine in contempt of various discovery Orders.**

On December 24, 2003, the Probate Court entered an Order adjudging Lauren and Christine in contempt of various discovery and discovery related Orders, explicitly finding

---

[15]This decision is attached as **Exhibit B**.

[16]After the Rhode Island Supreme Court decision issued, Glenn moved for and was awarded costs incurred in the probate and superior court proceedings in Griggs I. The cost award entered against Lauren, Christine, Courtney and Patricia. The Probate Court expressly found that Courtney and Patricia were co-petitioners in Griggs I. No appeal was taken from that finding and cost award Order, it is final, and Glenn was paid his costs.

[17]This exercise took approximately one (1) month for the respective parties to conduct discovery and submit memos to the Court. The Court later ruled that Mr. Gerstein and not Orabona was Glenn's attorney and should remain as the ward's counsel. Orabona's entry of appearance on behalf of Glenn was stricken from the record.

[18]This adjudication of contempt is set forth in a 19-page written decision. (See **Exhibit C**).

that their obstreperous conduct caused unnecessary delay and expense. One sanction imposed was a waiver of the attorney-client privilege with respect to certain matters.[19] An appeal was filed on behalf of Lauren and Christine to the Superior Court, which was subsequently withdrawn with prejudice. Lauren and Christine were also held liable for all attorneys' fees and costs incurred as a result of their contemptuous conduct, and the amount of fees and costs to be imposed as a sanction is currently pending in the Warwick Probate Court.[20]

### G. **The Warwick Probate Court appoints David Heal as the Limited Guardian.**

Mr. Heal was appointed limited guardian over Glenn's estate with respect to "any assets that are not within the scope of the private financial planning documents previously found to be an adequate less restrictive alternative". See **Exhibit E** (Warwick Probate Court Order entered on September 29, 2005). More importantly, and germane to the issues raised in this proceeding, Judge Earle made some of the following findings of fact:

> 1. This Court, per Evangelista, J., has previously dismissed a Petition for the Appointment of a Limited Guardian/Guardian because it determined that less restrictive means than a guardianship are available by virtue of private financial documents prepared for and executed by the Respondent. See Order dated July 3, 2001, and transcript of hearing June 21, 2001, in Estate of Glenn E. Griggs, No. 2000-481.
>
> 3. **The private financial planning documents prepared for and executed by the Respondent [Glenn] remain in effect.** (emphasis added).

Christine, Lauren and Monica appealed the appointment of Mr. Heal as Glenn's Limited Guardian to the Superior Court but that appeal was later dismissed by the Superior Court (Judge Rogeriee Thompson) on December 12, 2006. See In re Estate of Griggs, 2006 WL 3720309

---

[19]This Order is attached as **Exhibit D**.

[20]All monetary contempt sanctions will be paid to Glenn's estate (as were the costs awarded in Griggs I), not counsel, a fact that renders curious plaintiffs' claim of "Legal Fee Looting," yet explains their desire to have this Court interfere with on-going state court proceedings.

R.I.Super. (December 12, 2006).[21] An appeal by Christine and Monica[22] to the Rhode Island Supreme Court of Judge Thompson's decision was dismissed, leaving the September 29, 2005 Order of the Warwick Probate Court as a final judgment between the parties concerning the private financial planning documents and the suitability of Mr. Heal to act as a fiduciary, including as Trustee.

**H. The May 8, 2008 Order Defining the Scope of Contempt Sanctions.**

On May 8, 2008, Warwick Probate Court Judge Stephen Isherwood entered an Order which essentially defined the scope of sanctions which Glenn's estate is entitled to recover from Lauren, Christine, Nancy and Patricia for their contemptuous behavior in Griggs II.[23] This includes, without limitation, the obstreperous conduct of the purported termination of Mr. Gerstein, the creation and submission of fraudulent documents to the Probate Court, the improper conversion of the life insurance policy, and maters related thereto. The Court found that Mr. Heal's responsibilities to the guardianship estate include recovering the attorney's fees and costs incurred as a result of this contemptuous conduct. Mr. Heal anticipates that a hearing on contempt sanctions will take place before Judge Isherwood in the Warwick Probate Court sometime this summer. The compensatory sanctions to be awarded in favor of the Estate are substantial and will well exceed $100,000.00. Mr. Heal is duty bound to litigate this contempt issue in his capacity as limited guardian. It is not until this issue is resolved that Mr. Heal, and the Warwick Probate Court can determine whether an estate needs to be opened at all in the Warwick Probate Court.

---

[21]This decision is attached as **Exhibit E**.

[22]Lauren did not appeal.

[23]This Order is attached as **Exhibit G**.

**I. The Superior Court Litigation to Recover the $700,000 life insurance policy.**

The last piece of state court litigation this Court should be made aware of is the suit authorized by the Warwick Probate Court and filed by Mr. Heal in his capacity as Limited Guardian against Patricia in the Kent County Superior Court to recover ownership of the $700,000.00 life insurance policy Patricia converted with the assistance of other members of the group, including at least Lauren and Christine, during the eleven (11) days Glenn was absent from his home.

In or about June 14, 2007, a final judgment was entered in the Kent County Superior Court, in favor of Mr. Heal ordering Patricia to sign over ownership of the $700,00.00 policy.[24] Patricia has since signed over the policy.[25] As noted in the Warwick Probate Court Order of May 8, 2008, Patricia, Lauren and Christine have been held liable for all attorneys' fees and costs incurred in the Superior Court proceedings in recovering the insurance policy. [26]

**III. Brief Legal Argument**

The Defendants whose interests are represented in the Memorandum have not had an adequate opportunity to research the law and to present adequate legal arguments to the Court. Mr. Gerstein was served with the Complaint on Friday, June 27; Mr. Heal has not yet been served (although his counsel has been made aware of the Complaint and has reviewed it), and Mr. Bicki was served this morning.

Given the short notice, counsel have determined that it was important to make the Court aware of as much of the factual background and prior state court proceedings as possible,

[24]This Judgment is attached as **Exhibit H**.

[25]Although Patricia did not appeal from entry of the final judgment, she did file an appeal from an Order that lifted the stay of enforcement of the final judgment. That appeal is pending.

[26]This apparently is the same insurance policy the Plaintiffs aver in their Verified Complaint that Glenn purportedly wanted to leave to Patricia, Lauren and Monica.

principally because those proceedings impact three areas of concern in the TRO conference in particular and in this litigation in general: the plaintiffs' likelihood of success on the merits; the applicability of abstention principles; and the various res judicata and collateral estoppel issues that will be raised very early in this litigation.

Counsel will here make some abbreviated legal arguments and will continue to research these issues and be prepared to bring further authorities to the Court at this afternoon's conference.

**A. The doctrine of res judicata bars all or some of the Plaintiffs from challenging the private financial planning documents.**

The doctrine of res judicata "makes a prior judgment in a civil action between the same parties conclusive with regard to any issues that were litigated in the prior action, or, that could have been presented and litigated therein." ElGabri v. Lekas, 681 A.2d 271, 275 (R.I. 1996); See also Garganta v. Mobile Village, Inc., 730 A.2d 1, 4-5 (R.I. 1999). The doctrine "serves as an absolute bar to a second cause of action where there exists identity of parties, identity of issues, and finality of judgment in an earlier action." Gaudreau v. Blasbalg, 618 A.2d 1272, 1275 (R.I. 1993) (internal quotation marks omitted). The doctrine of res judicata precludes a party from re-litigating an issue even though that same party is "prepared in a second action to present evidence or grounds or theories of the case not presented . . . in the first action, or to seek remedies or forms of relief not demanded in that action." ElGabri, 681 A.2d at 276.

The Court in both Griggs I and Griggs II found that Glenn had prepared and executed private financial planning documents. Both Courts further found that those private documents were an acceptable less restrictive alternative to the appointment of a guardian. The litigants in those proceedings had ample opportunity to challenge the viability of Glenn's private financial planning documents, including the very Trust that they now seek to have this Court

determine. Those Warwick Probate proceedings recognizing and upholding the sanctity of those documents are now final and can not therefore be the subject of additional proceedings. Plaintiffs further had the opportunity to raise any claims of impropriety by defendants Heal, Gerstein and Bicki in any of the numerous probate and superior court proceedings.

**B. Plaintiffs have no legally recognized right to loss of society of companionship with their father.**

A major theme resonating throughout the Complaint is that the Defendants collectively conspired to isolate the Plaintiffs from their father causing them to lose the society and companionship of their father. It is undisputed that the Plaintiffs were all adult children at all relevant times hereto.

Defendants posit that Plaintiffs have no right to pursue essentially a loss of society claim against any of the Defendants since Rhode Island recognizes no such claim for emancipated, adult children. See R.I.G.L. § 9-1-41(b) ("An unemancipated minor is entitled to recover damages for the loss of parental society and companionship caused by tortious injury to his or her parent.").[27] Therefore, the Plaintiffs have failed to demonstrate a likelihood of success on the merits of those loss of society claims scattered throughout the Complaint.

**C. The Plaintiffs do not have a claim against Heal and others for interference with their expectation of an inheritance.**

Under the present circumstances, the Plaintiffs do not enjoy an independent right to bring a claim against Heal and the other defendants for interference with their expectation of an inheritance from Glenn's estate. See Umsted v. Umsted, 446 F.3d 17 (1st Cir. 2006) (applying Rhode Island law). Therefore, Count IX of the Plaintiff's Complaint alleging a cause

[27] Even assuming for a moment the validity of such a claim, the allegations raised in the Complaint in support of the purported loss of societal claims may be timed barred by the applicable one (1) or three (3) year statute of limitation referenced in subsection (d) of R.I.G.L. §9-1-41.

of action for "tortious interference with expectancy of inheritance" should be summarily dismissed.

**D. <u>The Plaintiffs have failed to demonstrate that they will suffer irreparable harm</u>.**

The Plaintiffs simply rely upon a one (1) page affidavit authored by Nancy Griggs (not a party to the litigation) stating that her daughter Deborah told her over the phone ("in hushed tones") that the so-called trust was being distributed on Friday, June 27, 2008. Regardless of what Deborah might have whispered to Nancy or what Deborah truly understands or does not understand about the operation of the trust, there is nothing anticipated in the near future which will result in the bulk distribution of trust assets or the termination of the trust. This trust will continue to be administered by Mr. Heal in the same manner as since his appointment as trustee approximately eight (8) years ago.

Moreover, the Plaintiffs have failed to demonstrate that they cannot be made whole by money damages in the event they should succeed on the merits of their frivolous and specious Complaint. There is absolutely no showing of irreparable harm.[28]

**E. <u>The issuance of a restraining order would frustrate the estate's obligation to reduce the contempt findings against members of the group</u>.**

As required by the Warwick Probate Court in its May 8, 2008 Order, Mr. Heal is charged with the responsibility of prosecuting the monetary portion of the contempt sanctions levied against two of the Plaintiffs and two other members of the group. It is ironic that the

---

[28]To the contrary, Defendants submit that the only irreparable harm would result to the companies if this Court were to place any restrictions on his ability to run the day-to-day affairs of the company in the ordinary course of business. In addition, Heal and the professionals assisting him in the administering of Glenn's estate including the preparation of estate income tax returns which are coming due would be severely hindered if any court intervention is imposed. Moreover, any provisional relief would create an aura of wrongdoing by attorneys Gerstein and Bicki that would result in an unwarranted negative impact on their professional reputations and practices, with the associated possible loss of clients.

very Plaintiffs (Lauren and Christine) who seek to restrain Mr. Heal's activities in his capacity as the trustee and executor of Glenn's estate, and who also claim that the defendants engaged in corruption in wasting and looting the estate, are the same persons who will be indebted to the estate for thousands of dollars for violating court orders and engaging in vexatious litigation.[29]

The Plaintiffs argue that this court should entertain their litigation as the will has not been probated and thus no probate court proceedings have been initiated. As noted an estate has not been opened in the Warwick Probate Court because Mr. Heal must first wind up the contempt litigation against the relevant parties. It will not be known whether an estate needs to be opened up until the issue of contempt if fully and finally adjudicated. Only when the contemnors are ordered to pay a liquidated amount of money will there be an asset warranting the opening of an estate. Moreover, Plaintiffs see to have this Court interfere with ongoing probate court proceedings by restraining the presentation of Glenn's will for probate, despite the fact that the probate of his will affords Plaintiffs a forum to present outstanding issues, if any, in the state probate and superior courts.

[29]While Monica is not liable for contempt sanctions, she was part of the group who assisted the four contemnors in Griggs II. She also actively participated in Griggs I as an interested party, as she was later assessed with the costs incurred in the Griggs I proceeding.

Respectfully submitted,
Edward L. Gerstein and
Richard C. Bicki,
By Their Attorney,

*/s/ Anthony M. Traini*
Anthony M. Traini (#4793)
56 Pine Street – Suite 200
Providence, RI 02903-2819
Tel. (401) 621-4700
Fax (401) 621-5888
E-mail:amt@atrainilaw.com

David Heal, individually and in his capacity as the Trustee of Glenn E. Griggs Trust,
By and through his attorneys,

*/s/ Michael J. Lepizzera*
Lepizzera & Laprocina Counsellors at Law, Ltd.
Michael J. Lepizzera, Jr. #4995
Christian C. Potter #5359
301 Metro Center Blvd. Suite 102
Warwick, Rhode Island 02886
Tel: (401) 739-7397
Fax: (401) 384-6950
Email: mlepizzera@leplap.com
cpotter@leplap.com

CERTIFICATE OF SERVICE

A copy of this pleading has been served via the ECF system upon Plaintiff's counsel.

*/s/ Anthony M. Traini*
Anthony M. Traini