STATE OF RHODE ISLAND
KENT, Sc.

PROBATE COURT
CITY OF WARWICK

In re:

Estate of
GLENN E. GRIGGS

Docket No. 2003-249

**DECISION AND ORDER ON RESPONDENT'S MOTION TO ADJUDGE IN CONTEMPT**

Before the court is the respondent's motion to adjudge Patricia Griggs, Lauren Griggs, Nancy Griggs, and Christine Peabody in contempt as a result of their failure or refusal to comply with the terms of an order which was issued by this court on June 26, 2003. (For ease of reference, Patricia Griggs, Lauren Griggs, Nancy Griggs and Christine Peabody will from time to time be referred to collectively herein as the "Griggs Women.") A hearing was held on August 12, 2004, with respect to this motion at which testimony and argument of counsel were presented. Memoranda of the parties were filed both prior to and after the August 12, 2004 hearing. To place the motion currently under consideration in an understandable context, a brief explanation of the events that occurred in the early history of this case is in order.

Facts and Travel of the Case

The June 26, 2003 order was entered following an emergency hearing held that day on a petition to appoint Dan Griggs and David Heal (respondent's son and a long-standing business associate of the respondent, respectively) as temporary limited guardians for the respondent, Glenn E. Griggs. Counsel for the respondent appeared at the emergency hearing and waived notice thereof on behalf of Glenn Griggs. The petition was supported by a sworn statement

containing allegations that the respondent, who suffers from certain frailties, had been removed from his home four days earlier by several other family members utilizing allegedly deceitful means. Respondent's counsel represented, and sworn testimony later confirmed, that these family members thereafter had refused to disclose respondent's whereabouts to either the petitioners or the respondent's counsel.

Although respondent was represented by counsel at the emergency hearing on June 26 and said counsel waived notice thereof on his behalf, the petitioners (one of whom is an heir at law of the respondent) had not provided notice to the respondent's other heirs at law in accordance with R.I. Gen. Laws §33-15-17.1. Those other heirs at law included the very family members who had allegedly spirited the respondent away from his home and who had allegedly refused to disclose the respondent's whereabouts. Mindful of the statute's (33-15-17.1) directives as to notice requirements with respect to a petition for the appointment of a permanent guardian or limited guardian, but also aware of the court's authority under R.I. Gen. Laws §33-15-10 to appoint a *temporary* guardian "for cause shown after notice,"[1] and especially in light of the exigent circumstances presented in the sworn statement filed with the court which supported the petitioners' and counsel's expressed fears for the safety and well-being of the respondent, this court heard the petition on an emergency basis and entered an order appointing the petitioners as temporary limited guardians. Owing to the circumstances in which the temporary order was entered, the matter was set down for hearing in one week (July 3), with notice to be provided to all heirs at law of the respondent.

[1] In the context of a petition seeking the appointment of a temporary guardian, the court construes the "notice" required by §33-15-10 to include only such notice as may be reasonable under the circumstances presented in the showing of "cause" necessitating a temporary order, which would normally include, at a minimum, reasonable notice to the proposed ward who would be the subject of such a petition. In the case at hand, the respondent was represented by counsel who, as officers of the court, indicated that their client waived his right to notice of the hearing on the petition.

The order entered at the conclusion of the June 26, 2003 emergency hearing appointed Dan Griggs and David Heal as "temporary limited co-guardians over the respondent's physical body," giving them "exclusive control over the respondent's physical body," and empowering the temporary co-guardians to "take Glenn E. Griggs into their exclusive custody" and "to determine the location of his abode." *Temporary Order*, June 26, 2003.

For several days before and after June 26, counsel for the respondent and counsel for the Griggs Women had engaged in what can best be described as a "cat-and-mouse" exchange of communications. Counsel for the Griggs Women acknowledged that they represented certain unidentified members of the Griggs family who were "in possession of" the respondent, but refused to disclose the identities of those family members or the respondent's whereabouts. It was not until June 30, 2003, that counsel for the Griggs Women identified their clients as all of the individual members of the Griggs Women group, as well as Courtney Griggs. (Courtney Griggs is not a subject of the present motion).

The following day, July 1, 2003, counsel for the petitioners communicated by telephone with counsel for the Griggs Women and provided their counsel with a copy of the June 26, 2003 order. Petitioners' counsel demanded compliance with the temporary order and requested that the respondent be presented to petitioners by 7:00 p.m. on July 1, 2003. The unchallenged testimony presented at the hearing on the instant motion indicates that counsel for the Griggs Women replied flatly that the temporary order would not be obeyed by his clients. Rather, on July 2, 2003, counsel for the Griggs Women sought an Order of the Superior Court vacating the probate court's temporary order of June 26. The Superior Court declined to vacate the June 26 order, and immediately thereafter (while still at the Superior Court) petitioners' counsel renewed his request that the commands of the June 26 order of this court be obeyed by the Griggs Women either by

presenting the respondent or disclosing the respondent's whereabouts so that the temporary limited co-guardians could go to his location and take him into their custody. Again, counsel for the Griggs Women indicated that his clients would not comply with the June 26 order.

It is clear that at least by July 1, 2003, counsel for the Griggs Women had received a copy of this court's June 26, 2003 temporary order. The terms of the order were unequivocal and certainly readily comprehensible not only to learned members of the bar but also to any person of ordinary intelligence. The temporary limited co-guardians were the only persons authorized to have possession and control over the respondent's physical being, as the authority of the temporary guardians in this regard was, in the explicit terms of the June 26 order, "exclusive." Counsel for the Griggs Women chose to ignore the order, flatly refused to comply in any respect with its provisions, and apparently advised the Griggs Women that they need not comply with the order of this court.

This court is aware that counsel for the Griggs Women[2] have expressed a *belief* that the June 26, 2003 temporary order was invalid, either because it was issued without prior notice to the heirs at law, or because it was in the nature of a "mandatory injunction" beyond the jurisdiction of this court. Whether or not counsel is correct on this point is not an issue before this court at this juncture. The facts remain that the order was issued on June 26, 2003, in what this court believed to be a valid exercise of its jurisdiction; and the order was neither rescinded nor modified by this court, nor was it vacated or modified by the Superior Court, nor was it otherwise successfully challenged by way of further appellate review. Accordingly, the order issued on June 26, 2003, stood then (and now stands) as an order of a court to which obedience was and is required by all those who had or have knowledge of it and who fall within its ambit.

---

[2] The Contempt Group is now represented by different counsel than was the case in June and July, 2003. Nevertheless, both then- and current- counsel for the Contempt Group have expressed their belief that the June 26, 2003 temporary order was issued erroneously.

Nancy Griggs testified during the hearing on August 12, 2004, that, at least as of July 1, 2003, she was aware that an order had issued from this court requiring that Glenn Griggs be turned over to the temporary limited guardians. Counsel for the Griggs Women stipulated at the August 12, 2004 hearing that Christine Peabody and Lauren Griggs were aware by July 1, 2003 that the order of this court required that Glenn Griggs be relinquished to the temporary guardians. Patricia Griggs, who was not present at the August 12 hearing, testified during a deposition on March 19, 2004, that she, too, was aware that the order had been issued and that Glenn Griggs was to be relinquished to the temporary guardians. Each of these women, however, also indicated (through live testimony at hearing, by testimony at deposition, by stipulation and/or by a combination of these methods) that they had been advised by their then-counsel that they did not have to comply with the court order. Accordingly, each of the Griggs Women have acknowledged to this court's satisfaction that, as of July 1, 2003, they knew that this court had ordered whoever had custody or control over Glenn Griggs to relinquish such custody or control to the persons named as the temporary guardians, and that they knew that Dan Griggs and David Heal, as the appointed temporary guardians, were to have exclusive control over the physical being of Glenn Griggs. This court is also satisfied that notwithstanding such knowledge, each of the Griggs Women chose, whether as a result of the advice they received from their then-counsel or otherwise, not to comply with the order of the court.

The evening of July 1, 2003, was a busy one for the Griggs Women. They had been advised by their counsel that this court had appointed the temporary guardians and had given those guardians the exclusive authority over Mr. Griggs' physical being. They claim that they also had been advised by their then-counsel that they were not required to obey this court's order (i.e., that they did not have to "turn over" Mr. Griggs to the temporary guardians), as their

counsel indicated that this court's order would be challenged the following day (July 2, 2003) in the Superior Court.[3] Notwithstanding their collective knowledge of the existence of the order requiring them to relinquish custody of Glenn Griggs to the temporary co-guardians, the Griggs Women met at the office of attorney Frank Orabona in Providence, with Mr. Griggs in tow, at approximately ten o'clock on the evening of July 1. The late-night meeting at Mr. Orabona's office had apparently been arranged by the Griggs Women's then-counsel and was obviously designed to bring about the purported engagement of Mr. Orabona as counsel for Glenn Griggs, ostensibly to represent him in the guardianship proceedings and to construct another barrier in the path of the petitioners' attempts to secure guardianship authority and control with respect to Mr. Griggs.

The next day, July 2, 2003, the Griggs Women and their then-counsel appeared at the Superior Court in Kent County, seeking an order of that Court vacating the temporary guardianship imposed by this court on June 26. The Superior Court refused to vacate this court's order. As indicated above, immediately following the Superior Court's refusal to vacate the temporary guardianship order and while all counsel and the Griggs Women were still at the Kent County courthouse, the petitioners' counsel orally reminded opposing counsel of the obligation to comply with this court's order and renewed the request that the Griggs Women relinquish custody of Mr. Griggs or at least disclose his location so that the petitioners/temporary guardians

[3] This court does not suggest that "custody" of Mr. Griggs was being maintained by the use of physical force, or for that matter that Mr. Griggs was being held against his will. Rather, the only conclusion that one can reach from a fair reading of the deposition testimony cited in this matter, combined with testimony of live witnesses before the court, the arguments presented by all counsel, and the court's own observations of the behavior and demeanor of Mr. Griggs (both in court on July 3, 2003 and at Mr. Griggs' home on July 28, 2003), is that Mr. Griggs, in that timeframe, was a most docile and agreeable person who was susceptible to being easily led by others, who had significant difficulty expressing independent thought, and who would most likely follow instructions and suggestions from whomever among his family, friends or acquaintances might have his immediate attention. Accordingly, the court does find that Mr. Griggs was effectively "in the custody" of the Griggs Women following the issuance of the June 26, 2003 order, that they were aware that the temporary guardians had requested that Mr. Griggs be turned over to them and that, although each of them had the apparent ability to do so, none of the Griggs Women took any action to disclose his whereabouts to the temporary guardians or to "relinquish" such "custody" until they were personally ordered to do so at the hearing of July 3, 2003.

could travel to him to take him in to their custody. Then-counsel for the Griggs Women again indicated that their clients would refuse to comply with the June 26 order.

The following day, July 3, 2003, a hearing was held by this court at which all counsel (excepting Mr. Orabona, who was not present at the outset of the hearing) and all of the Griggs Women were in attendance. Glenn Griggs was not present initially. Upon questioning by the court, the Griggs Women admitted that Mr. Griggs was located at the home of Patricia Griggs and Lauren Griggs in East Greenwich. The court recessed briefly after ordering them to retrieve Mr. Griggs immediately and to bring him before the court. Reconvening approximately one hour later, with both Mr. Griggs and Mr. Orabona (who had arrived late after appearing in another court) now in attendance, the court was faced with competing claims from two camps of attorneys (Messrs. Gerstein, Jones and Traini on one side; Mr. Orabona on the other), each asserting to be the legal representative of Glenn Griggs in these proceedings. After hearing arguments from both sides, as well as from petitioners' counsel, and after an *in camera* conference alone with Mr. Griggs (to which all had acquiesced), the court preliminarily determined that Mr. Griggs was an individual who would likely benefit from the continued assistance of a temporary limited guardian of his person--at least during the pending proceedings. Absent an agreement as to who should serve as temporary limited guardian, the court appointed attorney Michael St. Pierre, a respected and experienced member of the bar who had no connection with any of the persons involved in this litigation, to serve temporarily as limited guardian of the person of Mr. Griggs.

It was not until July 28, 2003, after untold hours of discovery proceedings and several hearings before the court, that the issue of Mr. Griggs' representation was resolved. Ultimately, the court determined that Mr. Griggs preferred that Mr. Gerstein, assisted by Messrs. Jones and

Traini, should represent his interests in these proceedings. Once the representation issue was resolved, the court expressed hesitation in proceeding further on the by-then-filed petition seeking the appointment of a limited guardian, as the court did not have the statutorily-required Decision Making Assessment Tool report from Mr. Griggs' treating physician or the assistance of the report of the court-appointed guardian *ad litem*. These items were later supplied to the court before further substantive proceedings, recitation of which is unnecessary in the context of the current motion, took place.

With the factual and procedural background briefly summarized above, the court will now address the issues raised by the parties during the hearing on the motion and in their memoranda.

<u>Jurisdiction, Specificity and Notice</u>

There is no dispute that the Griggs Women were aware that the June 26 order had been issued and that it (a) granted exclusive authority over the person of Glenn Griggs to the temporary guardians; and (b) required anyone who controlled the whereabouts of Mr. Griggs to relinquish him to the guardians. Although the Griggs Women may not have been served with an actual copy of the order, their counsel had received a copy and had discussed its contents and meaning with them; and there is no question that each of the Griggs Women knew of and understood the mandates contained in the order.[4]

[4] Although it is undisputed that the individual Griggs Women were not served personally with copies of the June 26 order, they have acknowledged that they knew of its existence and its contents prior to the Superior Court proceedings on July 2, 2003, as evidenced by their own assertion: "Their then-attorneys advised the family members that they did not have to turn over Glen Griggs and that he could remain with them until their appeal was heard." *Memorandum of Patricia Griggs, Lauren Griggs, Christine Peabody and Nancy Griggs in Opposition to Respondent's Motion to Adjudge in Contempt*, p.3.

The Griggs Women argue that they cannot be found to have been in contempt of the June 26 temporary order because they were not parties before the court, the order did not identify them by name, and it did not explicitly command them any one or more of them by name to do anything specifically or to refrain from doing anything. As to the first portion of this argument, the court is of the opinion that the fact that the Griggs Women were not specifically named as "parties" in the petition is of no assistance to them. The very nature of an order of a probate court appointing a guardian for a person is such that it constitutes an order applicable to *everyone* who has knowledge of it. The Griggs Women attempt to characterize the order appointing temporary guardians as being the equivalent of a mandatory injunction, suggesting that the probate court lacks subject matter jurisdiction to issue such an injunction because the court's equitable powers are limited only to the extent permitted under R.I. Gen. Law §8-9-9. It has been long settled that the jurisdiction of the probate court is purely statutory in nature. *E.g., Miller v. Verona*, 69 R.I. 285, 33 A.2d 178 (1943). The ability of the probate courts in Rhode Island to follow the course of equity extends only so far "as necessary to fulfill the mandates of title 33 of the General Laws." R.I. Gen. Laws §8-9-9. It is not necessary to inquire whether the appointment of a temporary limited guardian is such an exercise of judicial power "following the course of equity," however, as the probate courts in this state are specifically authorized to issue orders appointing temporary guardians and temporary limited guardians. R. I. Gen. Laws §33-15-10.

Making an award of custody is an inherent aspect of a temporary guardianship appointment. *In re Kimberly*, 583 A.2d 877 (R.I. 1990). The Griggs Women have not posited that the June 26, 2003 order appointing temporary limited guardians in the instant case exceeded the statutory powers of the court as set forth in §§33-15-10, 33-15-12, or 33-15-4(a). Rather, they argue that the temporary order appointing limited guardians was the "equivalent of a mandatory

injunction." The simple answer to this argument is that the temporary order appointing limited guardians in this matter was not "a mandatory injunction." It was a properly limited and temporary order as explicitly authorized by §33-15-10.

The Griggs Women also challenge the enforceability of the temporary order in a contempt context as they were not named specifically in the order, arguing that they were not required, directly by name, to take any clearly–denominated action or to refrain from taking any such action. In essence, the Griggs Women argue that because they were not named "parties" to the proceedings before the court, no order or decree could be issued by the court which could command them to do anything. This argument ignores the unique nature of guardianship proceedings in the probate court and the very nature of a probate court decree appointing a guardian or limited guardian. Although heirs at law may be "interested persons" in guardianship proceedings, they are not, absent the filing of appropriate pleadings, "parties" *per se* as might be typically contemplated in a civil action. Indeed, any probate court decree appointing a guardian or limited guardian is, by its very nature, a decree which has general application to <u>all</u> persons who may have dealings or relationships, whether in a business or personal context, with the ward. Rarely, if ever, does a probate court decree appointing a guardian or limited guardian provide, as part of its terms, explicit direction or command to third parties. A proper decree appointing a fiduciary under Chapter 15 of Title 33 sets out the nature and extent of the appointed person's authority and duties as they pertain to the ward. While not necessarily naming individual persons who may be specifically affected by its entry, such a decree of the probate court is nevertheless binding upon *all* persons who have knowledge of it (actual or constructive) in connection with their dealings and relationships with the ward who is the subject of the decree.

Beyond consideration of the unique nature of a probate court decree appointing a guardian or limited guardian, a person need not necessarily be named specifically in any order issued by a court, or even be a party to the litigation at the time the order enters, to be held in civil contempt for disobedience of the order. *City of Pawtucket v. Council No. 70, AFSCME, AFL-CIO, Local 1012,* 116 R.I. 198, 353 A.2d 607 (1976). There also exists authority that anyone who takes steps deliberately to thwart the enforcement of a judicial decree can be brought into court and dealt with summarily even though he or she is not named in the decree or acting in concert with someone that is, or violating any source of legal obligations other than the decree itself. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 692 N. 32, 99 S.Ct. 3055, 3078 N. 32, 61 L.Ed.2d 823 (1979); *Herrlein v. Kanakis*, 526 F.2d 252, 255 (7th Cir. 1975); *United States v. Hall*, 472 F.2d 261 (5th Cir. 1972). Additionally, if a nonparty knows of a judicial decree and nonetheless acts in defiance of it as an aider or abetter to a party subject to the decree, such aider or abetter may be held in civil contempt. *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 61 F.3d 94 (1st Cir. 1995); *Goya Foods, Inc. v. Wallack Management Co.*, 290 F.3d 63 (1st Cir. 2002), cert. denied, 537 U.S. 974, 123 S.Ct. 434, 154 L.Ed.2d 330 (2002). In the instant case, Mr. Griggs himself was a "party" subject to the decree, and it could be said that anyone acting in a manner to "assist" Mr. Griggs in the avoidance or defiance of the decree would be subject to being held in contempt.

<u>The Decision Making Assessment Tool</u>

The Griggs Women have also challenged the court's jurisdiction to enter the temporary order of June 26, 2003 on the ground that a Decision-Making Assessment Tool ("DMAT") was

not filed along with the petition for the appointment of a temporary limited guardian. The court labored over the issue of a DMAT early on in this case, particularly in attempting to resolve what the court termed as an "inherent tension" between the requirement that a DMAT be filed with a petition for the appointment of a guardian or a limited guardian (R.I. Gen. Laws §33-15-4) and the proscription against the unauthorized release of confidential health care information contained in Chapter 37.3 of Title 5 of the General Laws (Confidentiality of Health Care Communications and Information Act). Ultimately, this court came to the conclusion that it had the authority to proceed on the petition for the appointment of a *temporary* limited guardian, without requiring the immediate or contemporaneous filing of a DMAT, under R.I. Gen. Laws §33-15-10.

Unlike §33-15-4 which deals with the appointment of a permanent guardian or limited guardian, and which mandates that a DMAT "must be filed with the petition in each case," the statutory section authorizing the appointment of a temporary guardian or limited guardian, §33-15-10, contains no such requirement for the filing of a DMAT. Rather, in acting on a petition for the appointment of a temporary fiduciary ". . . pending any application for the appointment of a [permanent]limited guardian or guardian, . . . " the probate court is authorized to make such a temporary appointment upon a showing of "cause" and when the court deems such a temporary order "proper." R.I. Gen. Laws §33-15-10. The two statutes clearly distinguish the circumstances when a DMAT necessarily must be filed with a petition (permanent guardian or limited guardian) and when none is required (temporary guardian or limited guardian).[5] In the instant case, based upon the sworn statements presented to the court on June 26, 2003 laying out

[5] To underscore the distinction between these two types of applications, it should be noted that the General Assembly in its last session amended §33-15-4(a)(2) to provide that when a petition for the appointment of a temporary guardian is filed, the probate court may "excuse the filing of a decision-making assessment tool . . . in extraordinary or emergency circumstances and upon the provision of other competent evidence." P.L.2004, Ch. 573.

the unusual and suspicious manner in which Mr. Griggs had been removed from his home and subsequently secreted at a location or locations unknown, his apparent frailty and the refusal of the Griggs Women to disclose his whereabouts, the court found that "cause" had been shown for the issuance of a temporary order of appointment of limited guardians. Under the circumstances, and as the petition was accompanied by a waiver of notice and a statement of no objection by an attorney who had been Mr. Griggs' regular counsel for a number of years, the issuance of an order of limited scope and brief duration under §33-15-10 was deemed by this court to be "proper."

Purging of Contempt

The Griggs Women have also suggested that even if they are determined to have contemptuously violated the temporary order of June 26, 2003, they successfully purged themselves of any contempt associated with such violation when they finally relinquished "custody" of Mr. Griggs on July 3, 2003. This position is not accepted. The Griggs Women presented Mr. Griggs and relinquished him to the temporary limited guardians on July 3 only *after* they had appeared in person before the court *without* Mr. Griggs. The court was required to suspend proceedings that morning, and (this time, orally) ordered them *again* to retrieve Mr. Griggs and to bring him to the court. Their ultimate compliance with the direct oral order of the court issued on July 3 does not, in this court's mind, erase their defiant noncompliance with the temporary order of June 26, nor does it ameliorate the consequences which may have flowed (as are alleged by respondent in the instant motion) from that previous noncompliance.

Civil contempt serves two purposes: to coerce the contemnor into compliance with the court order; and to compensate the complaining party for losses sustained. *Biron v. Falardeau*, 798 A.2d 379, 382 (R.I. 2002). While the Griggs Women may have ultimately complied with the temporary order, fulfilling (or nullifying) the first purpose of civil contempt, it remains to be determined whether the complaining party, Mr. Griggs, has suffered any loss as a result of their prior disregard of the temporary order and what, if any, compensation may properly be due.

Admissibility of Deposition Transcript Testimony

Finally, the Griggs Women have objected to the admission as evidence of their testimony contained in their deposition transcripts which were submitted by the respondent in this matter and referred to in the memoranda filed in support of the instant motion. In this regard, the court must acknowledge its own contribution to some degree of confusion. At the end of the hearing on the instant motion on August 12, 2004, the Griggs Women objected to the "wholesale" admission and use of transcripts of their deposition testimony, as offered by the respondent in support of the motion to hold the women in civil contempt. At that hearing on August 12, 2004, counsel for the respondent asked the court to confirm the admission as evidence the "various deposition transcripts" referred to "throughout the pleadings" for the purposes of the motion to adjudge the Griggs Women in contempt. (Hearing Transcript, August 12, 2004, p.67.) Counsel for the Griggs Women noted that all objections in the depositions had been reserved until time of trial and indicated a desire " . . . to go back and make sure that none of those are improperly proffered and the ability to put in an objection." (Id. At 68.) Respondent's counsel indicated

that the deposition transcripts were just a "different format of sworn statements or affidavits," were offered in support of the motion. (Id. At 82.)

At one point in the proceedings on August 12, 2004, the court interjected by saying that " . . . to my recollection, the deposition transcripts themselves have not yet been entered into evidence." (Id. At 76.) The court was in error in making that statement. At the next prior hearing, held on July 29, 2004, the deposition transcripts were admitted as exhibits "to the extent that they are referred to in any of the memoranda or other pleadings filed in the case." (Hearing Transcript, July 29, 2004, p.46.) The only objection raised at that time by counsel for the Griggs Women was the potential cost of reproducing the transcripts in the event of an appeal. (Id., pp.42-43.) The court pointed out to counsel for the Griggs Women, however, that to the extent he believed that any of the excerpts of testimony cited by the respondent in support of his motion were taken out of context so as to be misleading, the Griggs Women would be given every opportunity to argue such matters to the court. No such argument has been offered.

In a post-hearing supplemental memorandum filed by the Griggs Women, they have posited an objection to the admission of the transcripts of their deposition testimony on the basis that they constitute inadmissible hearsay.[6] Although the Rules of Civil Procedure are not strictly applicable to proceedings before the probate court, in contested matters such as the instant proceedings, the Rhode Island Rules of Evidence apply. R.I. Gen. Laws §33-22-19.2. The testimony contained in those transcripts, to the extent that it has been referred to in the pleadings and memoranda and offered as evidence in connection with the instant motion, is determined by

[6] The court finds that the testimony of the Griggs Women at their depositions was properly admissible in support of the motion to adjudge them in contempt and such testimony does not constitute hearsay pursuant to Rule 801(d)(2)(A) of the Rhode Island Rules of Evidence. In the context of the motion to adjudge them in contempt, the Griggs Women are "parties opponent" and their own prior statements, as long as they are relevant to the issue before the court, are admissible under the rule.

the court to be admissible and has been accepted as evidence, to the extent it is relevant to the issue of contempt before the court.

The Court is satisfied nevertheless, even without the contested deposition transcripts, that sufficiently clear and convincing evidence has been placed before the court to establish that the Griggs Women were actually aware of the existence of the temporary order of June 26, 2003, that they knew and understood that the order required them to relinquish "custody" of Glenn Griggs to the temporary limited guardians (or at least to disclose his location to the guardians), and that they made a conscious decision, even if purportedly upon the advice of their then-counsel, to disobey the clear mandate of the order. This evidence consists of the testimony adduced and exhibits admitted at the hearing of August 12, 2004, as well as the stipulation made by counsel at said hearing (Hearing Transcript, August 12, 2004, p.107.)

## Conclusion

"Civil contempt . . . is established when it is proved by clear and convincing evidence that a lawful decree was violated." *Bergquist v. Cesario*, 844 A.2d 100 (R.I. 2004), *citing Biron v. Falardeau*, 798 A.2d 379, 382 (R.I.2002) (per curiam), (*quoting Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698, 704 (R.I.1994)). To avoid an order of the court, an individual must demonstrate that he or she is literally unable to comply because compliance is not presently within his or her power. *Zannini v. The Downing Corporation*, 701 A.2d 1016 (R.I. 1997). The burden of proving impossibility, however, is a heavy one; and mere inconvenience or annoyance is insufficient. *See Palmigiano v. DiPrete*, 700 F.Supp. 1180 (D.R.I. 1988).

Based upon all of the evidence presented to the court, and in consideration of the pleadings, argument and memoranda of counsel (including the references to deposition testimony transcripts contained in such memoranda), the court finds that evidence has been presented which establishes that each of the Griggs Women was aware of the existence of the court's order of June 26, 2003, and each was equally aware of its explicit directive that only the temporary guardians had the authority to obtain and retain custody of the physical being of Glenn E. Griggs. Each of the Griggs Women knew of the order at least as of the early evening hours of July 1, 2003, but chose to ignore the explicit dictates of the decree. When reminded of the requirements of the June 26 temporary order on July 2 after the Superior Court had refused to vacate or rescind the temporary order, the Griggs Women persisted in their defiance of the order.

This court is not unmindful of the fact that the Griggs Women have each indicated that in ignoring the clear mandate of the June 26 temporary order, they were acting in reliance upon the advice and direction of their then counsel. Nevertheless, such reliance is of no moment to a consideration of their actions or inactions in the context of determining whether or not contemptuous behavior has occurred. *State v. Price*, 820 A.2d 956 (R.I. 2003). As respondent's memorandum correctly points out, this is a matter between counsel and the clients and is not relevant to the issue presently before this court.[7]

Based upon the facts as presented, this court finds that the evidence of contemptuous disregard of this court's order of June 26, 2003 on the parts of the Griggs Women is clear and convincing.

---

[7] This court remains most troubled by a number of decisions, actions and representations made and undertaken by certain counsel who are no longer actively involved in the proceedings pending before this court. The court wishes to take pains to point out, however, that regardless of the troubling aspects of such behavior of those attorneys, these are matters for others to contemplate in another venue, and the court's concern in this regard has not reflected adversely, in a personal vein, upon any of the Griggs Women individually for the purposes of the court's decision herein.

The purpose of sanctions in a civil contempt context is to coerce a contemnor into compliance with a court order or to compensate a complaining party for losses sustained as a result of the contemptuous conduct. *E.g., Durfee v. Ocean State Steel, Inc.*, 636 A.2d 698 (R.I. 1994). The purpose of civil contempt is remedial, and the exercise of a court's civil contempt powers should be designed to reimburse a complainant for a wrong done as a result of noncompliance with a valid order of the court. *Rhode Island Council 94 v. State of Rhode Island*, 714 A.2d 584 (R.I. 1998).

Respondent has alleged that as a result of the disobedience of the Griggs Women to this court's order of June 26, 2003, he has incurred fees and costs which were unnecessary and which would not have been incurred but for such contemptuous conduct. Compensating the respondent for such fees and costs in reasonable amounts, to the extent that they can be shown to have been incurred as a result of the contempt found to have occurred, is an appropriate sanction and proper consequence of such conduct.

As indicated to the parties earlier, upon request this court will schedule a hearing for the purposes of determining the extent to which any costs or fees incurred by the respondent are attributable to the contempt committed by the Griggs Women and the amount thereof which should be subject to reimbursement; and to provide the Griggs Women with full and fair opportunity to present any matters they may offer in mitigation with respect to any sanctions to be imposed.

Accordingly, it is hereby

**ORDERED:**

1. Patricia Griggs, Lauren Griggs, Nancy Griggs and Christine Peabody are hereby adjudged to be in contempt of this court's Order of June 26, 2003.

2. This matter shall be set down for further hearing, upon the request of any party, for a determination as to the appropriate sanctions to be imposed as a result of such contempt.

ENTERED as the Order of the Warwick Probate Court on the _____ day of February, 2005.

ENTER:

[signature] 2-10-05
______________________

PER ORDER:

______________________

FILED
PROBATE COURT
WARWICK, R.I.
FEB 11 2005

Accordingly, it is hereby

**ORDERED:**

1. Patricia Griggs, Lauren Griggs, Nancy Griggs and Christine Peabody are hereby adjudged to be in contempt of this court's Order of June 26, 2003.

2. This matter shall be set down for further hearing, upon the request of any party, for a determination as to the appropriate sanctions to be imposed as a result of such contempt.

ENTERED as the Order of the Warwick Probate Court on the 10th day of February, 2005.

ENTER:

2-10-05

PER ORDER:

Marie C. Bennett