UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Christine Peabody; Michael Griggs;
Lauren Griggs; and C. Monica Griggs

Plaintiffs

vs. C.A. No.: 08-00243 ML

Carol Rita Kimberly Griggs, alias;
David Heal, Alias, individually and
in his capacity as purported Trustee of
the Irrevocable Trust estate of the late Glenn E. Griggs;
Deborah Griggs, alias; Dan A. Griggs, alias;
Edward L. Gerstein, alias; Edward Brayton, alias;
the Griggs & Browne Co, Incorporated;
Griggs & Browne Home Inspection Service, Inc.;
Griggs & Browne Services, Inc.;
Griggs & Browne Termite Control, Inc; John Does l
through 10; Jane Roes 1 through 10; XYZ Corporations,
Partnerships, Limited Liability Companies, Trusts and/or
Enterprises 1 through 10

Defendants

# **FIRST AMENDED VERIFIED COMPLAINT**

## **NATURE OF THE ACTION**

This action and First Amended Complaint arises from a lengthy scheme headed by Defendant, Carol Griggs, to gain control over the person and estate of Glenn E. Griggs and, through fraud on Glenn E. Griggs and upon the Probate Court of Warwick, Rhode Island, (1) gain control of the person and Estate of Glenn E. Griggs and over several businesses which Glenn E. Grigs had a controlling ownership interest in (i.e., the Griggs & Browne Corporations, as hereinafter defined) and (2) intentionally and proximately injure the Plaintiffs. Carol Griggs enlisted the assistance of defendants Deborah Griggs, Dan Griggs, David Heal, and Edward Brayton. Thereafter, in September of 2000, when Plaintiffs were preparing to file a guardianship

Petition to save their father (Glenn E. Griggs), Carol Griggs enlisted the aid of defendant Edward Gerstein. Gerstein – knowing that Glenn was either incompetent and/or susceptible to undue influence because of his mental condition – devised a plan for or with Carol to (1) appear and act as Glenn's attorney, (2) purport to advocate Glenn's will, (despite knowing that Glenn was incompetent and/or susceptible to undue influence) (2) cause Glenn to execute financial planning documents such as a power of attorney, Trusts, a "First Codicil" to Glenn's 1999 Last Will and Testament (though knowing that Glen was not competent to do so and/or that his will was being overcome by undue influence, including fraudulent representations to Glenn), (3) isolate Glenn from the Plaintiffs, Glenn's other family members, and trusted professionals, and (4) by manipulation of judicial processes, fraud and/or material misrepresentations upon the state courts, and a power of attorney (in Deborah Griggs and/or David Heal) prevent disclosure of Glenn's healthcare records and so-called "financial planning documents," all for the purpose of permitting Carol, Deborah, and Dan to control the person and estate of Glenn E. Griggs, his assets, to gain control of the Griggs & Browne Companies (hereinafter defined), and to do all things necessary to prevent plaintiffs from receiving any inheritance or property from or belonging to Glenn.

## PARTIES

### ***Parties Plaintiff***

1. Plaintiff, Christine Peabody ("Christine") is a resident of Coventry, Rhode Island and a daughter of the late Glenn E. Griggs ("Glenn) through his first marriage, to Nancy Griggs.

2. Plaintiff, Michael Griggs ("Michael") is a resident of Bourne, Massachusetts and a son of the late Glenn E. Griggs ("Glenn) through his first marriage, to Nancy Griggs.

3. Plaintiff, Lauren Griggs ("Lauren") is a resident of East Greenwich, Rhode Island and a daughter of the late Glenn E. Griggs ("Glenn) through his second marriage, to Patrizia Griggs (a/k/a Patricia Griggs).

4. Plaintiff, C. Monica Griggs ("Monica") is a resident of Jamestown, Rhode Island and a daughter of the late Glenn E. Griggs ("Glenn) through his second marriage, to Patrizia Griggs.

5. Christine, Michael, Lauren, and Monica are four (4) of the six (6) natural children and heirs at law of their late father, Glenn E. Griggs (hereinafter, "Glenn" or "their father").

## ***Parties Defendant***

6. Upon information and belief, defendant, Carol Rita Kimberly Griggs ("Carol") is a resident of the City of Cranston, Rhode Island 02920.

7. Upon information and belief, defendant, David Heal ("Heal") is a resident of Smithfield, Rhode Island and is the purported Trustee of a so-called "Irrevocable Trust" and/or other representative of Glenn's estate.

8. Upon information and belief, defendant, Deborah Griggs ("Deborah") is a resident of West Greenwich, Rhode Island.

9. Upon information and belief, defendant, Dan A (Anthony) Griggs ("Dan") is a resident Providence, Rhode Island.

10. Deborah and Dan are two (2) of the six (6) children and heirs at law of Glenn.

11. Upon information and belief, defendant, Edward L. Gerstein ("Gerstein"), is a resident of Rhode Island.

12. Upon information and belief, defendant, Gerstein, has at all times maintained an office or place of business in Little Compton, Rhode Island.

13. Upon information and belief, Edward Brayton ("Brayton") is a resident of East Providence, Rhode Island.

14. Upon information and belief, Heal and Brayton have at various times within the past several years been employed by and acted as managers, officers and/or directors of one or more of the Griggs businesses described below.

15. Upon information and belief, the **Griggs & Browne Co., Incorporated** is a Rhode Island business corporation (hereinafter referred to by its name and/or as "the first company") having its principal offices and place of business in Providence, Rhode Island and has since 1990 been authorized to transact and has, in fact, conducted business in the state of Connecticut. This corporation has been named pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, and the Uniform Declaratory Judgments Act, R.I.G.L. § 9-30-1, et seq., as a party that has an interest which might be affected by the outcome of this case and/or by the creation of resulting or constructive trust.

16. Upon information and belief, **Griggs & Browne Home Inspection Service, Inc**. is a Rhode Island business corporation having its principal offices and place of business in Providence, Rhode Island. This corporation has been named pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, and the Uniform Declaratory Judgments Act, R.I.G.L. § 9-30-1, et seq., as a party that has an interest which might be affected by the outcome of this case and/or by the creation of resulting or constructive trust.

17. Upon information and belief, **Griggs & Browne Services, Inc**. is a Rhode Island business corporation having its principal offices and place of business in Providence, Rhode and

has since 2003 been authorized to transact and has, in fact, conducted business as a foreign corporation in the Commonwealth of Massachusetts. This corporation has been named pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, and the Uniform Declaratory Judgments Act, R.I.G.L. § 9-30-1, et seq., as a party that has an interest which might be affected by the outcome of this case and/or by the creation of resulting or constructive trust.

18. Upon information and belief, **Griggs & Browne Termite Control Co., Inc**. is a Rhode Island business corporation having its principal offices and place of business in Providence, Rhode Island. In 1985 it was authorized to transact and has, in fact, conducted business as a foreign corporation in the Commonwealth of Massachusetts but ceased filing annual reports in 2000 and received an order of dissolution on that ground on or about May 31, 2007. This corporation has been named pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, and the Uniform Declaratory Judgments Act, R.I.G.L. § 9-30-1, et seq., as a party that has an interest which might be affected by the outcome of this case and/or by the creation of resulting or constructive trust.

19. The **Griggs & Browne** business corporations shall hereinafter sometimes be individually and collectively referred to as "the Griggs & Browne businesses", as "the corporations" and/or as "the enterprise".

20. Defendants John Doe 1 through 10 are a person or persons whose identity and/or culpability is currently unknown to the plaintiffs but, upon information and belief, may be or are responsible and/or liable toward plaintiffs under one or more of the following claims or counts.

21. Defendants Jane Doe 1 through 10 are a person or persons whose identity and/or culpability is currently unknown to the plaintiffs but, upon information and belief, may be or are responsible and/or liable toward plaintiffs under one or more of the following claims or counts.

22. Defendants XYZ Corporations, Partnerships, Limited Liability Companies, Trusts and/or Enterprises 1 through 10 are an entity or entities whose identity, utilization by other defendants, and/or culpability is currently unknown to the plaintiffs but, upon information and belief, may be holding or have held assets and/or may be responsible and/or liable toward plaintiffs under one or more of the following claims or counts.

## JURISDICTION

23. Jurisdiction is vested in this court pursuant to the provisions of 18 U.S.C. § 1331 and 1332 and 18 U.S.C. § 1961, 1962, 1964(a) *et seq.* (the Racketeer Influenced Corrupt Organizations Act).

24. This court also has jurisdiction under the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*.

25. Jurisdiction also exists pursuant to 18 U.S.C. 2511 (providing for punitive damages for unauthorized interception and disclosure of certain wire, oral, or electronic communications).

26. In furtherance of its federal jurisdiction, this court has jurisdiction to allow declaratory relief pursuant to 28 U.S.C. § 2201, *et seq.*

27. In furtherance of its pendant jurisdiction over the state causes of action made herein, this court has further jurisdiction to allow declaratory relief pursuant to Title IX, Chapter 30 of the General Laws of Rhode Island 1956, as amended (known as the "Uniform Declaratory Judgments Act"), in that Plaintiffs request that the court declare rights, status, and other relations of and among the parties.

## VENUE

28. Venue of this action is founded and appropriate in this Court and judicial district pursuant to 18 U.S.C. § 1965 and pursuant to 28 U.S.C. § 1391(b), in that most of the plaintiffs and (upon information and belief) all of the defendants reside in this judicial district; the events or omissions giving rise to the claims that are the subject of this action occurred in this judicial district and the property which is the subject of this action is for the most part located in this judicial district.

## FACTUAL PREDICATES AND BACKGROUND

### *Glenn Griggs*

29. Glenn was active in the aforementioned Griggs & Browne business during the 1960s, 1970s, 1980s and into the 1990s, although he generally relied upon trusted managers and others to assist and (in many instances) run things on his behalf.

30. On or about April 17, 1996, Glenn married his third and final wife, Carol; no children were born or adopted during this marriage.

31. Following a "honeymoon" of approximately three (3) weeks, the newlyweds returned to Carol's home in Cranston, Rhode Island.

32. Following less than a week of living together, Carol demanded that Glenn move out of her home and the couple separated.

33. On or about November 6, 1996, Carol filed a petition in the Kent County Family Court, alleging that they had separated in June, 1996 and seeking, *inter alia*, the dissolution of their marriage.

34. On or about January 21, 1997, Carol and Glenn were divorced and a final judgment of divorce was entered on April 22, 1997.

35. Pursuant to the final judgment of divorce, Carol specifically asked for and received permission to resume the use of the surname "Kimberly," but nevertheless utilized the name "Griggs" freely and often following the divorce.

***Early Relevant Years and Events***

36. At about the same time that Glenn's father initially brought Glenn into the first Griggs & Browne business, David J. Aubin, Jr. ("Aubin") was also hired to work at the company. See "*Affidavit of David J. Aubin, Jr.*," attached hereto as **Exhibit "A,"** and incorporated herein by reference.

37. Mr. Aubin became a manager of the first Griggs & Browne Company and had a lengthy, uninterrupted career with the first company of approximately forty-four (44) years' duration, retiring in December 1987. *Id*.

38. The written agreement of December 30, 1985 included reciprocal promises by the first Griggs & Browne Company that it would continue to pay Aubin's health insurance, provide Aubin a lifetime gasoline allowance, give him the company car that he (Aubin) was then using, and pay Aubin's life insurance policy until he attained the age of sixty-five (65) years. *Id.*

39. Aubin provided consulting services to Glenn and the Griggs & Browne companies until approximately 1999. *Id*.

***Enter Lady Macbeth***

40. Carol was hired as a receptionist at the first Griggs & Browne Company.

41. In an effort to obtain leverage and/or personal gain in the first company (and later in the other Griggs & Browne companies) she used and employed her feminine "charms" and/or "wiles" or other methods to obtain one goal after another.

42. In either July, 1993 or July 1998, Carol's father tape recorded a discussion with his daughter. In this conversation, Carol stated that she had gotten a "five dollar" raise and that this was better than anyone else had received. She also stated, ***"(m)y boss (Glenn) is so stupid …I gotta control myself … he was an adopted child who walked into the money….Dave (Aubin) ran the business….(Glenn) doesn't have a clue ….(Glenn) makes no decisions … we (the managers) make all the decisions."***

43. On or about April 10, 1996, Michael received an anonymous telephone call from an unknown female caller who claimed to know Carol very well and indicated that Carol and Glenn were going to be married, that the marriage was to be kept "secret" and that Carol was "out to take the business and assets from the children without anyone finding out."

44. Michael contacted Glenn's accountant, Vincent Vinci ("Vinci"), Daniel and others with this "news" and a form of pre-nuptial agreement was hastily drawn, with the assistance of Attorney Richard Boren.

45. Glenn questioned the need for a pre-nuptial agreement, claiming that Carol had told him many, many times that he (Glenn) was "broke," that Carol had more money than him, and, thus, he questioned the need for a pre-nuptial agreement.

46. Glenn was not "broke" as Carol told him, but, upon information and belief, could not comprehend or understand the value of his businesses, real estate and estate.

47. Upon information and belief, having apparently convinced Glenn over time that he (Glenn) was "broke" and that she (Carol) possessed greater financial assets, Carol had no choice but to sign the pre-nuptial agreement and thus did so.

48. The only material benefit that the pre-nuptial agreement between Glenn and Carol provided Carol was Glenn's promise to maintain a $300,000.00 life insurance policy on himself with Carol as irrevocable beneficiary for a period of ten (10) years.

49. Glen and Carol were married on April 17, 1996, announcing to all that he and Carol intended to have a honeymoon in St. Martin at a condominium that Glenn owned.

50. In May, 1996, about three (3) weeks after the wedding (at a time when Glenn and Carol were supposedly still on their "honeymoon") Patrizia was suddenly and unexpectedly visited by Glenn who advised Patrizia that Carol wanted a divorce, although he did not know why.

51. There followed telephone calls to Patrizia from Glenn wherein he advised that over the next five (5) days Carol had never come home in the evening until she thought Glenn was asleep and that Carol repeatedly told him that he (Glenn) made her "sick" when she saw him.

52. Carol found an apartment for Glenn in Cranston, furnished it with Glenn's money, forced him to move there and then visited him daily despite claiming to be "sick" whenever she saw him.

53. On or about November 6, 1996, Carol filed a petition for divorce from Glenn, falsely asserting under oath in her petition that the couple separated on June 16, 1996 when, in fact, this had actually occurred during May, 1996.

54. On or about January 21, 1997, Carol's divorce petition was heard and a preliminary decree of divorce was entered.

55. On or about January 27, 1997, Carol and her father had a telephone conversation (tape recorded by her father) in which Carol told her father that the divorce ***"doesn't change anything" and that she "just got rid of the idiot, that's all."***

56. At about this time, Glenn was relocated from his apartment to a condominium on Post Road in Warwick, Rhode Island.

57. On or about May 9, 1997, Carol's father taped another conversation between him and Carol in which Carol complained that she had to do "***everything" for Glenn's new residence, including getting the mortgage and attorney***. She complained that she has to make all calls and arrangements and that all Glenn does is ***"sit there and say ugh ugh ugh ugh."***

58. At about this time, Michael saw that Carol was conducting an extensive study of the divorce agreements for Glenn's prior marriages and told Glenn (in Michael's presence) what Glenn would and what Glenn would not give to his daughters with respect to college, clothes, and gifts. She told Glenn that he was responsible for their tuition and that was all.

59. At about this time, Griggs & Browne was changing its group life insurance company and a sales representative named Susan arrived to meet with Glenn and Michael, but Carol closed the door, barring Michael's entry so that only Susan, Carol and Glenn were present for the important discussion.

60. After a 20-30 minute meeting, Susan emerged from the room and told Michael and others (in the parking lot) that "you have some trouble on your hands," explaining that Carol was "overpowering" during this meeting and how Glenn "gave in" to whatever Carol had to say.

61. Susan further advised that eventually, when Glenn wasn't sure what to do, Susan indicated that Carol said, ***"I'll tell you what you're going to do… you're going to keep this policy and make me the beneficiary,***" and Glenn agreed and made her beneficiary.

62. In the summer of 1997, Carol began manipulating Deborah, telling her not to worry because she (Debby) would get 52% of "everything" (apparently with the exception of whatever Carol could "get" first).

63. By December, 1997, Glenn told Monica that he could not visit her because "Carol's coming" and he also stated that Carol was telling him bad things about how his children were only interested in his money, not in him.

64. Carol (having previously experienced that she could make all arrangements for Glenn) connived her way to become a joint tenant on the deed to a new house with Glenn, and Glenn's money and/or corporate funds were used to pay for major upgrades estimated to have cost as much as $200,000.00.

65. In September 1999, Glenn advised Lauren and her mother that he "*could not trust anyone who works at Griggs & Browne*," so he suggested that Lauren begin working there.

66. Lauren followed Glenn's instructions and met with Heal whereupon it was decided that Lauren would begin working with the advertising aspect of the business, but the following day Heal called and told her that she could not be employed at Griggs & Browne because it was "not the type of instution where one can be mentored."

67. Lauren called her father and told her about this, asking if he could hire her anyway, but this head-of-the-businesses (later described to a court by Gerstein and Attorney Richard Bicki as making all the daily decisions of the companies, including hiring and firing) told Lauren, "I can't… I can't."

68. Throughout the time after their divorce, Glenn told Patrizia and some or all of the plaintiffs that Carol continually told him that he was "broke," that his family was "evil," that they were only interested in his money, that she was the only one who could "save" him, and he believed her.

69. Upon information and belief, the Griggs & Browne companies grossed about seven million five hundred thousand ($7,500,000) dollars during Michael's last year with the companies (1999) and Glenn was by far the major shareholder.

70. Carol was aware or became aware that the value of the businesses and real estate was significant, but continually lied to Glenn to the end of his life about his financial condition in order to exert undue influence over him and manipulate him to her advantage.

71. Upon information and belief, Carol has "retired" from the Griggs & Browne businesses, obtaining a company car and other benefits (the exact type and extent currently unknown) as part of her termination compensation.

72. Following Glenn's death, the Nausauket property passed to Carol as a surviving joint tenant and she presently owns it in fee and, upon information and belief, derives rental income or other benefits from it at the time of this complaint.

## ***Isolating Glenn – Out Goes Aubin***

73. Aubin undertook yearly golfing sojourns with Glenn and others that provided Aubin opportunities to observe his friend, Glenn's, physical and mental condition. *See* Exhibit "A" (Affidavit of David J. Aubin, Jr.).

74. Aubin is of the opinion that each year Glenn's memory became worse. While Aubin was visiting Glenn on Post Road in Warwick (near the railroad tracks), Glenn showed

Aubin a Will he said he had just made but was not going to sign because it contained the words "this is my last Will and Testament." *Id*.

75. After Glenn's divorce from Carol, Glenn met Aubin on a Friday for lunch or dinner in East Greenwich and Aubin convinced Glenn to go on another golfing trip. *Id*.

76. Matthew Tierney, a Griggs & Browne employee, accompanied Glenn to the luncheon and Aubin's impression was that Tierney was acting as some sort of "bodyguard." A company underling had never accompanied Glenn to previous meetings of this social type. *Id*.

77. At the end of the meal the check arrived and Aubin observed that Glenn's mental abilities had deteriorated so badly that he could not remember things they had done together, he could not add or calculate the tip, and he had to ask Tierney to take care of the tab. *Id*.

78. The New Hampshire trip was scheduled to depart on the following Monday morning, but when Aubin arrived Brayton met him and advised Aubin that Glenn could not go, and, when Aubin inquired "why?," he was told that Aubin "did not need to know that stuff." *Id*.

79. Upon hearing this, Aubin went to Glenn's office, but Glenn was not there, whereupon Aubin became so disgusted that he removed his own picture from the "wall of fame" and left. *Id*.

80. In a letter to Aubin dated April 20, 1999, Aubin was unceremoniously advised by "Claudette" (a bookkeeper) that Michael Griggs was "no longer here (with the businesses)," that "Carol and Glenn" asked her to revoke Aubin's telephone bill payments, and that "Carol and Glenn" had "appointed David Heal to replace Michael." *Id*.

81. On May 14, 1999, "Claudette" sent another letter to Aubin, claiming that Aubin's longtime (over 40 year) friend, Glenn, wanted to have Aubin's health premiums and gas credit

card payments stopped immediately. If Aubin had any questions he was to "call Glenn or Carol." *Id*.

82. Aubin called Glenn, but Glenn denied any knowledge this had happened. The next time Aubin called, he got Carol who said that's what Glenn wants. Aubin advised he that he had a contract. She asked for a copy and Aubin and sent a copy of his December 30, 1985, agreement to the Griggs & Browne business offices so as to have his promises honored. *Id*.

***Isolating Glenn – A Corporate Lawyer Replaced***

83. Attorney Maryann Patalano ("Patalano") is a Rhode Island lawyer who, as a corporate counsel, represented Glenn and his businesses for nearly a decade with apparent competence and without apparent difficulties.

84. During a meeting or "closing" Patalano asked Glenn several times whether he (Glenn) understood the terms of the transaction, but Glenn was not able to reply, whereupon Patalano recessed the meeting and asked Michael to meet with her privately.

85. In their "sidebar" session, Patalano told Michael that she was uncomfortable with the transaction because Glenn did not seem to understand what was happening.

86. Michael assured Patalano that he (Michael) was also an officer of the company or companies, that they were following a recommendation by Vinci, and that Glenn was merely present to sign the documents as President, thus the "closing" was resumed and completed.

87. Michael reported the scenario and Patalano's concerns to others at the Griggs & Browne companies.

88. Upon information and belief, Carol was or became aware of Patalano's concerns about Glenn's ability to understand this relatively simple financial transaction.

89. On or about July 1, 1999, Patalano was suddenly, unceremoniously and unexpectedly replaced as corporate attorney and registered agent for service of three (3) of the Griggs & Browne companies by another Attorney.

90. Following the change of corporate counsel, Carol became a Director of the Griggs & Browne companies.

***Isolating Glenn – Replacing Family Physician/Medical Issues***

91. G. Alan Kurose, M.D. was Glenn's family physician in the 1990s, sometimes assisted by Charles J. Brex, M.D., an internist.

92. After, or in connection with, Carol's surge to power and influence over Glenn and with respect to the Griggs & Browne businesses, Dr. Kurose was discharged as Glenn's physician.

93. Dr. Kurose advised family members that "Carol Kimberly" fired him after a visit by Glenn in which Dr. Kurose offered to get Glenn help and questioned the advisability of Glenn being allowed or able to continue driving motor vehicles.

94. At some unknown point in time thereafter, Aman Nanda, M.D., an internal medicine physician first licensed in Rhode Island in June 2000, became Glenn's physician and, upon information and belief, Carol was involved in the selection of Dr. Nanda.

95. Defendants have subsequently resisted any and all efforts by or on behalf of Plaintiffs to obtain copies of Glenn's medical history and charts and have not furnished Plaintiffs any health care release that would permit Plaintiffs or their agents to access such records and/or discuss recollections of Glenn with Dr. Kurose or other physicians.

96. On or about September 13, 2000, Glenn was visited at home by Sharon Murray (accompanied by Kathy Herron of the Rhode Island Department of Elderly Affairs) and Ms.

Murray spoke with Glenn and entered his answers and her observations on a so-called Decision-Making Assessment Tool form ("DMAT").

97. During her visit Ms. Murray (a trained, professional observer) noted that Glenn seemed to have severe memory, *judgment* and language impairment, could not subtract 3 from 20, and stated that he did not know what his assets were. Further, he could not draw the face of a clock and could not dial 911.

98. Ms. Murray's written assessment was reviewed by John Stoukides, M.D. and Dr. Stoukides briefly met with Glenn on or about September 27, 2000, at which point he concluded that he agreed with Ms. Murray's notes and signed the D.M.A.T. form.

99. Before the end of September, 2000, Christine confided in Dan that Glenn had been evaluated by Ms. Murray and Dr. Stoukides.

100. Upon information and belief, Dan passed that information along to Carol and Heal.

101. In October, 2000, Gerstein suddenly appeared and proclaimed that he was representing Glenn as Glenn's lawyer.

102. Upon information and belief, Gerstein also represented Carol personally.

103. Deborah stated that in October 2000, Gerstein ordered her to take Glenn to Carlo Brogna, M.D. and an M.R.I. of the brain was performed on Glenn at the Westerly Hospital at the request of Dr. Brogna. Deborah claims that she was never told of the results of the 2000 M.R.I.

104. Upon information and belief, the M.R.I. revealed that Glenn had severe frontal lobe brain deterioration.

105. None of the Plaintiffs learned of the October 2000 Westerly Hospital M.R.I. until much later but, upon information and belief, the MRI and its results were made available to and known by Dr. Brogna.

106. Dr. Brogna signed a sworn affidavit on or about February 8, 2001, wherein he diagnosed Glenn as suffering from "Primary Progressive Aphasia" which he claimed was a degenerative condition that "affects a patient's communicative abilities". His affidavit did not mention a 2000 M.R.I. or its findings.

107. Dr. Brogna's affidavit proclaims that he reviewed "historical information provided (to Dr. Brogna) that is a generally accepted element of the process", but none of this information came from and no contact was made with Plaintiffs or Glenn's former wives, former physician, friend Mr. Aubin, or others.

108. Upon information and belief, the "historical information" cited by Dr. Brogna was provided by Carol and/or Gerstein.

109. Dr. Brogna's affidavit also indicated that Glenn had "provided for adequate assistance" that was "in place to assist him in dealing with financial matters."

110. Upon information and belief, Dr. Brogna's information concerning adequate assistance in dealing with financial matters was provided by Carol and/or Gerstein and did not mention (nor did Dr. Brogna consider) that such "adequate assistance" was created to assist Defendants (and particularly Carol) with exerting improper and undue influence over those decisions so as to exploit Glenn's condition for her or their benefit.

111. In October 2002, Glenn was transported to the Kent Hospital, an M.R.I. of Glenn's brain or head was taken and family members learned from neurologists (including Dr. Nieto) that Glenn was suffering from a form of dementia that would get worse, severe brain

atrophy (the atrophy of a 90-year-old) and that this latest M.R.I. was essentially the same as an M.R.I. done in 2000.

112. The October 2002 Kent Hospital visit was the first time that the plaintiffs learned there had been a previous M.R.I. in 2000, and that it had apparently been administered at Dr. Brogna's request at the Westerly Hospital.

## ***Isolating Glenn – Accountant Vinci***

113. Vincent J. Vinci, CPA ("Vinci") first began performing accounting services for Glenn and the Griggs & Browne businesses in about 1977, while employed at David Allen & Associates, CPA. The firm had worked for Glenn and Glenn's company since the 1950s.

114. Upon information and belief, Vinci observed that the day-to-day operations were run by David Aubin and (after Aubin's retirement) by George Cardoza and Michael Griggs.

115. Upon information and belief, Vinci observed Carol to be a receptionist/dispatcher when she first worked for the Griggs & Browne companies. In early April 1996, Vinci was contacted by Michael and advised that Carol and Glenn were planning a "secret marriage."

116. Vinci and Michael became aware that Glenn was spending thousands upon thousands of dollars on his corporate American Express credit card.

117. Michael and Vinci urged upon Glenn that this type of spending was fiscally irresponsible and must be stopped, but he refused and neither Vinci nor Michael realized that this money was being used (at Carol's urging) to extensively renovate the fortress property in which Carol had a fifty (50%) percent ownership interest.

118. Upon information and belief, Vinci had no idea about the allegations or issues concerning Michael that resulted in Michael being forced to leave the company, and being offered no opportunity to reconcile with his father in April - May, 1999.

119. Upon information and belief, within approximately one week of Michael's ouster, Heal, Carol, "Claudette" and an attorney asked Vinci to work with them on a plan for the redemption of Michael's stock in any and all Griggs & Browne business.

120. Vinci was present at another meeting where Dan, Glenn and Debbie were present at Vinci's office arguing over who best should run the business. Both children were standing and arguing across the table at one another while Glenn simply sat there, smiling during the heated confrontation.

121. Upon information and belief, Vinci had less and less communication with Glenn as time proceeded. In further meetings, Glenn was always accompanied by Carol, Ed Brayton and Heal. Glenn usually came alone in the past.

122. Upon information and belief, during his last six months as Glenn's accountant, Vinci was never allowed to meet with Glenn. Calls or contact were always filtered through or screened by Carol and/or Brayton (asking "what do you need to talk to him about?").

123. Upon information and belief, an estate plan had been created for Glen by a lawyer, but Glenn had not appeared to execute the documents. Carol became involved and advised Vinci that a different lawyer was now going to be doing the estate plan.

124. Upon information and belief, in March 2000, Brayton advised Vinci that he (Brayton) would "be down to see you," and when Brayton arrived, Vinci was advised that he was discharged as accountant for Glenn and the Griggs & Browne businesses.

125. Upon information and belief, after receiving notice from Brayton that he had been terminated as company accountant, Vinci learned that he was being replaced by Carol's accountant. Vinci attempted to call Glenn on more than one occasion to discuss this, but was never allowed to speak with Glenn.

***Isolating Glenn – Financial Planner Veasey***

126. Robert E. Veasey, Jr. ("Veasey") has since 1988 been a certified financial planner and advisor. He was formerly affiliated with the Sowa Financial Group, but currently does business under the name "Veasey Financial Advisors" in Providence, Rhode Island.

127. Upon information and belief, Veasey first met Glenn in about 1981 - 1982 while working for Mutual of New York and began working with Glenn concerning financial planning and related matters.

128. Upon information and belief, Veasey's early impressions of Glenn were that he was amiable, liked to talk about golf, business and his family, and made quick decisions.

129. Upon information and belief, Veasey first met Carol when he visited Glenn at Griggs & Browne since Carol was greeting visitors at the window at that time.

130. Upon information and belief, in about 1982 – 1983, Veasey met Patrizia and recalls that Glenn explained to him and another financial planner that Patrizia and her children (Lauren and Monica) were to receive the benefits of an insurance policy on his life. Glenn had Patrizia listed as the "irrevocable beneficiary" of an annuity or policy.

131. Upon information and belief, in about 1997, Veasey had a visit with Glenn and reviewed an annuity that had been procured in 1987. Glenn indicated that the policy should be rounded up to $1,000,000.00 and instructed that the new, revised policy should have Patrizia

named as irrevocable beneficiary and Lauren and Monica named as contingent beneficiaries. This could not be done due to Glenn's health problems.

132. Veasey recalls a 1997-1998 meeting about Glenn reevaluating risk. Carol interjected that this was "not a big problem" because Glenn was a "big boy" with "lots of holdings, lots of money, plenty of cash and real estate all over the place."

133. About a month later, Carol and Glenn walked into Veasey's office and dropped a copy of a Trust on the conference table. Carol asked Veasey to turn to the first page and he found out that he (Veasey) and Debbie were listed as co-trustees. Carol was doing most of the talking and Glenn was merely smiling.

134. Veasey called Attorney Anthony Mignanelli and was told that Glenn had insisted that Veasey be listed as a trustee.

135. Veasey had a subsequent meeting when certain certificates of deposit were coming due and asked about Glenn's total financial picture, as is required of a certified financial planner. Carol was the one who responded, always in vague terms and without giving any specifics.

136. Upon information and belief, Veasey became nervous as to whether Glenn was doing well at this point.

137. Veasey had a further meeting at which Glenn arrived with annuities that he had with the Midland National Bank. Glenn threw these on the desk and Carol (also present) indicated that Glenn wanted these to be in variable instruments, not fixed ones.

138. Veasey indicated that he would investigate the surrender charge for doing this and Carol stated that this was okay but that they wanted him to proceed and handle it. Veasey began

to believe that Glenn was being manipulated and feared that he was being used as part of that manipulation.

139. Veasey formed the opinion that Carol postured herself as Glenn's only friend, repeatedly stating that she was "protecting Glenn."

140. Carol thereafter made appointments to come in alone and gave Veasey specific information concerning her sickly father who was not well but had made a "late in the game" reconciliation with Carol. She explained that her father had annuities that he wanted to change to name her as the beneficiary since he had "abused" her in the past.

141. There followed a meeting at which Carol asked whether "ramifications" might occur if her father put annuities in Carol's name immediately. She was advised that she might be better off waiting until he died due to tax ramifications. She asked whether she could transfer these to her name and avoid taxes but Veasey told her to go speak to an expert. The topic was never again brought up.

142. Veasey recalls a day when Carol called and told Veasey that Glenn's "lawyer" (Mr. Gerstein) wanted to talk with Veasey.

143. Shortly after that, Carol and Gerstein arrived and a 15 – 20 minute meeting took place. During the meeting, Gerstein asked whether Veasey thought Glenn was competent, why he had raised questions about who would be Glenn's beneficiaries, what he understood about the situation and what he thought was "going on." Veasey responded, stating his concerns.

144. Within approximately three months, the annuities were surrendered, the 1035 Plan was exchanged to Midland National Life (other assets went there too), and Veasey was advised that Mr. Hubert McGuirl was from that point forward Glenn's financial advisor and planner.

145. Veasey attempted to contact Glenn to discuss this, but Carol intercepted the communication and told Veasey that Glenn wanted his funds with his "friend," Mr. McGuirl, and would not let Glenn speak with Veasey.

### ***Isolating Glenn – Michael Griggs***

146. Michael began working for Griggs & Browne as a laborer in May 1979. This was the same year that Carol began working for the company.

147. In approximately 1983 – 1984, Michael was promoted to assistant manager. In approximately 1985, Michael was further promoted to manager.

148. In 1988 through 1989, Michael was placed in charge of the then new Cape Cod office of the Griggs & Browne companies, in the capacity as manager.

149. In 1992 – 1993, Michael was selected to run the Griggs & Browne companies as executive vice president.

150. Throughout this time, Glenn was the titular president, director and/or head of the Griggs & Browne companies, but never knew how to actually run the companies and deferred decision making (including hiring, firing, and day-to-day operations) to his managers.

151. Throughout the time that Mr. Aubin was a manager, he (Aubin) and other managers received certain rebates that came to the Griggs & Browne companies as a result of purchases it had made.

152. Glenn received rebates from Yellow Pages advertising done by the company, sometimes amounting to as much as $30,000 per year.

153. Michael was required to handle vehicle acquisitions for the Griggs & Browne companies and to sign personal guarantees for each of the vehicles.

154. Due to the number of personal guarantees that he signed, Michael's credit rating was downgraded and he was unable to obtain certain financing.

155. As a result of the practice of having him responsible for personally guaranteeing company vehicles and his resultant loss of credit, Michael took vehicle rebates for over a period of approximately four (4) years to assist with financing projects that he was otherwise unable to undertake.

156. During this time Michael also gave his brother Dan some of the rebate funds from automobiles when Dan was short of cash.

157. Dan was aware of the source of the funds and, upon information and belief, Glenn was aware this was taking place.

158. Carol was not properly performing her marketing work, thus Sharon Gilstein had to be hired to do her job. Carol disliked Ms. Gilstein.

159. From 1994 through 1995, Michael noted that Glenn was having trouble finishing sentences and had become limited in engaging in "small talk."

160. During approximately 1996 through 1997, Glenn blurted things out when he was angry but could not talk about important things.

161. In 1997, a broker came to the company to discuss a group life disability policy. Michael was not allowed to join Carol and the broker when they saw Glenn.

162. The broker subsequently told Michael that there was "trouble," that Glenn seemed to have no clue, and that Carol put her name on the policy.

163. Carol was heard commenting to another person that "*this is great, I can get everything I want and I don't have to sleep with him anymore*."

164. In the fall of 1998, Brayton was set up as a "liaison" between Michael and Glenn. Michael was told that Glenn did not like the "direction" the company was heading and from now on if Glenn tells Ed he wants something changed, Ed would have to tell Michael and Michael would have to comply.

165. This went on for a month or two until Michael refused to take orders in this way, telling Brayton that the orders were not coming from Glenn but were coming directly from Carol. Brayton agreed and said "*what are you going to do, she calls the shots*."

166. Although he gave no reason(s), Brayton told Michael that Carol wanted Michael to quit so that they did not have to fire him.

167. In January 1999, Michael and Vincent Vinci had told Glenn that he must slow down and/or stop spending so much money on his corporate credit card. Carol stopped Michael in the office hallway telling him she just came from Glenn's office and that Michael was to "butt out" of his father's business (allegedly per Glenn) and that if he continued to question Glenn's spending he (Michael) would be fired.

168. Carol continued this threat, indicating that this is "Glenn's company" and he "will spend his money any way he wants." She added, "he doesn't have to answer to you."

169. Carol, Brayton and Heal took over all Griggs & Browne business decisions on or about April 2, 1999, (the Friday before Easter) and this included advising Michael that he had been "caught" keeping automotive rebates and must resign or be fired.

170. Almost immediately after being advised of his firing, Michael encountered his father in the corporate parking lot and his father exchanged greetings as if nothing had happened. Glenn tried to make small talk as if Michael would be back to work on Monday, giving Michael the impression that Glenn didn't even know Michael was being terminated.

171. Later, Michael learned that Carol told many people that he (Michael) was "choking" Carol the day he was fired and that his father had to pull Michael off Carol to "save" her, but this was entirely false.

172. About a week after this parking lot encounter, Michael called Glenn and told him he wanted to return a deposit for an apartment near the Cape Cod office. Glenn stated that this was fine and that he would be home when Michael arrived.

173. Michael made the lengthy journey to Rhode Island, arrived at about 9:00 P.M. and when entered Glenn's residence, there were four or five Griggs & Browne managers (Brayton, Tierney, Heal, Brunetti, and perhaps one other) there to "protect" Glenn (the same Glenn who had recently allegedly overpowered Michael while Michael was allegedly choking Carol).

174. The managers informed Michael that they were advised by "a lawyer" to go to Glenn's residence, await Michael's arrival, witness the return of the deposit, and then make sure that Michael was sent on his way. Michael was also advised that under no circumstance was there to be any conversation between Glenn and Michael regarding Michael's firing, the business, or any employees of the company.

175. Michael had hoped to try to use this occasion to reconcile things with his father, but was followed closely by one or two managers the entire time he was there (approximately 10 minutes), and they advised Glenn to hurry up and finish his conversation.

176. Upon leaving, Michael was told by the managers that he was "no longer welcome" at his father's house and that phone calls were out of the question. If Michael violated these directions, the managers warned that negotiations concerning the value of his forced stock buy-out would be decreased and/or that they would "press charges" for keeping the previously mentioned authorized rebates.

177. Subsequent to this, Heal and Brayton told Michael that he was never to call his father again.

178. In mid September, 1999, Michael was made an offer by Heal for the forced stock buy-out (at approximately .05 cents on the dollar). Michael was not happy with the offer and expressed his displeasure. Heal told Michael "if you don't take this deal we will come after your house!" Michael had to take the deal as he did not have $70,000.00 to pay back and he had made a loan for startup cost for Griggs and Browne Services (carpet cleaning).

179. Both the Stock Redemption Agreement and its Addendum were entered into on the basis of the extortion and threats described above, and are thus voidable.

180. In 2001, Michael went to see his father on three occasions. He jumped the fence each time and they exchanged some pleasantries.

181. In 2002, Michael again saw his father and noted that his father had deteriorated so much that he could not communicate.

182. At Christmastime 2002, Michael tried to visit his father but housekeepers or caregivers told him that he could not visit his father, upon information and belief this reflected directions they received from Carol, Heal and/or Gerstein.

183. At Christmastime 2004, Michael tried to visit again but was told by two housekeepers or caregivers that he needed to get permission to do so. They called Heal who told Michael that he (Michael) was not allowed to be there and that he had to leave.

184. Within two or three minutes of Heal's call, there was another telephone call to the residence on December 24, 2004, from a person who identified himself as Gerstein. This person (Gerstein) was yelling at Michael, claiming that Glenn was "under protective custody" and that

"nobody is allowed to see him." Gerstein further threatened that Michael would have to leave or he would "call the police" and that "if you do not leave in two minutes I will call the police."

185. At the time that Heal and Gerstein spoke to Michael they knew that there was no restraining order against Michael visiting his father, and Gerstein was well aware that the statements and threats he made to Michael were false and outright lies.

186. Michael was never served with a restraining order against visiting his father and wanted throughout this time to attempt to reconcile his relationship with his father (just as Carol claimed to have been able to reconcile herself both with her mother and with a father who she claimed had raped her two thousand times as a child).

187. At Christmastime 2005, Michael tried to visit his father once again and deliver a bucket of cookies, but the housekeepers or caregivers told him that Carol said he was an "evil person" and should not be allowed to see his own father.

188. In September 2007, Michael was finally allowed to see his father and the housekeepers or caregivers again told him that they had been instructed by Carol not to allow him to see his father nor to accept any presents for Glenn from Michael.

***Isolating Glenn – Deborah's Participation***

189. In October 2000, Carol advised Deborah that her sisters (Christine and Lauren) had filed for a guardianship for their father, Glenn.

190. Carol told Deborah that the reason they did this was to take possession of his company and place him in a nursing home.

191. Carol told Deborah that she had "found" a lawyer for Glenn and that this would be Gerstein.

192. Carol told Deborah that Gerstein was representing her in a lawsuit against her brothers and some friends of her late father who were accusing her of changing their father's will and taking the money and all the assets for herself.

193. Deborah was aware that her father was having speech difficulties and confused thinking at the time and had nothing to do with retaining Gerstein to represent him.

194. Gerstein and Carol told Deborah that she also needed a lawyer and that they had found one, Richard Bicki, Esq. ("Bicki"), to represent her.

195. Upon information and belief, Bicki is a resident of Rhode Island and has at all times maintained an office or place of business in Providence, Rhode Island.

196. Deborah was told that she had no say in the matter, was told to do what they told her, and since she was working for Griggs & Browne at the time and did not want to lose her salary, vehicle and/or health coverage, she consented to this arrangement.

197. Deborah heard Carol telling Tierney to lie to Glenn about Danny (her brother), saying that Dan had ruined a job when he had not done so. Tierney apparently refused.

198. Dan told Christine that he overheard Tierney saying that he (Tierney) would not lie to Glenn and that later he (Dan) immediately talked to Tierney and Tierney told Dan that Carol had asked Tierney to lie to Glenn by telling Glenn that Dan was not doing a good job.

199. Carol was continually heard to tell Glenn that he (Glenn) had no money. At the same time, she bragged about how much money she had and that she had no need for his money. Deborah was instructed that if Glenn ever got into an automobile accident or was lost, she was never to call the police but only call Carol or David Heal.

200. Carol and Gerstein kept Glenn under their supervision, and when he was alone they made sure he was locked behind a stockade fence at his own home.

201. The lawyers (Gerstein and Bicki) told Deborah to be careful to keep Glenn away from her sisters and his ex-wives, saying "it's all about the case, Deb."

202. Deborah has stated that Bicki told her not to disclose concerns she had about Glenn and his behavior because it would "hurt the case."

203. Carol eventually told Deborah that she had to keep Glenn at her (Deborah's) house and that Deborah would care for him and no one else could have access.

204. Carol visited often and acted as if Deborah's house was her own. She ordered Deborah around, came without telling Deborah, and took Glenn out whenever she wanted to do so. Deborah observed that when Glenn would return he was upset and agitated.

205. Carol and Heal allowed for or assisted Glenn in buying a new car and told Deborah that this was done to make it seem as if he was still "normal."

206. When it became clear that Glenn could no longer drive, Carol took his car and used it as if it was her own.

207. On Christmas day, December 25, 2002, Monica called Deborah's house, asking to talk to her father to wish him a merry Christmas, but was told that he did not want to talk with her. Deborah added that Monica was "suing" her father, but Monica denied this, whereupon Deborah said "get rid of the lawyers and you can talk to him" and "drop the suit and you can talk to him." So Monica was unable to make her simple Christmas wish to her father and the call was terminated.

208. Deborah has stated that on several occasions she observed Carol show Glenn photographs of his ex-wives and children, point to them and say "bad" or "good" so as to influence how he recognized and felt toward them.

209. On or about March 2, 2005, Deborah signed a three-page statement (copy attached as **Exhibit "B"** and incorporated herein, by reference).

210. This statement was furnished to the Warwick Probate Court, but Deborah never gave testimony before that Court and it was apparently one of the many things ignored under and during the avalanche of obfuscation heaped upon that Court by Glenn's supposed lawyers.

***<u>Corroboration of Deborah's Account by David Laliberte</u>***

211. David F. Laliberte ("Laliberte") was Deborah's companion, residing with her at 207 Robin Hollow Road, West Greenwich, Rhode Island for many years.

212. Laliberte knew Glenn, Carol, and most members of the Griggs family.

213. On or about July 26, 2004, Laliberte furnished an affidavit outlining his observations of Glenn, Carol, and other matters including the lawyers supposedly representing Glenn and Carol.

214. A copy of Mr. Laliberte's Affidavit is attached as **Exhibit "C"** and is incorporated herein by reference.

215. Laliberte corroborates many things described by Deborah, including particularly that Gerstein and Bicki refused to allow Gerstein's supposed client (Glenn) into a room when they were discussing matters pertaining to him.

216. Although Laliberte's Affidavit was also presented to the Probate Court, it, too, appears to have been obfuscated by the concerted efforts of Gerstein, Bicki and others to use that Court as a vehicle of retribution against plaintiffs.

***Isolating Glenn -The House of Usher***

217. On or about October 29, 1998, the purchase of a home at 500 Nausauket Road, Warwick ("the fortress") was completed with Glenn and Carol holding the deed as *joint tenants.*

218. From the time that Glenn moved in until approximately early 2000, Lauren, Monica, Christine, Debbie, Dan, and the ex-wives had access to Glenn at the fortress.

219. Upon information and belief, Carol (or someone at her direction) had listening devices and video surveillance cameras installed at the Nausauket Avenue fortress.

220. In the fall of 2000, Christine and Lauren filed a Petition that Glenn be placed under Guardianship (discussed in greater detail below).

221. After the filing of the Petition for Guardianship, the fortress was encircled by a tall, solid fence with electrically operated gate, warning signs and other means of restricting access to Glenn by those who Carol thought should not have access to her emotional and financial prey.

222. During this period of time, Gerstein appeared as Glenn's supposed lawyer and with "apparent authority" instructed Christine, Lauren, and Monica that they were not to visit their own father.

223. Carol was generally present at the fortress during weekday work hours, but there was no court order prohibiting visits and, after hours, Lauren, Christine and Monica would try to visit their father.

224. Glenn expressed fear that Carol would hear or learn of these visits and communicated to Lauren, Christine and Monica that he did not want to "disappoint" Carol by seeing them or having them visit him.

225. Upon information and belief, Carol had Glenn's telephone number changed to a non-published number in an effort to limit Plaintiffs' ability to contact Glenn.

226. Over the Columbus Day weekend in October, 2002, Christine, Lauren and Monica hopped the fence at the fortress, found Glenn's doors unlocked, and found him sitting on his bed with 3 televisions blaring. He appeared ashen, confused, had urinated on himself, and so Lauren called 9-1-1 for assistance.

227. The Rescue squad arrived, examined him, determined that it was an emergency and transported him to the Kent County Hospital.

228. Up to this point, the individual defendants had consistently but falsely claimed that Glenn was "fine," was "operating the company," made "hiring and firing" decisions, and needed no assistance dealing with the business or his own finances.

229. Upon information and belief, there was no acute event or cause for Glenn's presentation or condition at Kent Hospital; rather, plaintiffs were advised that this was part of an ongoing process or disease.

230. The doctors at Kent Hospital advised Lauren, Monica and Christine that Glenn needed a power of attorney, but that he was not (in their medical opinion) mentally capable of making health care decisions.

231. Christine and Lauren went to the fortress to get Glenn some personal belongings for his hospital stay. They discovered "post-it" notes over all the walls containing names and phone numbers of Carol, Carol's son, Gerstein, Heal, Brayton, and Rodney Sexton ("Sexton"), but no family members. There were also notes in his car showing him how to use it.

232. Bicki, Carol, and Gerstein arrived at the Kent Hospital, told Monica and Christine to leave the room in which their father was resting.

233. Bicki, Carol and Gerstein presented a "power of attorney" after which Lauren, Monica and Christine were no longer allowed to be privy to any medical health care information.

234. Later that week Glenn had to go back to the Hospital, but Plaintiffs were not informed. Debbie told Plaintiffs that Carol and Gerstein told her (Debbie) that Glenn had to be "guarded 24-7" to prevent Plaintiffs from seeing Glenn and that as a result of such instructions, Carol, Debbie, Carol's boyfriend and another person took shifts staying with Glenn at the hospital so that plaintiffs could not see Glenn.

235. After this second October, 2002, hospitalization, Glenn was sent to live with Debbie and Plaintiffs were not given the opportunity to visit with their father.

236. In about March, 2003, Debbie brought Glenn to her mother's house for a "secret visit" and this was followed by another "secret visit" at which Christine, Patrizia, and Lauren went to Debbie's mother's house and saw Glenn.

237. When Carol learned that Glenn had contact with Christine, Patrizia and Lauren while under Deborah's "custody," Carol had Tierney (under false pretenses) took Glenn from Debbie's home and secreted him at the Hillsgrove Nursing Home (an assisted living facility). Dan was the only family member who knew of his whereabouts.

238. On or about March 19, 2003, Carol took Glenn from an assisted living center (where he had been placed at her direction) to Citizens Bank where she and he executed a Promissory note and Mortgage apparently refinancing the fortress at 500 Nausucket Road, Warwick, Rhode Island in which they were joint tenants. (This act was similar in nature and very close in time to the documents signed by Glenn in June 2003, at which point she and Gerstein claimed that Glenn was incompetent).

239. Upon information and belief, Glenn's stay at the assisted living facility was of short duration because they did not feel able to care for his needs, thus Carol hired a home care agency to visit and assist Glenn. Upon information and belief, this was known as the "Comfort Keepers Agency."

240. One of the persons employed by the "Comfort Keepers Agency" was named Beverly Forte ("Forte") and, as described below, she gave a false and misleading affidavit concerning material events that occurred at this fortress.

241. Beginning in late 2006, Sally Mello ("Mello") and her sisters were among several persons who had been or were hired by Carol to perform companion/homemaker work with Glenn at the fortress.

242. Carol visited the fortress frequently, usually wearing low-cut, revealing blouses, and on several visits was observed to bend over Glenn, essentially putting her breasts in Glenn's face, and talk to him in a "sweet" way.

243. Glenn seemed genuinely happy to see her arrive and would watch her every move. She was observed to have great influence over Glenn; for example, being able to feed him quite easily when others were having difficulty doing so.

244. During the time that Carol was a frequent visitor to the fortress, Glenn was often in an "agitated" state when she was not present. Eventually, Carol indicated that she had "retired" from "Griggs & Browne," after which her visits were less frequent and Glenn seemed to have fewer "agitated" episodes.

245. Carol repeatedly told the fortress helpers that Glenn's children and his ex-wives were "evil and greedy," that they just used him for his money, and that all of the children (except Dan) and both ex-wives had "restraining orders" against them and that only Dan could have free

access to the fortress. Carol further indicated that Lauren and Monica could visit, but only after they made an appointment through a Probate guardian, Attorney Michael St. Pierre ("St. Pierre").

246. Carol did not allow visits by Lauren and Monica to take place unless Lori Myers ("Myers") was the caregiver on duty.

247. Myers eventually left her employment at the fortress for a maternity leave and Mello supervised a very uneventful visit from Lauren and Monica, observing that it was obvious that they loved their father (Glenn) and that he (Glenn) seemed very happy to see his daughters.

248. After the visit, Carol asked Mello if Glenn was "agitated" by this visit by his daughters. Mello advised Carol that, to the contrary, the visit had gone well.

249. Carol insisted that Glenn "must have been agitated and combative" as a result of the visit by Lauren and Monica, but Mello again denied that such was the case.

250. Carol told Mello that she (Mello) should tell St. Pierre that after the visit Glenn became agitated and combative and struck the companions/homemakers. Mello disagreed and voiced the opinion that family visits were wonderful for Glenn.

251. On September 23, 2004, Lauren wrote to St. Pierre, reminding him that he had never met with Glenn's estranged daughters, but St. Pierre apparently disregarded the continuing pleas of Glenn's family and seems to have failed to conduct a detailed investigation of the situation and conditions at the fortress.

252. Before and during Mello's employment, Myers had apparently previously complied with Carol's wishes, telling St. Pierre or someone at his office by telephone that visits from Glenn's daughters "agitated" him, and Mello heard Carol remark that passing this false information to St. Pierre "will keep them away for another several months."

253. St. Pierre was evidently misled about plaintiffs from the first moment of his appointment, and with these repeated misrepresentations directed to him, failed to investigate or to properly investigate these allegations and caused plaintiffs much unwarranted and unnecessary anguish and grief, by evidently believing in the honesty of Gerstein, Carol and Myers and that these strangers with so many conniving persons among their ranks were better able to care for Glenn than his own family.

254. In September 2007, Mello encountered Gerstein and told him about her observations of the successful visits between Glenn and his two youngest daughters but Gerstein did not respond.

255. Mello also discussed these visits with St. Pierre's secretary and told her that they went very well. St. Pierre apparently never spoke with Mello about the quality of these visits or the discrepancy in accounts of post-visit "agitation."

256. During the time that Mello was employed at the fortress, Carol showed her a sheet of paper upon which were mounted photographs of Michael, Christine, Deborah, Lauren and Monica and advised that if any of these people showed up they were not to be allowed to enter the house.

257. Mello was employed from the end of 2006 until Glenn's death in December 2007, and during this time Carol told her that Debbie and Danny were going to get the Griggs & Browne businesses since Glenn "hated" "Chrissy" and Michael and that Lauren and Monica had gotten $100,000 "educations" and did not need his money. Carol also stated that "everyone" would have been in Glenn's will if they had not "gone with Pat(rizia)"(Glenn's second wife).

258. During Mello's employment, Carol also bragged that she had "made up" with her own mother and that a couple of days later she took her mother to change her will so that Carol became the beneficiary.

259. The fortress house, or "House of Usher," with its restricted access was one way that Carol could keep Glenn isolated so that none of the Griggs children could "make up" with their father and undo Carol's nefarious schemes.

260. During this same period of time, Mello accompanied Glenn and Carol on an ambulance trip to see Carlo Brogna, M.D. Carol insisted that Mello remain in the ambulance and, after Glenn got back in following this visit, Mello saw a slip in which Dr. Brogna concluded that Glenn's diagnosis of Parkinson's disease was inaccurate, thus he should be weaned off his Parkinson's medication.

261. Upon information and belief, during this same trip, Mello learned that Dr. Brogna diagnosed Glenn as being in the "end stages of Pick's Syndrome".

262. After Glenn was weaned from his improperly diagnosed and prescribed medication, Glenn fell and hurt himself. He was taken to the Kent County Memorial Hospital and diagnosed with fractures of the neck and leg but transferred to Rhode Island Hospital where further diagnostic studies revealed a malignant tumor.

263. Mello noticed that the fortress had what appeared to be video cameras or camcorders over the sliding glass doors and at the foot of Glenn's bed. She did not consent to being observed or recorded while on duty and has no knowledge that Lauren, Monica or Michael had any knowledge of these devices during their visits. When she asked Carol about these devices Mello was told that the camera at the foot of the bed was an "air filter" or "air purifier."

264. In the fall of 2007, Mello and other housekeepers or caregivers at the fortress told plaintiffs and Patrizia that they saw and heard Carol playing a tape recording of one of the visits that Lauren and Monica had with their father. The caretakers denied making the tape, Carol was not present and Glenn was incapable of doing so.

265. Accompanying this first amended verified complaint as **Exhibit D**, and incorporated herein by reference, is a true and accurate copy of a photograph taken of a video camera secreted in an air filter or air purifier in Glenn's home, taken by or at the direction of Plaintiffs during 2007. Additional photos depicting the cameras and showing the larger area where the cameras were secreted are in Plaintiffs' possession.

266. During Glenn's 2007 hospitalization, the plaintiffs learned for the first time that their father had been diagnosed with lung cancer six (6) months earlier but that this information (as well as all other health care information) was kept from them at the direction of Gerstein and Carol.

267. During this time the family also learned that Glenn had needed dental work but that Carol refused to allow this to occur.

268. During Glenn's September 2007 hospitalization, plaintiffs learned that Carol required the housekeepers to keep a notebook about Glenn's daily activities, who came to see him, how long they stayed, etc. These were given to Carol on a periodic basis.

269. During or after Glenn's hospitalization in September 2007, Carol informed Mello that she was going to "clean up" or "clean out" the fortress.

270. When Mello observed the "clean up," all that she saw was that the cabling was disconnected from the cameras and recorders and that the sheet with photographs had disappeared from the drawer in the caretaker bedroom where it had previously been located.

271. On or about December 9, 2007, Heal told Mello that Carol had told him she was "done with the Griggs family" and after this does not recall Carol ever visiting again. See Mello affidavit (restated and incorporated herein, by reference) concerning the allegations of paragraphs 241-264 and 270-271, accompanying this amended verified complaint at **Exhibit "E."**

***<u>The Probate Court Guardianship Cunnard</u>***

272. As previously indicated, Christine and Lauren petitioned the Warwick Probate Court in October, 2000, that Glenn be placed under a Guardianship. The Guardianship petition followed several incidents of dramatically altered behavior being exhibited by Glenn.

273. In May, 2000, Dan told Patrizia that Heal was now co-signing Glenn's checks because his spending was "out of control;" furthermore, he claimed that Carol "walks around like she owns (Griggs & Browne)."

274. Dan told Christine that all he cared about was his position in the business and not about his father's alleged condition.

275. On May 31, 2000, Deborah complained that Carol was in control of Glenn and the businesses and that that Carol had the power to determine Deborah's fate at the company despite Glenn's presence. Deborah was promised 52% of the business for "playing along" and so eventually allowed Carol, Heal and Gerstein to hire Bicki to be her lawyer at "no cost" to Deborah.

276. Since Griggs & Browne money and/or Glenn's funds would be available, Carol and/or Gerstein added not only Bicki but two or three other lawyers to Glenn's defense "team."

277. Among other things, this team argued at the Probate Court level that the D.M.A.T. had not been administered by Glenn's "treating physician" – a convenient thing to argue since Carol had previously fired his longtime "treating physician."

278. At a hearing before the Warwick Probate Court on November 30, 2000, the Court indicated its desire to appoint Glenn's "treating physician" to perform a "DMAT" and Gerstein asserted that Glenn's "treating physician" was Carlo Brogna, M.D., this was not correct and Dr. Brogna (a neurologist known to accept attorney referrals for evaluation of their clients) was specially engaged to assess Glenn for the defense team.

279. At the same hearing on November 30, 2000, both Gerstein and Bicki falsely advised the court that Glenn was making business decisions of the Griggs & Browne companies and was going to the business office on a daily basis.

280. Karl Kilguss was appointed guardian ad litem for Glenn by the Warwick Probate Court. His June, 2001 report concluded that Glenn had trouble remembering the names of his children and of his doctor, thus, Mr. Kilguss could not say for certain whether or not Glenn needed a guardian.

281. On or about June 26, 2003, Forte signed an affidavit that, upon information and belief, was prepared by the law firm of Lepizzera and Laprocina (hereinafter, "Lepizzera") in Cranston, Rhode Island ("the Forte affidavit"). This contained numerous, self-serving inaccuracies and was used by Gerstein and others on the "defense team" to sensationalize the situation and so as to mislead and persuade a judge to issue an order for the appointment of Dan and Heal as emergency guardians.

282. On or about the same 26th day of June, 2003, Dan also signed an affidavit at Lepizzera ("Dan's Affidavit"). This also contained numerous material omissions, including but

not limited to the fact that Carol, he, Debbie and others had recently engaged in the same type of activity that he now proclaimed was improper (i.e., removal of Glenn from the fortress, secreting him from family members, and taking other actions such that had Plaintiffs' lawyers sought an *ex parte* hearing with the Probate Court they more likely than not could have obtained an order or orders similar to the order subsequently obtained by Gerstein, *et al* )

283. On or about that same 26th day of June, 2003, Dan signed a Petition for Limited Guardianship or Guardianship of his father with the knowledge that it would be filed with the Probate Court ("Dan's Petition").

284. In Dan's Petition it was alleged (and Dan duly swore under the pains and penalties of perjury) that Glenn lacked decision-making ability because he was "physically taken away by third parties who upon information and belief are unlawfully making all decisions for the respondent." Dan's Petition did not assert that Glenn was physically taken away previously nor did it allege that his father lacked decision-making ability when Carol asported him to Citizens Bank a couple of months earlier, nor that Glenn had been "placed" with Deborah and/or at an assisted living facility as described above.

285. Dan's Petition included the false assertion that he and Heal had no conflict of interest that would interfere with their guardianship duties if so appointed.

286. Dan's Petition evidenced the desire that he and Heal had to control the Griggs & Browne businesses and Glenn's financial affairs by further proclaiming that they had the "capacity to manage financial resources involved."

287. Upon information and belief, Dan was present with Gerstein, Lepizzera, and/or others when the Probate Court considered Dan's Petition, *ex parte*; none of the assembled array mentioned having secreted Glenn at Deborah's house or an assisted living facility within recent

weeks without contact of or by plaintiffs, and apparently remained silent about Glenn's equitable net worth, their true intent or motivation and/or Carol's actions.

288. From that point forward, Carol, Gerstein, and/or others made numerous additional material misrepresentations and withheld material information from the Probate Court, thereby using the probate proceeding as another enterprise of and for their illicit purposes.

289. On August 7, 2003, St. Pierre wrote to Gerstein, requesting that he be able to meet and confer with Glenn's treating physician or physicians, for the "purpose of exploring Mr. Griggs' past and present medical condition, and also the directive to obtain a Decision Making Assessment Tool."

290. On or about August 12, 2003, Gerstein replied that St. Pierre's request "presents some rather complex issues that involve the relationships between the Confidentiality of Health Care Information Act… the Guardianship statute… and the nuances that are particular to this case" (the translation of this gibberish being that under no circumstances would he readily agree to these disclosures).

291. On August 20, 2003, another attorney from the team sent a facsimile communication to the Probate Court Judge with copies to all attorneys, indicating that as Glenn's lawyers "(w)e are unable at this time to provide a waiver or consent by Mr. Griggs to the preparation of a DMAT."

292. Dr. Brogna apparently prepared another DMAT, that was reviewed by the Probate Court Judge on or about October 10, 2003, and promptly "sealed" at the request of Gerstein and others on his team

293. Upon information and belief, at all times that Glenn was under the care or evaluation of Dr. Brogna and at all times that the defendants sought to seal and conceal Glenn's

medical records and true condition, Glenn was receiving health care insurance coverage pursuant to a health care benefit program sponsored by the Griggs & Browne companies.

294. On several occasions during the time the Probate proceeds were pending, and after surveillance cameras and listening devices were installed in the fortress by or at the direction of Carol and/or another of her co-defendants, Lauren and Monica had visits with their father during which the housekeepers left their presence (often going outside) and they were alone with their father.

295. Despite these being intended as private, unsupervised visits and conversations, the content of any discussions or happenings was invariably promptly discussed by others and even became the subject of written complaints by St. Pierre.

296. For example, on May 31, 2006, St. Pierre wrote to lawyers then representing Lauren and Monica (Courtney), admonishing that they had taken pictures of their father and tried to discuss "possible visits of ex-wives." St. Pierre's letter also indicated that he was "informed" that the visit to which he was referring began at 5:20 p.m. (a whopping "20 minutes late"), that this interfered with Glenn's daily routine and that henceforth these plaintiffs must visit no later than 4:00 p.m. (regardless of whatever work schedule they might have).

297. Upon information and belief, St. Pierre was misled and unable to properly evaluate the situation that continued to develop during his stewardship of the situation and this further enabled Carol and Gerstein to carry out and accomplish their devious schemes.

***<u>Glenn's Testamentary and Related Documents</u>***

298. On December 20, 1990, Glenn executed a document entitled "The Glenn E. Griggs Irrevocable Trust" at the offices of Licht & Semonoff, Attorneys, One Park Row, Providence, Rhode Island.

299. The December 20, 1990 Trust appointed or designated Aubin and Alec B. Sinel ("Sinel") as "Trustees," each of whom accepted their appointment and agreed to faithfully execute the duties of Trustee.

300. On or about June 24, 1998, Glenn executed a Durable Power of Attorney, appointing Deborah to certain powers therein described.

301. On or about July 28, 1999, Glenn executed a "Last Will and Testament," prepared by Attorney Anthony Mignanelli in which "my friend" Robert E. Veasey, Jr. ("Veasey") and Deborah were to be co-executors. Under the terms of this document Carol was to receive the fortress house in Warwick, described above.

302. On or about May 19, 2000, Glenn executed a Rhode Island Statutory Form Durable Power of Attorney for Health Care, appointing Carol as his Agent and Deborah as First Alternate Agent for such purposes. John M. Roney and Hubert A. McGuirl, Jr., witnessed the execution of this document but, upon information and belief, had neither knowledge of nor opportunity to investigate the undue influence Carol had continuously and maliciously exercised over Glenn.

In the fall of 2007, Glenn became terminally ill and Carol declined her appointment. Gerstein and Lepizzera filed an "emergency motion" to have St. Pierre appointed sole guardian for healthcare purposes, claiming that this was necessary because Deborah was not qualified to make decisions of this type. By way of compromise, but without in any fashion considering the

validity of the May 2000 document, the parties agreed that St. Pierre and Deborah would jointly exercise the health care decision-making powers.

303. On or about October 25, 2000 (only a few days before the first Probate Court hearing was to take place) Glenn apparently executed a General Durable Power of Attorney adding Heal as co-appointee with Deborah (being represented by Bicki) to have certain powers therein described and purporting to revoke all prior Powers of Attorney (except those made for healthcare purposes and/or power to deal with the Internal Revenue Service).

304. On or about that same date of October 25, 2000, a “First Codicil” to Glenn’s July, 1999 “Last Will and Testament” was apparently executed. Monica and Lauren were included by name whereas they had not been directly mentioned in the July 1999 testamentary instrument. The inspiration for this revision was more likely than not the realization that the previous will’s omission or pretermission of Monica and Lauren would call Glenn’s testamentary capacity into question.

305. The “First Codicil” of October 25, 2000 recites that the 1990 Trust was amended on that same day. As a result, Veasey was no longer a Trustee, being replaced by Glenn’s “associate, David Heal.” Deborah was also named as a Trustee. There may have been other changes to the Trust, which has always been secreted and concealed from the Plaintiffs. Upon information and belief, the amendments were made following several meetings at the offices of Attorney Roney (on at least one such occasion Carol having been present), , with the draftsmanship of Attorney David Riedel of Tillinghast, Licht, LLP (successor firm to Licht & Semonoff) in Providence, Rhode Island.

***Legal Fee Looting***

306. Upon information and belief, (since defendants have exclusive control over all records pertaining to this issue) Gerstein, Bicki, Lepizerra and/or other members of the team engaged to "represent" Glenn, his Estate, the Guardians appointed by the Probate Court, Dan, Debbie and Carol in matters relating to the Griggs & Browne businesses, Glenn, Glenn's ex-wives and Plaintiffs, at various times, from 1997 to the present have been paid for by funds improperly and/or fraudulently taken from Glenn, his estate and/or one or more of the Griggs & Brown companies in furtherance of Carol's undue influence and malicious scheming.

307. Gerstein, Bicki and/or (upon information and belief) other members of the team (sometimes numbering five or more in number) have actively and materially participated in Carol's illicit plans and have aided and abetted her efforts by making false representations to courts and other third parties, covering up material information, and (in some instances) empowering Carol and/or encouraging their alleged "clients" or other witnesses to remain silent or give false reports to courts and/or guardians concerning the matters described herein.

308. During several of the years in question, Gerstein represented Carol in unrelated Superior Court and United States District Court proceedings related to allegations that Carol had used undue influence to induce her own father into changing beneficiaries on numerous insurance policies or annuities from his other children and many good friends to Carol.

309. In 2003, as a result of disclosures ordered by the Probate Court, Gerstein (as well as other members of the legal team purporting to represent Glenn Griggs and/or Dan Griggs's in his petition for guardianship of Glenn) became aware of the tape recorded conversations between Carol Griggs and her father (see paragraphs 44, 57, and 59), but ratified his prior actions and

representations and continued in a course of conduct intended to, and or which he knew would, result in Carol continuing to have control and undue influence over Glenn Griggs.

310. The allegations against Carol in these companion cases were strikingly similar to those raised by the plaintiffs in this action.

311. On or about August 24, 2007, Bicki signed affidavits for use in the Superior Court, indicating that he had reviewed the Affidavits of Gerstein and another member of the team, their "redacted" statements of billing charges, and that "given the time and labor involved in (the Superior Court) matter, the novelty and difficulty of the legal questions involved, the results obtained, and the nature and length of the professional relationship with the client" their claims for reimbursement of fees were "fair and reasonable."

312. Mr. Bicki's affidavits did not make reference to his involvement with Gerstein in the Beatrice S. Demers matter in which they sought to "seal" Probate records in a matter investigated by the Rhode Island Department of Attorney General to determine whether she was exploited, abused and/or neglected, nor did it make reference to the role he played in the Probate proceedings described above.

313. Mr. Bicki's affidavits did not indicate how he could determine the "novelty and difficulty" of the legal questions involved without reviewing unredacted billing records or other related documents.

314. Mr. Bicki's affidavits did not reveal the compensation he had received and the source of such compensaton for his purported representation of Deborah and consultations with Gerstein and others in connection with matters occurring prior to August, 2007.

**INCORPORATION OF FACTS, BY REFERENCE**

**315. Paragraphs one (1) through five (5) (entitled, "parties plaintiff"), six (6) through twenty-two (22)(entitled, "parties defendant"), twenty-three (23) through twenty-eight (28)(relating to jurisdiction and venue), and twenty-nine (29) through thirty-five (35)(entitled, "Glenn Griggs") are restated and incorporated, by reference, in each count of this first amended verified complaint that follows as if fully set forth therein.**

**COUNT I**
**(FEDERAL R.I.C.O. VIOLATIONS)**
**(18 U.S.C. § 1962(c))**

316. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 36-314 of this First Amended Verified Complaint as if fully stated herein.

317. At all relevant times, some of the named individual Defendants formed an association-in-fact for the common purpose of carrying out the fraudulent schemes described in this Complaint, namely (1) to unlawfully gain control of Michael Griggs's interest in Griggs & Browne, (2) to gain control over the person and assets of Glenn E. Griggs, his Trust, (3) to gain control over the Griggs & Brown Corporations, and (4) to wrongfully exclude the plaintiffs from inheriting from Glenn Griggs.

318. At various times, the members of the association-in-fact, included Carol, Heal, Deborah, Dan, Gerstein, and Brayton,

319. Upon information and belief – derived from the acts of the parties and the particular involvement of Gerstein (in temporal order, see paragraphs 101, 102, 192, 194, 196, 275, 276, 220, 221, 222, 200, 201, 202, 103, 108-110, 278, 279, 142, 143, 144,145, 226, 227, 230, 233, 234, 182, 287, 288, 289, 290, 291, 292, 309, 183, 184, 185, 211, 212, 213, 214, 215,

253, 254, 266) – Gerstein devised a plan for or with Carol to (1) appear and act as Glenn's attorney, (2) cause Glenn to execute financial planning documents such as powers of attorney and trusts and to correct an obvious error (omission of Monica and Lauten) through executing a "First Codicil" to Glenn's 1999 Last Will and Testament (though knowing that Glen was not competent to do so), (3) isolate Glenn from the Plaintiffs, Glenn's other family members, and trusted professionals, and (4) by manipulation of judicial processes prevent disclosure of Glenn's healthcare records and so-called "financial planning documents," all for the purpose of permitting Carol, Deborah, and Dan – assisted by Heal and Brayton – to control the person and estate of Glenn E. Griggs and his assets, and to gain control of the Griggs & Browne Corporations.

320. Upon information and belief – derived from the acts of the parties, and the particular involvement of Heal and Brayton, as alleged previously in this First Amended Complaint – Carol had enlisted the assistance of Heal and Brayton who aided and abetted the plan to isolate Glenn from his family, to wrest control and management of Griggs and Browne from Michael and Glenn, and to deprive Plaintiffs of any ownership or expectation of ownership of the corporations.

321. Heal and Brayton had previously aided and abetted Carol in isolating Glenn from his family and professionals knowing and/or under circumstances where they should have known, Carol's objective and purposes, and intending that they be accomplished.

322. The Griggs & Browne Corporations and the last Trust comprised and comprise "enterprises" within the meaning of 18 U.S.C. § 1961(4) and 1962 (b) and (c) that are also engaged in legitimate business, and the activities of which affect, interstate commerce, as separate and distinct from any other Defendant(s).

323. The Individual Defendants Carol, Gerstein, Dan, Deborah, Heal and Brayton participated in, controlled and/or conducted the affairs of the Griggs and Browne Corporations and the last Trust through a pattern of racketeering activity. The Individual Defendants' pattern of racketeering activity consisted of: extortion, mail fraud, and wire fraud (hereinafter referred to as "predicate acts").

324. The person and estate of Glenn E. Griggs constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962 (b) and (c), especially by use of certain so-called "financial planning documents" such as powers of attorney and Trusts. (See *supra*., paragraphs 233, 298, and 300-305).

325. The Individual Defendants Carol, Gerstein, Dan, Deborah, Heal and Brayton participated in, controlled and/or conducted the affairs of Glenn E. Griggs's person and estate through a pattern of racketeering activity. Such Individual Defendants' pattern of racketeering activity consisted of: extortion, mail fraud, and wire fraud (hereinafter referred to as "predicate acts").

326. Carol is an individual "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise(s).

327. Heal is an individual "person" within the meaning of 18 U.S.C. § 1961(3) and 1962(c)**,** who associated in fact with and/or participated in the conduct of the affairs of the enterprise(s).

328. Deborah is an individual "person" within the meaning of 18 U.S.C. §1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise(s).

329. Dan is an individual "person" within the meaning of 18 U.S.C. § 1961(3) and 1962 (c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise(s).

330. Gerstein is an individual "person" within the meaning of 18 U.S.C. §1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise(s).

331. Brayton is an individual "person" within the meaning of 18 U.S.C. §1961(3) and 1962(c), who associated in fact with and/or participated in the conduct of the affairs of the enterprise(s).

332. Such Defendants' unlawful activities through some or all of the Griggs & Brown Corporations directly and/or the Trust affected interstate commerce.

333. The Griggs & Browne Corporations or several of them have at all material times routinely and continuously operated and/or conducted business in interstate commerce (Rhode Island, Massachusetts, and Connecticut) as part of their their day to day activities, business and affairs.

334. During most of the years from about 1999 through the present, such Individual Defendants each personally and separately participated in, engaged in, conspired to engage in, and/or aided and abetted, the conduct of the affairs of the enterprise(s) though a pattern of racketeering activity within the meaning of 18 U.S.C.§1961(1), 1961(5) and 1962(c). The Individual Defendants' pattern of racketeering activity consisted of: *extortion, mail fraud, and wire fraud* (hereinafter referred to as "predicate acts").

335. The predicate acts took place during the course of Defendants' concerted campaign to isolate and control the person of Glenn E. Griggs in order to acquire his assets and

businesses and were based on extortionate or fraudulent actions consisting of: (a) threats of arrest based on court orders which defendants knew of should have known did not exist; (b) false or misleading representations to the probate court regarding Glenn E. Griggs' mental competence to manage his affairs, e.g., that he was going to work and running the office when he was incapable of doing so; concealment of the true state of his health and mental abilities; concealment of the state of his finances and business affairs (c) wire communications, using interstate wires, by an imposter claiming to be Glenn Griggs at the direction of Carol attempting to illegally sell Glenn's property utilizing telephonic communication to a foreign country; (d) communications by mail and wire, using interstate wires, in furtherance of defendants' take-over of the Griggs & Browne Corporations from Glenn E. Griggs, including, but not limited to, causing the filing of annual corporate reports (through mail and/or electronically, using interstate wires) and numerous transactions purported to be under his "authority."

336. Since defendants have exclusive control over many of the records demonstrating such predicate acts, this is of necessity an incomplete listing of such acts, their time, content and participants.

337. These predicate acts all occurred after the effective (enactment) date of RICO and more than two (2) of such acts occurred within ten (10) years of one another.

338. The enterprise or enterprises described herein were at all times distinct from the pattern of racketeering activity alleged herein in that the enterprise or enterprises engaged in legitimate business activities beyond those necessary to carry out the alleged acts of racketeering.

339. The predicate acts described in paragraph and below were related to each other so as to establish a pattern of racketeering activity within the meaning of 18 U.S.C. §1962 (c), in that the acts alleged employed the same or similar methods of commission, common victims, and

the common purpose and result of the Individual Defendants, each personally or through their agent or agents, directly or indirectly, was to defraud and defeat the opportunity of the Plaintiffs to the enjoyment of their property, opportunities, expectations and/or rights in and to the legitimate business of the Griggs & Browne Corporations and the estate of their beloved father.

340. All of these predicate acts described in paragraph  and below were continuous so as to form a pattern of racketeering activity in that:

> (a) The Individual Defendants engaged in the predicate acts over a substantial time; and/or
> (b) The pattern of racketeering activity engaged in by the Individual Defendants continue or threaten to continue because such conduct has become a regular way of on-going business activities inasmuch as Defendants continue to control and deplete the Griggs & Brown Corporations. Glenn's last trust, and remain in possession of property obtained through racketeering acts.

341. As a direct and proximate result of, and by reason of, the activities of such Defendants Carol, Heal, Deborah, Dan, Gerstein, and Brayton, and their conduct in violation of 18 U.S.C. § 1962(c), each of the Plaintiffs have been injured in their property, opportunities, expectation and/or rights, within the meaning of 18 U.S.C. §1964 (c) and are, therefore, entitled to recover *threefold* the damages each Plaintiff has sustained plus interest, their costs of the suit, and reasonable attorney fees.

342. Because such Defendants have at all times mentioned herein refused to provide Plaintiffs with pertinent medical and financial records, including the Trust, Glenn E. Griggs's Will, and Codicils thereto (and have invoked alleged powers of attorney to assist them in doing so), plaintiffs were unable to discover the injury to them (namely the wrongful transfer of property from the estate of Glenn E. Griggs and their exclusion as beneficiaries form the Trust) until his death or, in any event, no earlier than the release of a "Universal Inventory" from the Probate Court for Warwick, Rhode Island, subsequent to March, 2006, indicating that Mr.

Griggs's assets had been diminished to just over $100,000.00 in accounts and household effects. Until subsequent revelation of such document, Plaintiffs could only speculate what, if any, assets had been dissipated, transferred to the Trust, or otherwise utilized and lost. Additionally, Plaintiffs' claims were not ripe since Glenn, upon information and belief, could have amended his Trust at any time prior to his death.

**(Predicate Acts - Extortion)**

343. Paragraphs 146-172 (relating to threats against Michael by Brayton and Carol in about 1999), 173-179 (relating to threats against Michael by Heal, Brayton and others at the direction of "a lawyer") in 1999), 183-186 (relating to threats against Michael in December, 2004 by Heal and Gerstein) and 207 (relating to extortionate conduct by Deborah toward Monica in December, 2002), are restated and incorporated herein, by reference.

344. Section 11-42-2 of the General Laws of Rhode Island, 1956, as amended (hereinafter, the "R.I.G.L.") provides that "(w)hoever, in verbal or written communications, maliciously threatens **to accuse another of a crime or offense,** or maliciously threatens injury to the **person, reputation, property or financial condition of another** or threatens to engage in criminal conduct with the intent to extort money **or any unlawful pecuniary advantage, or with the intent to compel any person to do any act against her or her will** or prohibit any person from carrying out any duty imposed by law, **commits <u>extortion</u>." (Emphasis added).**

345. Such Individual Defendants intentionally and willfully secreted Glenn, isolated him from plaintiffs (his children), his trusted advisors and friends, and any other persons who threatened the ability of Carol and others to exert undue influence over him, extorted compliance with their demands from Plaintiffs under threat of both non-existent court orders and those

obtained ex-parte through misrepresentation and distortion, and thereby took control of the Griggs & Browne companies, abetted Carol in stealing money and property and looted money (including legal fees from the Griggs & Browne corporations and Trust, depleting its assets and retarding its potential growth. All of this was in furtherance of their scheme to assist Carol, Deborah, and Dan to control the person and estate of Glenn E. Griggs and to gain control of the Griggs & Browne Corporations, looting them in the process.

346. As described in the claims and allegations above and (upon information and belief) on numerous other occasions, defendants Carol, Heal, Brayton, Deborah, Gerstein and others known and unknown to Plaintiffs, made oral and and/or written threats to harm the persons and property of some or all of the plaintiffs. Defendants issued their threats with the intent to compel the Plaintiffs to accede to Defendants' demands against Plaintiffs' will in violation of Rhode Island law.

347. Specifically, such Defendants threatened to accuse Michael Griggs of embezzlement, to go after his "house" (despite statutory protections for one's domicile), Carol Griggs' falsely accused Michael of choking her, and Gerstein threatened Michael with calling the police (and thereby deprive Michael of the opportunity to reconcile with his father and regain his inheritance rights), with the intent to compel the Plaintffs to accede to their demands.

348. Such Defendants have also threatened some and all of the Plaintiffs with with contempt proceedings and with only being able to see their father if they abandoned their attempts to protect Glenn, and, thus, their pecuniary interests, and if they did not resist the actions taken by such individual defendants to sequester, unduly influence and cause Glenn to be used as a means of gaining control of the Griggs & Browne corporations, (in the process deceiving and abusing the lawful processes of law enforcement and the courts to enable, cover

up, and provide the appearance of legitimacy to their scheme to loot and defraud the Griggs & Browne Corporations).

349. The acts set forth above constitute chargeable offenses pursuant to R.I.G.L. 1956 § 11-42-2 (relating to extortion), in that they constitute threats to harm Plaintiffs' persons, reputations, property, and/or Defendants' financial conditions and/or pecuniary advantage(s).

350. By engaging in the activities described above, including but not limited to transferring, wasting, and appropriating the assets and income of the Griggs & Browne Corporations and/or Glenn's estate and/or last trust for their own benefit, such Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(b) and (c).

351. Each of the Defendants named in paragraph 346 have associated with the business and participated directly or indirectly in the conduct of Griggs & Browne's affairs and/or the affairs of Glenn E. Griggs (constituting an enterprise subject to control by and through the exercise of undue influence and resultant powers of attorney and trust(s)), through a pattern of racketeering activity.

352. Plaintiffs are persons who have been injured in their business opportunities and property by reason of this conduct as defined by 18 U.S.C. § 1961(3).

**(Predicate Acts - Mail Fraud)**

353. Pursuant to the provisions of 18 U.S.C. § 1341 "(**w)hoever, having devised a scheme to defraud or obtain property by fraudulent pretenses uses the mail for the purpose of executing that scheme, or attempts to do so, commits mail fraud."**

354. The Defendants listed in paragraph 346 specifically intended to, and did, misrepresent the status of Glenn E. Griggs' business interests, health, mental capacity, and estate,

and in so doing gained control of Glenn E. Griggs' business and personal assets through a scheme of fraud executed, in part, through the United States Mails.

355. In each of the claims described above, as well on numerous other occasions, defendants Carol, Heal, Dan, Deborah, Gerstein and others known and unknown to plaintiffs, caused to be prepared and mailed false, fraudulent, and/or misleading documents to plaintiffs, to financial institutions, to one or more of the Griggs & Browne Corporations, to persons appointed to evaluate and care for Glenn, and to others in furtherance of the individual defendants' corrupt scheme to defraud.

356. Such Defendants knew or reasonably could have foreseen that the use of mails and in furtherance of their scheme to defraud would occur in furtherance of their scheme(s).

357. Among other things, on numerous occasions (the exact dates, place and content of which are unknown to Plaintiffs due to the secrecy achieved by such defendants and/or others acting at their direction and on their behalf, and Plaintiffs' lack of appropriate standing prior to their father's death) the individual defendants routinely siphoned monies from the Griggs & Browne Corporations and/or Glenn's last Trust, and checks in payment for services rendered in furtherance of their scheme were delivered through the United States Mail and/or other courier services within the meaning of the mail fraud act.

358. Such Defendants have sought to keep "sealed" pertinent financial records, pertinent medical records (even after Glenn E. Griggs' death), refused to provide copies of the Trust, and thus concealed the means by which they executed their fraudulent scheme. Defendants' convenient invocation of Glenn E. Griggs' "privacy," their secrecy and penchant for seeking to have documents and records "sealed," in state and probate court proceedings leads to the **inescapable inference** that they also retain **exclusive control** over the records of numerous

mailings relating to the planning and execution of defendants' scheme to defraud and/or take over the Griggs & Browne businesses and Glenn's last Trust.

359. Gerstein has, at various times, falsely asserted that he was hired by Glenn E. Griggs (stating or implying that Glenn was competent enough to have hired Gerstein), that Glenn did not want and/or was agitated by visits from his daughters (the Plaintiffs), that visits violated court orders, that his daughter and/or others caused him "significant harm," that his daughters and/or others put him in "fear," and/or falsely accusing the Plaintiffs of engaging in fraudulent and deceptive acts. All in furtherance of a scheme to isolate Glenn and to wrest ownership and control of his estate and the Griggs & Browne Companies from Glenn and, concomitantly, the Plaintiff's interest and/or expectancies.

360. In furtherance of such Defendants' scheme to defraud Glenn E. Griggs, and to thereby directly injure Plaintiffs, Gerstein has used the mails to accuse the Plaintiffs of fraudulent and deceptive acts, make unreasonable threats of contempt and demands for exorbitant sums to "settle" the contempt issues, to "demand" that some of the Plaintiffs give custody of Glenn to him and Defendants. Some such communications, sent (upon information and belief) by mail, are attached hereto as **Exhibit "F,"** and incorporated herein by reference.

361. In furtherance of the Defendants' scheme to defraud Glenn E. Griggs, and to thereby directly injure Plaintiffs, Gerstein has used the mails to make fraudulent filings with the Probate Court. For example, he has falsely represented that Glenn was agitated by the Plaintiffs' visits and that visitation had to be restricted and/or supervised. One such Court submission is attached hereto as **Exhibit "G,"** and incorporated herein by reference.

362. Such Defendants have used or caused to be used the U.S. Mails to file fraudulent reports with the Rhode Island Secretary of State. Upon information and belief, prior to 2007 all

annual reports of the three Griggs & Browne businesses described in paragraphs 17-20 were sent to the Rhode Island Secretary of State through the United States Mails. The annual reports for the years 1999 through 2007 constitute part of an ongoing racketeering effort to maintain control of these companies by such Defendants. *These reports were statements made to a government agency and to the public purporting to represent that these persons were "legitimately" elected as directors and/or officers of the Corporations, when they had in fact usurped the authority to manage and control the Corporations*.

363. Glenn's signatures appeared on the annual reports from 2000 through February, 2003, as part of the plan to make it appear that he was competent, running the businesses, and not under undue influence, thereby thwarting efforts of family members to aid him and furthering the scheme to gain control of the Griggs & Browne businesses.

364. The annual reports of such companies during the years 1999 through 2007 comprise several separate violations of 18 U.S.C.§ 1341, as the use of the mails to file these reports were for the purpose of exercising a scheme to obtain control of the Griggs & Browne companies.

365. Through their use of the United States Mails to further their scheme to unlawfully take over the Griggs & Browne Corporations and/or deplete the Griggs & Browne Corporations, such Defendants intended to advance said scheme and to injure plaintiffs in their property opportunities, expectations, and/or rights.

366. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (relating to mail fraud). By engaging in the activities described above, including but not limited to transferring, wasting, and appropriating the assets and income of the Griggs & Browne

Companies and/or Glenn's personal funds for their own benefit, such defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c),

367. As a direct and proximate result of defendants' acts, plaintiffs have been injured within the meaning of 18 U.S.C. §1962.

**(Predicate Acts - Wire Fraud)**

368. Pursuant to the provisions of 18 U.S.C. § 1343, **"(w)hoever, having devised a scheme to defraud or obtain property by fraudulent pretenses transmits via wire, radio, or television a communication for the purpose of executing that scheme, commits wire fraud.**

369. In each of the claims described with particularity above, as well on numerous other occasions (the exact dates, places and content of which are unknown to Plaintiffs due to the secrecy achieved by the Individual defendants and Plaintiffs lack of appropriate standing prior to their father's death), defendants Carol, Heal, Dan, Deborah, Gerstein and/or others presently unknown to plaintiffs, transmitted or caused to be transmitted false, fraudulent, and/or misleading communications to one or more of the Griggs & Browne companies, one or more Griggs & Browne employees, to financial institutions, to attorneys, to persons hired or appointed to evaluate and assist Glenn, to governmental agencies, and to some or all of the plaintiffs in furtherance of the individual defendants' corrupt scheme to defraud plaintiffs.

370. Among other things, fraudulent transactions were completed routinely in which such defendants unlawfully diverted monies from Griggs & Browne and made material misrepresentations as to Glenn's condition repeatedly during the period from 1999 to December, 2008, utilizing telephone and/or email communications to accomplish their illicit objectives.

371. Page three (3) of **Exhibit "B"** (a statement by Deborah) recounts that a real estate agent in St. Martin called her, advising that the realtor had been called (by telephone) by someone claiming to be Glenn Griggs and that this caller indicated that he wanted to "sell" a condominium in St. Martin owned by Glenn. Deborah claims that the realtor immediately knew that this call was an impersonation since the realtor was aware that Glenn was not able to talk.

372. Page three (3) of **Exhibit "B"** also indicates that after hearing from the realtor in St. Martin, Deborah called Carol and Carol "told me that she had Matt Tierney (a Griggs & Browne employee) call St. Martin impersonating (Glenn)," adding that "Carol said she did this because (Glenn) needed the money which is obviously a complete lie."

373. The aforementioned inter-state telephone call to St. Martin occurred at a time prior to March 2, 2005 (the date of **Exhibit "B"**), but plaintiffs only learned of this at a later date and are unaware of the exact time it was made. Nevertheless, it is a violation of 18 U.S.C. § 1343, and another example of the scheme to steal Glenn's business and personal wealth.

374. Such Defendants have used the telephone wires to plan and execute their fraudulent scheme, but Defendants have sought to keep "sealed" pertinent financial records, pertinent medical records (even after Glenn E. Griggs' death), refused to provided copies of the trust(s) and thus concealed the means by which they executed their fraudulent scheme. Defendants' convenient invocation of Glenn E. Griggs' "privacy," their secrecy and penchant for seeking to have documents "sealed," in state and probate court proceedings leads to the inescapable inference that they also retain exclusive control over the records of numerous mailings relating to the planning and execution of their scheme to defraud and/or take over the Griggs & Browne businesses and Glenn's last trust.

375. In furtherance of the Defendants' scheme to defraud Glenn E. Griggs, and to thereby directly injure the Plaintiffs, Gerstein has used interstate wires to send facsimiles falsely accusing the Plaintiffs of fraudulent and deceptive acts, make unreasonable threats of contempt and demands for exorbitant sums to "settle" the contempt issues, and to "demand" that some of the Plaintiffs give custody of Glenn to him and Defendants. Some such communications, sent (upon information and belief) by facsimile, are included in attached **Exhibit "F,"** and incorporated herein by reference.

376. Defendants have used interstate wires to file fraudulent reports with the Rhode Island Secretary of State. Annual reports of the four (4) Griggs & Browne Corporations described in paragraphs 15, 16, 17 and 18 were individually and separately electronically filed with the Secretary of State on or about March 29, 2008. The electronically filed annual reports were and constitute an ongoing racketeering effort to maintain control of these companies.

377. The electronically filed annual reports comprise three (3) separate violations of 18 U.S.C.§ 1343, and actions such as this will continue unless restrained and enjoined by this court.

378. Through their use of wire communications to execute their scheme to unlawfully gain control of the Griggs & Browne Corporations and/or extract money from the Griggs & Browne Corporations, and/or Glenn's last Trust, Defendants intended to advance their scheme defraud and to injure plaintiffs in their property opportunities, expectations, and/or rights.

379. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1343 (relating to wire fraud). By engaging in the activities described above, including but not limited to transferring, wasting, and appropriating the assets and income of Glenn and/or the Griggs & Browne Companies for their own benefit, the individual defendants engaged in a

pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(b) and (c), proximately causing injury to Plaintiffs

380. Each of such defendants, Carol, Heal, Deborah, Dan, and Brayton, have associated with the businesses and participated directly or indirectly in the conduct of Griggs & Brown's affairs through a pattern of racketeering activity.

381. Defendants Carol, Heal, Deborah, Dan, Brayton, and Gerstein have associated with the businesses and participated directly or indirectly in the conduct of the estate of Glenn E. Griggs, through a pattern of racketeering activity.

382. As a direct and proximate result of defendants' acts, plaintiffs have been injured, within the meaning of 18 U.S.C. §1962,in their business opportunities, estates and property.

383. By virtue of the Defendants' violations of 18 U.S.C. § 1962(b) and (c), Plaintiffs are entitled to recover from each of such Defendants three (3) times the damages sustained by reason of the frauds, thefts, unlawful conversions and misappropriations committed by the individual defendants and others acting in concert with them, with interest, the costs of suit, and reasonable attorney fees.

**WHEREFORE,** plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs, Dan A. Griggs, Edward Brayton, and Edward L. Gerstein.

**COUNT II**
[VIOLATION OF 18 U.S.C. § 1962(b) R.I.C.O.]

384. Plaintiffs restate and incorporate, by reference, paragraphs 73-82 (relating to the ouster of contact with "wall of fame" member Aubin), 83-90 (concerning the replacement of corporate counsel), 113-125 (concerning accountant Vinci and financial planner Veasey), 146-

188 (concerning the ouster of Michael form Griggs & Browne), 189-271 (pertaining to the isolation Glenn Griggs), 272-314 (concerning guardianship and predatory legal fees) of this First Amended Verified Complaint as if fully set forth herein.

385. Defendants engaged in the previously described predicate crimes in order to directly or indirectly acquire and obtain an interest or control over some or all of the Griggs & Browne Companies and over the person and estate of Glenn E. Griggs.

386. Defendants Carol, Heal, Debora, Dan, and Brayton, fraudulently acquired and obtained an interest in and/or control of some or all of the Griggs & Browne companies through a pattern of racketeering activity.

387. Defendants Carol, Heal, Deborah, Dan, and Brayton, fraudulently acquired and obtained an interest in and/or control of some or all of the Griggs & Browne companies through a pattern of racketeering activity, which control they used to obtain further control over the Griggs & Brown companies.

388. In February, 1996, 1997 and 1998, the annual reports of this company list Glenn, Michael and Dan as the Directors and officers, with Brayton holding the position of Secretary.

389. A meeting of some of the defendants allegedly took place in February, 1999, at which time Heal was added as a Director of that Corporation due to the conspiratorial effort initiated by Carol to gain control of the business. Heal's addition is noted in the annual report of March 1 or March 2, 1999.

390. On or about July 1, 2001, s Statement of Change of Registered agent form was signed by or for Glenn and notarized by an employee ("Claudette"), on instructions from Carol, at a time when Glenn was unable to knowingly understand what he was signing.

391. A further meeting allegedly took place in about February, 2000, at which time Carol and Brayton became directors (with Glenn) and both Dan and Michael were no longer officers or directors. This was reflected in the annual report dated February 22, 2000, and by this time Carol was firmly in actual control of the business, aided by Heal and Brayton.

392. Another meeting allegedly occurred in February, 2001, following which an annual report was filed on or about February 20, 2001, with no changes from 2000 and the conspiracy and racketeering activity in full effect.

393. Another meeting allegedly occurred in January, 2002, with identical results as those in the year 2001. This is reflected in the annual report of the business dated January 23, 2002.

394. Another meeting allegedly occurred in February, 2003, with Heal being added as Vice President and no other changes from the array of persons listed in the 2002 annual report. This is demonstrated by the 2003 annual report filed in February, 2003.

395. Glenn's signatures appeared on the annual reports from 2000 through February, 2003, as part of the plan to make it appear that he was competent, running the businesses, and not under undue influence, thereby thwarting efforts of family members to aid him and furthering the scheme to gain control of the Griggs & Browne businesses.

396. Following the July, 2003 events wherein Dan and Heal became guardians for Glenn, the racketeering conspirators could no longer convincingly have Glenn sign reports.

397. In July, 2004 another meeting took place and this resulted in the decision to proclaim Dan as "President" and "Treasurer" of the corporation, with Glenn remaining as a titular Director. Carol and Brayton continued as directors and Heal and Brayton were also officers. This was evidenced by an annual report signed by Dan on or about July 19, 2004.

398. Dan was made an officer of the company to assure his allegiance to the other Individual defendants.

399. Another meeting took place at some time in early March, 2005, at which time the same officers and directors were allegedly selected as in 2004. This was reflected in the annual report signed by Dan on or about March 17, 2005.

400. Another meeting of some or all of the racketeering individual defendants took place in early February, 2006, with the same officers and directors allegedly selected as in the previous two (2) years. Dan once again signed an annual report, this time on or about February, 17, 2006.

401. In March, 2007, the racketeering individual conspirators changed the registered agent again as is reflected in a Statement of Change of Registered Agent signed by Heal on or about March 21, 2007. At this point in time plaintiffs believe Carol had "retired" with inappropriate benefits currently not known to plaintiffs.

402. Another meeting took place in early 2007, at which time Dan replaced Brayton as Secretary, Paul Brunetti ("Brunetti") Dan and Heal were selected as Directors, while Glenn, Carol and Brayton were removed as Directors. This is reflected in the annual report signed by Heal and received by the Secretary of State of Rhode Island on March 20, 2007.

403. Another meeting took place in March, 2008, following Glenn's death. This resulted in the purported reelection of the same officers and directors as the previous year. An annual report was electronically filed with the Secretary of State on March 29, 2008.

404. Prior to 2007 all annual reports were sent to the Secretary of State through the United States mails.

405. The Griggs & Browne Corporations (or some of them) constitute an "enterprise" that is engaged in, and the activities of which, affect interstate commerce.

406. The Individual Defendants, Carol, Heal, Dan, Brayton, and Debbie have derived and continue to derive fraudulently obtained income directly or indirectly from the pattern of racketeering activity as alleged with particularity above and have acquired interest and/or control in the operation of the enterprise directly, utilizing undue influence, and/or through "the Trust."

407. Defendants, Carol, Heal, Dan, Brayton, Gerstein and Debbie have derived and continue to derive fraudulently obtained income directly or indirectly from the estate of Glenn E. Griggs by controlling him and his property utilizing undue influence, powers of attorney, and/or through "the Trust." The estate of Glenn E. Griggs is or was of such a nature as to affect interstate commerce (especially by control of the Grigs & Brown Corporations).

408. As a direct and proximate result of defendants' acts, plaintiffs have been injured, within the meaning of 18 U.S.C. §1962, in their business opportunities, estates and property.by reason of defendants' conduct in acquiring and controlling the enterprise(s) as alleged above.

409. By virtue of the defendants violations of 18 U.S.C. § 1962(b), Plaintiffs are entitled to recover from each of the individual defendants three (3) times the damages sustained by reason of the frauds, thefts, unlawful conversions and misappropriations committed by the individual defendants and others acting in concert with them, with interest, their costs of suit, and reasonable attorney fees.

**WHEREFORE,** plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs, Dan A. Griggs, Edward Brayton, and Edward L. Gerstein.

**COUNT III**
(VIOLATION OF 18 U.S.C. § 1962(d)(R.I.C.O. Conspiracy))

410. Plaintiffs restate and incorporate, by reference, the allegations of Counts I and II of this First Amended Verified Complaint as if fully stated herein.

411. Defendants Carol, Heal, Dan, Brayton, Gerstein and Debbie were associated with the enterprise(s) and combined, conspired, confederated with one another and agreed to violate 18 U.S.C. § 1962 (b) and (c), directly or indirectly in the conduct of the affairs of the enterprise, through a pattern of racketeering activity and thereby violated 18 U.S.C. § 1962(d). At all relevant times the enterprise was engaged in, and its activities affected, interstate commerce.

412. The conspirators committed or caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including the acts set forth above. As a direct and proximate result of this conspiracy, the Plaintiffs have been injured in their business opportunities, estates and property.

413. As a direct and proximate result of these individual defendants' acts, plaintiffs have been injured, within the meaning of 18 U.S.C. §1962,in their business opportunities, estates and property.

414. By virtue of the defendants' violations of 18 U.S.C. § 1962(d), plaintiffs are entitled to recover from each of the individual defendants three (3) times the damages sustained by reason of the frauds, thefts, unlawful conversions and misappropriations committed by the defendants and others acting in concert with them, with their costs of suit, interest and reasonable attorney fees.

**WHEREFORE,** plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs, Dan A. Griggs, Edward Brayton, and Edward L. Gerstein.

**COUNT IV**
VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT
(18 U.S.C. § 2510 et seq.)

415. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 217-271 of this First Amended Verified Complaint as if fully set forth herein.

416. Pursuant to the provisions of the Electronic Communications Privacy Act, 18 U.S.C. 2520, et seq. ("the Privacy Act"), **"any person who – intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication … shall be fined under this title or imprisoned not more than five years, or both."**

417. On numerous occasions during the period from 2000 to and including October, 2007, some or all of the plaintiffs visited Glenn at the fortress and, during several such visits, had private moments with their father (with no other persons present in his room or within the house) during which they expressed their personal thoughts, love, affection and wishes to each other and to their father while located or positioned in his bedroom.

418. On more than one such occasion they were subsequently directly of indirectly contacted by Attorney St. Pierre and/or others who discussed what had occurred during their visits in significant detail and issued warnings against them talking of certain things and even taking pictures of their father.

419. At no time did any of the plaintiffs consent to having their visits and the discussions described above tape recorded or intercepted by any other person.

420. At the times described above, Glenn was unable to speak in much more than monosyllables and was suffering from cognitive defects or deficits that caused him to have two appointed guardians.

421. During the year 2007, Sally Mello ("Ms. Mello"), a home health aid for Glenn observed what appeared to be video cameras or camcorders not only over the sliding doors of Glenn's bedroom but also at the foot of Glenn's bed, concealed over a television.

422. Ms. Mello did not consent to being observed or recorded while on duty and has no knowledge that Lauren, Monica or Michael had any knowledge of the device over the television during their visits with Glenn .

423. Plaintiffs observed the video camera above the sliding doors leading to Glenn's room, but never saw the "foot of the bed" device.

424. The housekeepers at the fortress had a separate bedroom in which there was a television that gave a view of Glenn from the aspect of the foot of his bed. There was no known view from the camera above the sliding glass doorway.

425. The aforementioned actions taken by Carol (see paragraphs 269 and 270), and others acting in concert with her, while Glenn was hospitalized and had been diagnosed with a terminal illness were akin to a criminal wiping away fingerprints after a crime and constitute and comprise the spoliation of evidence; accordingly an adverse inference should be drawn against Carol and/or any other person having counseled or assisted her in taking such actions.

426. Upon information and belief, the recording devices in question were intentionally and knowingly used to improperly intercept wire and/or oral communications designed and

installed by or at the direction of Carol and/or another person or person to monitor Glenn's visits with family members without regard that this might violate the rights of Plaintiffs.

427. Upon information and belief, the use of recording devices to violate the rights of others was known or should have been known to most or all of the defendants, but they individually and collectively took no action to prohibit their use.

428. The defendants were not, at any relevant time or with respect to the eavesdropping or interception of communications described in this count, acting under color of law.

429. Carol and any other defendants' intentional, reckless, wanton or malicious interception, disclosure and/or use of plaintiffs' communication(s), as aforesaid, was and is in violation of 18 U.S.C. 2510, et. seq.

430. Plaintiffs are accordingly entitled to maintain a civil action against Carol and any involved Defendants for equitable or declaratory relief, actual and punitive damages, costs and a reasonable attorney fee in accordance with 18 U.S.C. 2520 (a)-(c).

**WHEREFORE,** Plaintiffs demand judgment against defendant Carol Griggs and any other Defendant who acted in concert with her, conspired with her, and/or aided and abetted her, or otherwise acted in violation of 18 U.S.C. 2510, et. seq.

## COUNT V

(Conspiracy to violate 18 U.S.C.§ 2510)

431. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 217-271 and Count IV of this First Amended Verified Complaint as if fully set forth herein.

432. Carol and each or all of the Individual Defendants (the exact identities of whom are currently unknown to Plaintiffs) have combined, conspired and confederated to accomplish an unlawful end and to achieve such ends by violating the provisions of 18 U.S.C. 2510 et seq.

433. Plaintiffs are accordingly entitled to maintain a civil action against each or all of the defendants for actual and punitive damages, plus interest, costs and reasonable attorney fees.

**WHEREFORE,** Plaintiffs demand judgment against defendant Carol Griggs and any other Defendant who acted in concert with her, conspired with her, and/or aided and abetted her, or otherwise acted in violation of 18 U.S.C. 2510, et. seq.

**COUNT VI**
(Rhode Island R.I.C.O. Violations)

434. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 36-314 of this First Amended Verified Complaint as if fully set forth herein.

435. Defendants Carol, Dan, Deborah, and Gerstein, ton and others presently unknown to Plaintiffs wrongfully appropriated monies from Glenn Griggs, and/or Glenn's Trust some or all of the Griggs & Browne companies through "racketeering activity" (or activities) as defined in R.I.G.L. §7-15-1(c), including, but not limited to larceny, fraud, embezzlement and/or unlawful appropriation.

436. Defendants Carol, Dan, Deborah, Heal and Brayton and others presently unknown to Plaintiffs, wrongfully conducted or participated, directly or indirectly, in the conduct of the affairs of some or all of the Griggs & Browne companies through "racketeering activity" (or activities) as defined in R.I.G.L. §7-15-1(c), including, but not limited to larceny, fraud, embezzlement and/or unlawful appropriation.

437. Defendants Carol, Deborah, Heal and Gerstein, and others presently unknown to Plaintiffs, wrongfully conducted or participated, directly or indirectly, in the conduct of the affairs of the person and estate of Glenn Griggs and/or Glenn's Trust through "racketeering activity" (or activities) as defined in R.I.G.L. §7-15-1(c), including, but not limited to larceny, fraud, embezzlement and/or unlawful appropriation.

438. The Defendants acted together and as an "enterprise" as defined in R.I.G.L. §7-15-1(a).

439. Such defendants are "persons" as defined in R.I.G.L. §7-15-1 of the Rhode Island state RICO statute.

440. The Griggs & Browne companies constitute an "enterprise" as defined in R.I.G.L. §7-15-1.

441. The person and estate of Glenn E. Griggs constituted an "enterprise" as defined in R.I.G.L. §7-15-1.

442. At all relevant times, some or all of such Defendants (or some of them, at various times) formed a "group of individuals associated for a particular purpose" – namely (1) to gain control over the person and assets of Glenn E. Griggs, his Trust, (2) to gain control over the Griggs & Brown Corporations, and (3) to wrongfully exclude the plaintiffs from inheriting from Glenn Griggs – as defined in R.I.G.L. §7-15-1.

443. Defendants Carol, Heal, Dan, Deborah, Gerstein, Brayton and others not presently known to Plaintiffs knowingly received income from the aforementioned racketeering activities, acquire or maintain any interest in or control of one or more such enterprise(s), conducted the affairs of one or more such enterprise(s) through racketeering activities, and/or directly or indirectly used and/or invested that income (or a part thereof) in the establishment, conduct

and/or operation of an enterprise consisting of their own personal affairs, as prohibited by R.I.G.L. §7-15-2.

444. The such Defendants knowingly received income from the aforementioned racketeering activities, and directly or indirectly used and/or invested that income (or a part thereof) in the establishment, conduct and/or operation of an enterprise, including "the Trust" and the person and estate of Glenn E. Griggs as prohibited by R.I.G.L. §7-15-2.

445. Plaintiffs have been damaged by the actions of such defendants and are accordingly entitled to compensatory and exemplary damages, plus interest, costs, reasonable attorney fees and such further relief as may be appropriate in the circumstances.

**WHEREFORE,** plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs, Dan A. Griggs, Edward Brayton, and Edward L. Gerstein.

## **COUNT VII**

(VIOLATION OF RIGHT TO PRIVACY – RHODE ISLAND LAW)

446. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 217-271 of this First Amended Verified Complaint as if fully set forth herein.

447. Pursuant to R.I.G.L. § 9-1-28.1 (a), at all times that Plaintiffs visited with their father they had the right to be secure from unreasonable intrusion upon their physical solitude and seclusion.

448. Plaintiffs' meetings with their father at which they were led to believe that they were alone with him were recorded and/or were the subject of eavesdropping, despite their reasonable expectations that they would be and were entitled to privacy.

449. The aforementioned invasions of Plaintiffs' privacy rights were offensive and/or objectionable to any reasonable person.

450. The aforementioned invasions of Plaintiffs' privacy rights were disclosed by those who caused or participated in such invasions to other persons for the purpose of personal gain, vendettas, and/or to prevent the possibility of releasing Glenn from his undue influence, although under this section of Rhode Island law the person who discloses the information need not profit by the disclosure.

451. Carol, and any other Defendants who participated in the violation of Plaintiffs' privacy rights as described herein are liable to plaintiffs for compensatory damages, plus interest, costs, and reasonable attorney fees under R.I.G.L. § 9-1-28.1 (b).

**WHEREFORE,** Plaintiffs demand judgment against defendant Carol Griggs and any other Defendant who acted in concert with her, conspired with her, and/or aided and abetted her, or otherwise acted in violation of Plaintiffs' rights of privacy.

## COUNT VIII

(VIOLATION OF RIGHT TO PRIVACY – RHODE ISLAND LAW)

452. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 217-271 of this First Amended Verified Complaint as if fully set forth herein.

453. Pursuant to R.I.G.L. § 9-2-28.1 (2), Plaintiffs have at all times had the right to be secure from an appropriation of their image or likeness.

454. Plaintiffs' meetings with their father at which they were led to believe that they were alone with him were videotaped during the period from 2003 to about October, 2007, without their consent or permission.

455. Although supposedly done for the protection and benefit of Glenn, the videotaping was in actuality done in furtherance of Carol's, and others acting in concert with her, diabolical efforts to exert undue influence over and to isolate Glenn so that none of the plaintiffs would have the opportunity to reconcile with their father or stop the ongoing undue influence she utilized in gaining ultimate ownership of the fortress and influence, power and control over the Griggs & Browne companies.

456. Plaintiffs need not establish that the appropriation of their images and likenesses through the use of such videotaping was published to any other person.

457. Carol and any other defendant who participated in the violation of Plaintiffs' privacy rights as described herein are liable to plaintiffs for compensatory damages, plus interest, costs, and reasonable attorney fees under R.I.G.L. § 9-1-28.1 (b).

**WHEREFORE,** Plaintiffs demand judgment against defendant Carol Griggs and any other Defendant who acted in concert with her, conspired with her, and/or aided and abetted her, or otherwise acted in violation of Plaintiffs' rights of privacy.

## COUNT IX
(TORTIOUS INTERFERENCE WITH EXPECTANCY OF INHERITANCE)

458. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 36-314 of this First Amended Complaint as if fully set forth herein.

459. As the majority of the Glenn's children and heirs at law, there existed at all relevant times a reasonable expectation on the part of the plaintiffs of receiving an appropriate inheritance from him or his estate. (To the extent that Rhode Island's Supreme Court has not ruled on this cause of action at the time of filing of plaintiffs' original complaint and/or this

amended complaint (or hereafter), this Court is respectfully requested to certify the question of the viability of such cause of action to the Rhode Island Supreme Court.)

460. Carol, Gerstein, Heal, Dan, Deborah, and others presently not known with specificity intentionally interfered with plaintiffs' expectancy of inheritance.

461. The aforementioned individual defendants utilized conduct that was, in its nature, fraudulent, duress, and/or involved undue influence to achieve such interference.

462. Based upon Glenn's actions and affection for plaintiffs prior to the conduct undertaken by such defendants described herein, there existed a reasonable certainty that the expectancy of inheritance would have been realized but for the interference of such defendants and those acting in concert with them.

463. Plaintiffs have been damaged as a result of the actions of such defendants and those acting in concert with them by having their expected inheritance stripped away or diminished so completely as to result in their being materially disinherited from Glenn's estate

**WHEREFORE,** plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs, Dan A. Griggs and Edward L. Gerstein.

## COUNT X
(BREACH OF FIDUCIARY DUTY)

464. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 73-82 (relating to Aubin), 83-90 (relating to change of corporate lawyers), 91-112 (relating to replacement of health care providers), 113-125 (relating to Vinci), 126-145 (relating to Veasey), 146-210, 217-237, 250, 254, 259, 272-314 of this First Amended Complaint as if fully set forth herein.

465. Defendants Carol, Heal, Deborah, Gerstein, and/or others each had fiduciary obligations to Glenn, the Griggs & Browne companies, and the Plaintiffs to assure that Glenn was not subjected to undue influence in his personal and/or business affairs.

466. Notwithstanding their various fiduciary obligations, they (individually and collectively) allowed and/or assisted Carol in exploiting Glenn by depriving him of longtime friends, advisors, contact with Plaintiffs, contact with anyone who challenged their nefarious schemes, depriving Glenn of access to, or the use of benefits, resources, belongings, and assets through the use of undue influence, deception, false representation and/or false pretenses.

**WHEREFORE**, plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs and Edward L. Gerstein.

## COUNT XI
(INVALIDATION OF REAL ESTATE DEED)

467. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 64, 72, 84-88, 117, 139, 199, 238 of this First Amended Verified Complaint as well as all allegations of Count X and the "Exploitation" Count, below, as if fully set forth herein.

468. At all relevant times, Carol enjoyed a relationship of trust and confidence with Glenn that was fiduciary in nature in view of the fact that she (a) learned and experienced how to arrange his affairs for him and make him dependent upon her, (b) falsely misrepresented to him the state of his finances, (c) convinced him that she was the only person who had his best interests at heart and in mind, (d) repeatedly lied to him about the intentions of his beloved children (the plaintiffs), (e) had gained experience in preying upon her own elderly father and (f)

exercised undue influence over him to such an extent that he added her as a joint tenant to the property at 500 Nausauket Road, Warwick, Rhode Island 02886 ("the fortress").

469. Upon information and belief, Carol's efforts to make the transaction appear legitimate and voluntary on Glenn's part included pretending that she did not want to be added to the deed and taking Glenn to various other persons (including lawyers) and asking the unduly influenced and incapacitated Glenn whether he really wanted her on the deed in the presence of these people (thereby creating purported witnesses).

470. The totality of circumstances demonstrates that Carol's influence resulted in an unfair and unreasonable transfer of the fortress by deed to her as a joint tenant with Glenn.

471. Under the circumstances the deed should be declared invalid and the home at 500 Nausauket Road, Warwick, Rhode Island should be returned to Glenn's Estate and/or beneficiaries.

## COUNT XII
(CONVERSION AND CONSTRUCTIVE TRUST– RHODE ISLAND LAW)

472. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 64, 72, 84-88, 117, 139, 199, 238 of this First Amended Verified Complaint as well as all allegations of Count X (Breach of Fiduciary Duty), Count XI (invalidation of the Real Estate Deed) and the "Exploitation" Count, below, as if fully set forth herein.

473. Under Rhode Island law, whoever takes possession of the personal property of another without consent and exercises dominion over it inconsistent with that other person's right to possession commits conversion.

474. Carol's actions in obtaining a joint interest in the fortress home, in becoming its sole owner upon or at the time of Glenn's death, and in retaining that asset that should have

remained in Glenn's sole estate constitutes conversion of that and any other property she may have so taken.

475. Accordingly, plaintiffs are entitled to the return of all such property (including specifically the residential real estate at 500 Nausauket Road, Warwick, Rhode Island).

**WHEREFORE**, plaintiffs demand the return of all of Glenn's real and personal property that has been wrongfully and/or pursuant to undue influence taken and converted to the use, name and/or title of Carol and any persons acting at her direction and/or conspiring with her, and that, until its return, all such property be ordered held in a constructive trust for the benefit of Glenn's heirs at law (the Plaintiffs), for compensatory and/or exemplary damages, costs, expenses, interest and reasonable attorney fees.

## COUNT XIII
(INVALIDATION OF TRUST AND ESTABLISHMENT OF CONSTRUCTIVE AND/OR RESULTING TRUST)

476. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 83-90, 113-145, 298-305 of this First Amended Verified Complaint as well as all allegations of Count X (Breach of Fiduciary Duty) and of the "Exploitation" Count below, as if fully set forth herein.

477. At all relevant times, Carol and Heal enjoyed a relationship of trust and confidence with Glenn that was fiduciary in nature in view of the fact that she (a) learned and experienced how to arrange his affairs for him and make him dependent upon her, (b) falsely misrepresented to him the state of his finances, (c) convinced him that she was the only person who had his best interests at heart and in mind, (d) repeatedly lied to him about the intentions of his beloved children (the plaintiffs), (e) had gained experience in preying upon her own elderly

father and (f) exercised undue influence over him and isolated him from his friends and close family members to such an extent that she and Heal caused a new Trust to be drafted and executed or amended on or about October 25, 2000.

478. Plaintiffs have made demand for a copy of the current Trust instrument or documents but their request has been denied.

479. Upon information and belief, Heal (having conspired and consorted with Carol) is named as Trustee of the October 25, 2000 "Trust" document and Debbie and Dan are "beneficiaries" thereof.

480. To properly execute a Trust, a settlor must have requisite capacity, and upon and belief, Glenn did not have such capacity on October 25, 2000.

481. Plaintiffs have until the time of this Complaint been denied access to all of Glenn's healthcare records but are aware of certain examinations that question the mental capacity of Glenn at the time of the execution of the Trust.

482. The Trust may have been executed in proper form, but was the product of undue influence and should therefore be declared invalid.

483. Under Rhode Island law, plaintiffs may rely on circumstantial evidence to meet their burden of proof of undue influence and/or coercion since it is often accomplished in secret.

484. The totality of circumstances demonstrates that Carol's influence and the participation of Heal and/or others resulted in the creation of the unnatural and disproportionate putative Trust.

485. Under the circumstances, the Trust executed on or about October 25, 2000 (and any subsequent amendments thereto) should be annulled and a resulting and/or constructive trust imposed to safeguard any assets and avoid their further dissipation.

**WHEREFORE**, plaintiffs demand that the Trust executed on or about October 25, 2000 (and any subsequent amendments thereto) be declared void and annulled and a resulting and/or constructive trust imposed to safeguard any assets and avoid their further dissipation.

**COUNT XIV**
(ABUSE OF PROCESS)

486. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 272-314 of this First Amended Verified Complaint as if fully set forth herein.

487. Under Rhode Island law, when a legal proceeding, although set in motion in proper form becomes perverted so as to use the proceedings to accomplish an ulterior or wrongful purpose for which the process or proceedings were not designed, such activities give rise to a claim for abuse of process.

488. Despite having engaged in sequestering and attempting to isolate Glenn from several of his own children, Carol, Gerstein, Heal, Dan, and/or others acting in concert with them and/or at their direction, convened an ex parte meeting with a State Probate Court Judge (since deceased), setting in motion a series of Orders and allegations of "contempt" accompanied by false and malicious misrepresentations concerning the plaintiffs.

489. The aforementioned defendants misused legal process to continue and/or obtain an advantage not properly involved in the proceeding itself.

490. The actions of such defendants were designed to estrange Glenn from the plaintiffs though as to allow them to continue to exert influence over Glenn and thwart any attempts by the plaintiffs to reestablish their relationship with their father since that might lead to the discharge and/or removal of the individual defendants from their positions and roles with

respect to Glenn and the Griggs & Browne companies and bring to an end their stream of income being derived from Glenn and/or the Griggs & Browne companies.

491. The penultimate example of this abuse was Gerstein having advised Michael that he was prohibited from seeing his father, even though Michael had never been named in nor served an Order that prevented him from seeing his father.

492. More recently, Deborah has advised that the defendants Heal, Gerstein and others are seeking financial penalties against Christine, Lauren and others to "drive (them) into bankruptcy."

493. Under the totality of circumstances, the aforementioned defendants have sought orders limiting Plaintiffs' access to their father and contempt orders for purposes entirely unrelated to the aforementioned Probate proceeding, resulting in an abuse of process for which plaintiffs have suffered anxiety, emotional distress for the violation of their legal rights and/or other damages.

**WHEREFORE**, plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Dan Griggs, Edward L. Gerstein and any other Defendants or individuals, currently unknown, who have conspired and/or aided or abetted such defendants' wrongful acts.

## COUNT XV
(Exploitation)

494. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 40-72 (relating to Carol), 73-83 (regarding Aubin), 83-90 (regarding changing corporate counsel), 91-112 (regarding medical issues), 113-125 (relating to Vinci's ouster), 126-145 (concerning Veasey), 146-188 (regarding Michael), 189-216 (regarding Deborah), 217-271 (concerning

isolation at the Nausauket property), 272-297 (about certain Probate Court matters), and 298-305 (documents) of this First Amended Verified Complaint as if fully set forth herein.

495. Article I, § 24 of the Rhode Island State Constitution is entitled **"Rights not enumerated – State rights not dependent on federal rights"** and provides that the enumeration of various rights in the other sections or articles of the state constitution "shall not be construed to impair or deny others retained by the people". It also provides that "(t)he rights guaranteed by (the Rhode Island) Constitution are not dependent on those guaranteed by the Constitution of the United States."

496. R.I.G.L.§ 9-1-2 is entitled **"Civil liability for crimes and offenses"** and provides, in pertinent part, that "(w)henever any person shall suffer any injury to his or her person, reputation or estate by reason of the commission of any crime or offense, he or she may recover his or her damages in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made".

497. R.I.G.L. § 42-66-8.2 (d) provides that the State Department of Elderly Affairs shall immediately forward information to law enforcement agencies if it has reasonable cause to know or suspect that a person sixty (60) years of age or older (such as Glenn was at all material times described herein) has been a victim of "exploitation" as defined in that chapter of the laws of the State of Rhode Island.

498. R.I.G.L. § 42-66-4.1 (2) defines "Exploitation" as the "the fraudulent or otherwise illegal, unauthorized or improper act or process of an individual, including, but not limited to, a caregiver or fiduciary, that uses the resources of an elder for monetary or personal benefit, profit, gain, or that results in depriving an elder of rightful access to, or use of, benefits, resources,

belongings, or assets by use of undue influence, harassment, duress, deception, false representation or false pretenses".

499. The "Exploitation" described and defined in the preceding paragraph constitutes a type of crime or offense within the meaning of R.I.G.L. § 9-1-2.

500. Upon information and belief, the State Department of Elderly Affairs attempted to investigate Glenn's condition but was thwarted by Carol and took no further action.

501. Under the circumstances and based upon the aforementioned constitutional and statutory provisions of Rhode Island law, the actions of Carol, Deborah, Dan, Heal, Gerstein, and others presently unknown to plaintiffs toward Glenn were such as to constitute exploitation, conspiracy to commit exploitation and/or aiding and abetting exploitation.

502. Plaintiffs have been materially harmed and damaged and continue to be harmed and damaged in their persons, reputations and/or estates as a result of such exploitation.

503. Plaintiffs are accordingly entitled to their damages from such individual defendants pursuant to R.I.G.L. 9-1-2.

**WHEREFORE**, plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs, Dan Griggs, and Edward L. Gerstein and any other Defendants or individuals, currently unknown, who have conspired and/or aided or abetted such defendants' wrongful acts.

**COUNT XVI**
(Common Law Conspiracy)

504. Plaintiffs restate and incorporate, by reference, the allegations of Counts VII through XV and paragraphs 36 through 314 of this First Amended Verified Complaint as if fully set forth herein.

505. Common law conspiracy is recognized and may be prosecuted and punished as an offense in accordance with R.I.G.L. §11-1-1.

506. Common law conspiracy involves a combination of two or more persons to commit some unlawful act or do some lawful act for an unlawful purpose.

507. Common law conspiracy is complete when the agreement has been made and does not require any overt acts take place in furtherance of the agreement.

508. In Rhode Island, common law conspiracy is a separate and distinct offense from the substantive offense or offenses for which the conspiracy was formed.

509. Upon information and belief, the Defendants have combined, conspired and confederated on one or more occasions to conceal and further their Fraud, Larceny, Conversion, Embezzlement, and/or Unlawful Appropriation, Violation of Privacy, Exploitation, and Abuse of Process.

510. Upon information and belief, the Defendants have combined, conspired and confederated on more than one occasion to conceal and further their "racketeering activities" (including, but not limited to, larceny, and the goals of the enterprise(s) that they created and as defined by R.I.G.L. §7-15-2) and/or acts of undue influence, fraud, exploitation, and/or interference with inheritance rights.

511. Plaintiffs have been materially harmed and damaged and continue to be harmed and damaged in their persons, reputations and/or estates as a result of such common law conspiracy.

512. Plaintiffs are accordingly entitled to their damages from each and all of the individual defendants pursuant to R.I.G.L. § 9-1-2.

**WHEREFORE**, plaintiffs demand judgment against defendants Carol Griggs, David Heal, individually and in his capacity as purported Trustee of the Irrevocable Trust estate of the late Glenn E. Griggs, Deborah Griggs, Dan Griggs, Edward Brayton, Edward L. Gerstein, and any other Defendants or individuals, currently unknown, who have conspired and/or aided or abetted such defendants' wrongful acts.

## COUNT XVII
(Declaratory Relief)

513. Plaintiffs restate and incorporate, by reference, the allegations of Counts X through XVI of this First Amended Complaint as if fully set forth herein.

514. In furtherance of the Court's federal claims jurisdiction this Court has jurisdiction to allow Declaratory relief pursuant to 28 U.S.C. § 2201.

515. In furtherance of its pendant jurisdiction over the state causes of action made herein, this court has further jurisdiction to allow declaratory relief pursuant to Title IX, Chapter 30 of the General Laws of Rhode Island 1956, as amended (known as the "Uniform Declaratory Judgments Act"), in that Plaintiffs request that the court declare rights, status, and other legal relations of and among the parties.

516. Accordingly, Plaintiffs respectfully request that this court grant them declaratory review and relief, namely that it do the following:

517. Construe the facts, circumstances and rights of the parties;

518. Declare that the deed to the improved real estate at 500 Nausauket Road, Warwick, Rhode Island was the product of undue influence, is invalid, and that title to such property should be returned to Glenn's Estate and/or beneficiaries;

519. Declare that the Trust executed on or about October 25, 2000 (and any subsequent amendments thereto) was also the product of undue influence and/or that Glenn lacked sufficient capacity to understand its or their meaning, thus should be annulled and declared totally void and a resulting and/or constructive Trust be established for the equitable benefit of the lawful heirs of Glenn E. Griggs;

520. Declare that Plaintiffs are entitled to a full accounting and to recover all monies or things of value (including real estate) that the individual Defendants improperly, unlawfully converted, misappropriated, or fraudulently received (including legal fees paid to lawyers to prepare documents and/or to commence and/or defend litigation against or related to Plaintiffs) and/or have transferred to the aforementioned Trust or any amendments thereto;

521. Declare that the individual Defendants are not legally entitled to hold title to and must return any and all of Glenn's property and putative estate over which they exercised dominion and control or obtained control by the use of undue influence, exploitation, false pretenses, artifice or other illicit means;

522. Declare that under the circumstances any documents or purported agreements that claim to limit the rights of any or all of the Plaintiffs to proceed with this action are annulled and voided as the product of extortion or for lack of consideration;

523. Declare that none of the Defendants legally and/or equitably entitled to manage, control, act as officers of, act as directors of, hold shares in or otherwise profit from any or all of the Griggs & Brown Companies;

524. Construe the law and matters in question and determine the rights and obligations of parties under these circumstances;

525. Make such further orders that are appropriate in the circumstances, to the end that all parties have clear notice and understanding of the decision and directives of this court and;

526. Pursuant to 28 U.S.C. § 2202, grant Plaintiffs such further relief, as may be fitting, just and appropriate in the circumstances, including but not limited to an award of Plaintiffs' attorney fees and costs.

**COUNT XVIII**
(Injunctive Relief)

527. Plaintiffs restate and incorporate, by reference, the allegations of paragraphs 40-72 (relating to Carol), 73-83 (regarding Aubin), 83-90 (regarding changing corporate counsel), 91-112 (regarding medical issues), 113-125 (relating to Vinci's ouster), 126-145 (concerning Veasey), 146-188 (regarding Michael), 189-216 (regarding Deborah), 217-271 (concerning isolation at the Nausauket property), 272-297 (about certain Probate Court matters), and 298-305 (documents) of this First Amended Verified Complaint as if fully set forth herein.

528. The actions of the defendants have been and are such as to create a tangible and real fear that they will continue to loot, transfer, hypothecate, misappropriate and/or pilfer Glenn's estate, the Trust and/or the assets of some or all of the Griggs & Browne Corporations for their own benefit or in an attempt to place such assets beyond Plaintiffs' reach.

529. Under the circumstances, Plaintiffs have no reasonable remedy at law and to the contrary will suffer irreparable harm, save by and through this court's equitable powers of injunctive relief.

530. Plaintiffs have presented a compelling showing of the probability of their success on the merits of their claims.

531. Accordingly, Plaintiffs request that defendants be permanently restrained and enjoined from continuing to unlawfully use the income and assets of Glenn's estate, the Trust, real estate taken from him by undue influence and from any and all of the Griggs & Browne companies.

532. Further, that the individual Defendants be permanently enjoined and restrained from continuing to use and enjoy the benefit of any assets and income or property that has been unjustly and fraudulently acquired by them and/or using Glenn's assets, Trust assets and/or the assets of any or all of the Griggs & Browne companies to pay their expenses, costs and/or legal fees in this litigation.

533. Restrain and enjoin the individual Defendants and any other person(s) acting at their direction or on their behalf from destroying and/or disposing of any and all evidence of their financial and corporate transactions that involved the acquisition of any property, real or personal, belonging to or through the use of Glenn's assets, Trust assets, and/or the assets of any or all of the Griggs & Browne companies.

534. Restrain and enjoin the individual Defendants and any other person(s) acting at their direction or on their behalf from destroying or disposing of any and all evidence of Glenn's health records, mental status evaluations, decision-making ability assessments, or other personal records.

535. That the individual Defendants be restrained and enjoined from disposing of, alienating, selling, secreting, hypothecating, wasting, or transferring assets or real or personal property derived from Glenn, his estate, the Trust and/or any or all of the Griggs & Browne companies, whether allegedly belonging to them personally, held by or in a business entity, in trust, in offshore accounts, or any other manner.

536. That the individual Defendants be restrained and enjoined from attempting to offer the so-called Last Will and Testament of Glenn Griggs or any such testamentary instrument for Probate or for any other purpose in any state court.

537. That the individual Defendants be ordered to cause all health records for or pertaining to Glenn (including so-called "DMAT" evaluations) to be provided plaintiffs forthwith.

538. Finally, that the court retain jurisdiction and grant plaintiffs such further relief and orders as may be fitting, just, necessary and/or appropriate in the circumstances.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiffs prays that this Court enter judgment against the Defendants individually, jointly, and severally as to each count of this Amended Complaint (as applicable) as follows:

A. That the Court construe the facts and circumstances described herein;

B. That the Court Declare the parties' rights and obligations;

C. That the Court Permanently Enjoin and Restrain the individual defendants and/or any person acting by, through or for them from using, accessing, or appropriating the income and/or profits of the Griggs & Browne companies, its cash reserves, property, customer information, and any other asset(s) thereof directly or indirectly for their individual use or benefit.

D. That the Court Order the Rescission of all Conveyances, Trusts, Deeds, Transfers, Assignments, Codicils, Wills and Amendments that are the products of misrepresentation, undue influence, and duress and incapacity;

E. That the Court Order Defendants to divest themselves of any interest, direct or indirect, derived from Griggs & Brown Companies;

F. That Plaintiffs be awarded compensatory damages, in an amount to be determined at trial, plus interest;

G. That Plaintiffs be awarded treble and/or punitive damages;

H. That Plaintiffs be awarded interest, costs and reasonable attorney fees; and,

I. That Plaintiffs be awarded all further relief that this Court deems appropriate under the circumstances.

**CLAIM OF JURY TRIAL AND DESIGNATION OF TRIAL COUNSEL**

Plaintiffs hereby claim a trial, by jury, on all issues herein that are so triable. They designate John B. Reilly as and for their trial counsel.

PLAINTIFFS,
By Their Attorneys,

/s/ John B. Reilly
John B. Reilly, Esq. (#1811)
John Reilly & Associates
100 North Main St., 4th Floor
Providence, RI 02903
tel: 401-272-2800
fax: 401-272-2811

Date: September 8, 2008

**VERIFICATION**

The undersigned, being duly sworn upon oath, hereby depose and say that:

1. We are the plaintiffs in the preceding matter.

2. We hereby verify that the facts and matters contained in the foregoing Amended Verified Complaint are, to the best of our collective personal knowledge and belief, true and accurate and, with respect to those matters which are asserted to be "upon information and belief," we believe them to be, to the best of our individual and collective personal knowledge and belief, as stated.

3. Many of the facts and matters contained in the foregoing Amended Verified Complaint were first learned or discovered by the undersigned during or after 2006-2007.

Subscribed and sworn before me at Providence, Rhode Island, this 8th day of September, 2008.

Notary Public

**CERTIFICATION**

I hereby certify that on the 8th day of September, 2008, a true copy of the within document has been filed through the ECF system and will be sent electronically to the following registered participants as identified on the Notice of Electronic Filing (NEF).

Stacey P. Nakasian, Esq.
Duffy, Sweeney & Scott, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
snakasian@duffysweeney.com

Michael J. Lepizzera, Jr., Esq.
Lepizzera & Laprocina Counsellors at Law, Ltd.
117 Metro Center Boulevard, Suite 2001
Warwick, RI 02886
mlepizzera@lldlawyers.com

Anthony M. Traini, Esq.
56 Pine Street
Providence, RI 02903
amt@atrainilaw.com

Richard C. Bicki, Esq.
56 Pine Street, Suite 200
Providence, RI 02903
rbickiesq@aol.com

Edward L. Gerstein, Esq.
29 Meeting House Lane
Little Compton, RI 02837
elg@zomolo.com

Melody A. Alger
Baluch, Gianfrancesco, Mathieu & Alger
155 South Main Street, Suite 101
Providence, RI 02903
melody.alger@bgmalaw.com

Joseph J. Altieri
Joseph J. Altieri, Ltd.
350 South Main Street
Providence, RI 02903
JoeAltieri@JJALTD.com

David Jesse Oliveira
David Oliveira, Esq.
155 South Main Street
Suite 305
Providence, RI 02903
doliveira@djolaw.com

Craig M. Scott
Duffy Sweeney & Scott, Ltd.
One Turks Head Place
Suite 1200
Providence, RI 02903
cscott@duffysweeney.com

It is also hereby certified that a true copy of the within will be sent by first-class mail, postage prepaid on this 8th day of September, 2008 to the following defendants who have been served with process at their last known address.

Edward Brayton
396 Bullocks Point Ave
Riverside RI, 02915

/s/ John B. Reilly