UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Christine Peabody; Michael Griggs; Lauren Griggs; and C. Monica Griggs

Plaintiffs

VS. C.A. No.: 08-243 ML

Carol Rita Kimberly Griggs, Alias;
David Heal, Alias, individually and
in his capacity as purported Trustee of
the Irrevocable Trust estate of the late Glenn E. Griggs;
Deborah Griggs, Alias; Dan A. Griggs, Alias;
Edward L. Gerstein, Alias;
Edward Brayton, Alias; the Griggs & Browne Co, Incorporated;
Griggs & Browne Home Inspection Service, Inc.;
Griggs & Browne Services, Inc.;
Griggs & Browne Termite Control, Inc; John Does 1 through 10; Jane Roes 1 through 10; XYZ Corporations, Partnerships, Limited Liability Companies, Trusts and/or Enterprises 1 through 10

Defendants

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' [DAVID HEAL AND EDWARD L. GERSTEIN] MOTION FOR SANCTIONS PURSUANT TO F.R.CIV.P. 11**

Defendants David Heal and Edward L. Gerstein have moved this Honorable Court for appropriate relief pursuant to F.R.Civ.P. 11.[1]

INTRODUCTION

Apparently dissatisfied with the results obtained by 10 prior teams of lawyers, plaintiffs now seek in this Court to forum shop, to relitigate issues previously decided in state

[1]It should be noted that the attorney defendant (Mr. Gerstein), attempted to avoid the necessity of bringing the instant motion by first requesting in writing that plaintiff's counsel dismiss the complaint as against them, pursuant to the procedure followed in Pol-Sella v. SER Jobs For Progress National, Inc., 11 F.Supp.2d 170, 176-177 (D.P.R. 1998). See Exhibit 1. See also, Cabell v. Petty, 810 F.2d 463, 465 (4th Cir. 1987).

court, and to chill the role of adversary litigation counsel in state court proceedings. Reading the Complaint in the context of the information presented here will demonstrate that despite plaintiffs' verification of the allegations, their counsel, John B. Reilly ("Mr. Reilly"), has violated the provisions of Rule 11(b), and that by "verifying" the allegations, the plaintiffs themselves have done the same.[2] Plaintiffs were aware of and participated in, and Mr. Reilly knew or should have known of, the prior legal proceedings in the state courts resulting in final judgments adverse to the claims now raised, and have made numerous material misrepresentations to this Court. The Complaint violates the pleading rules and, upon reasonable inquiry, should not have been filed.[3]

BACKGROUND AND FACTS

This matter has a long and detailed history. To place the 83-page, 535-paragraph Complaint in context requires significant reference to the extensive prior state court

[2]It was apparent from the TRO conference on June 30, 2008, that Mr. Reilly had not familiarized himself with the underlying litigation that preceded the filing of the Complaint, or that he was aware of what relief he was seeking or for what purpose. He was not conversant with his own complaint, and was unable to respond to the court's inquiry about the history and pendency of the state court litigation. See, e.g., Fred A. Smith Lumber Co. v. Edidin, 845 F.2d 750, 754 (7th Cir. 1988).

[3]Also relevant here is Mr. Reilly's representation of the interests of another of his clients, Paul Gonya, a person not a party to the litigation, but whom the defendants have reasonable grounds to believe is the "mastermind" of this litigation, and who plaintiffs have admitted was their financier in most of the state court proceedings. Mr. Reilly is participating in what amounts to champerty (which continues to be actionable in Rhode Island [see, Toste Farm Corp. v. Hadbury, Inc., 798 A.2d 901 (R.I. 2002); see also, Progressive Gaming International, Inc. v. Venturi, 2008 WL 2388266, *2-3 (D.R.I. 06/10/08)]), and this conduct is relevant to an appropriate sanction.

Plaintiffs and their counsel knew, or should have known, when the Complaint was filed, that there exists deposition testimony, documentary evidence, and at least one judicial determination attesting to Gonya's involvement and motivation in the state court litigation, as well as his previous payment of legal fees and costs on behalf of these plaintiffs. Gonya, who is the brother of defendant Carol Griggs, is no stranger to litigation in Rhode Island, or to causing false, scandalous, and misleading papers to be filed with our courts. (See, Sun Life Assurance Co. of Canada (U.S.) v. Conroy, 2006 WL561500 (D.R.I. 01/12/06). See also, Paul Gonya, et al v. Carol Kimberly, a/k/a Carol Kimberly Griggs, Providence County Superior Court, no. 99-4697 and Paul Gonya v. Metropolitan Life Ins. Co., et al, Providence County Superior Court no. 99-4822 (Order dated June 13, 2007 striking pleadings filed by Gonya and his then-counsel).

It is also noteworthy that the "affidavit" of David Laliberte appended to the Complaint is notarized by the attorney who represented Gonya in the proceedings before this Court in Sun Life Assurance Co. of Canada (U.S.) v. Conroy, 2006 WL 561500. Because of Gonya's involvement, Mr. Reilly was advised not to destroy any records relating to the payment of costs and fees, whether by plaintiffs or any third parties, including Gonya. See Exhibit 1.

litigation.[4] Long before the instant Complaint was filed, plaintiffs Lauren Griggs, Christine Peabody, Monica Griggs, and their various attorneys, had the record of the Probate, Superior and Supreme Court proceedings, and all of it was readily available to Michael and Mr. Reilly.[5] The facts set forth in this memorandum are taken from judgments, opinions, orders,

[4]The defendants apologize to the Court for the length of this memorandum; however, in order to meet their burden here, it is necessary—because of the facts and circumstances of this matter—to demonstrate the extent to which the required prefiling inquiry into the law and the facts was not performed. This can be done only by showing what evidence and information existed and was available to plaintiffs and their counsel.

[5]Three of the plaintiffs—Christine Peabody, Lauren Griggs, and C. Monica Griggs—were parties to one or more of the prior state court proceedings and have been involved in the state court litigation for the past 8 years. During that time, exhaustive discovery and court proceedings occurred, and plaintiffs and their various counsel have and have had access to voluminous amounts of material generated during that litigation and concerning all the matters now raised in this Complaint. The fourth plaintiff, Michael Griggs, verified the allegations of the Complaint, by which he swore to the knowledge of all the material facts alleged therein. He is therefore chargeable with knowledge of the information surrounding those allegations.

Included in the state court litigation materials are the following: transcripts of 12 deposition sessions of Christine Peabody (12/06/00; 12/13/00; 02/26/01; 10/14/03; 11/26/03; 01/15/04; 01/16/04; 01/23/04; 02/04/04; 02/24/04; 03/08/04; and 12/19/05); 9 deposition sessions of Lauren Griggs (12/07/00; 02/06/01; 02/23/01; 10/03/03; 12/03/03; 12/04/03; 02/06/04; 02/27/04; and 12/27/05); and 2 deposition sessions of C. Monica Griggs (12/09/01 and 05/13/04). Nancy Griggs (mother of plaintiff Christine Peabody), who provided the "affidavit" in support of the emergency request for TRO relief, was herself the subject of 3 deposition sessions (03/02/04; 03/04/04; and 12/20/05), and Patricia Griggs (mother of plaintiffs Lauren and C. Monica Griggs), who is referred to throughout the Complaint and referenced liberally as a source of information for the allegations, was the subject of 6 deposition sessions (03/18/04; 03/19/04; 04/05/04; 04/06/08; 04/08/04; and 12/22/05). Plaintiffs Christine and Lauren, as well as Nancy and Patricia, had occasion to assert their privileges against self-incrimination on numerous occasions during thee deposition sessions.

In addition, many of the individuals who are referenced in the Complaint as having some participation in or knowledge of the alleged events, as well as several others who were not, were also deposed: Hubert McGuirl (12/14/00); Robert Veasey (04/22/04) and his associate, Michael Valois [who is not mentioned](06/09/04); Dr. John Stoukides (06/05/01); and Christian Davodet [also not mentioned] (06/23/04). Notably absent from the Complaint is attorney Frank Orabona, who fraudulently purported to represent Glenn Griggs as part of the efforts begun in 2003 by some of the plaintiffs and their then-counsel to separate him from his home, his attorneys, his companies and his money. Mr. Orabona was the subject of 6 deposition sessions (12/12/03; 12/19/03; 12/20/03; 01/10/04; 02/19/04; 03/25/04). Two of the defendants named here were also deposed: Carol Griggs (03/20/01 and 05/30/01), and Deborah Griggs (04/02/04 and 04/19/04). The depositions generated over 150 exhibits.

More importantly, this material also includes transcripts of 39 hearing sessions in the Warwick Probate Court ([before Evangelista, J.]: 11/30/00; 01/24/01; 02/16/01; 05/17/01; [before Earle, J.]: 07/03/03; 07/16/03; 07/23/03; 07/28/03 [3 sessions, including the court's in camera interview of Glenn]; 08/13/03; 08/21/03; 09/18/03; 09/24/03 [2 sessions, including the sealed in camera hearing on plaintiffs' then-counsel's motion to withdraw]; 10/10/03; 10/30/03; 11/25/03; 12/09/03; 12/23/03; 01/15/04; 02/12/04; 04/15/04; 06/10/04; 07/22/04; 07/29/04 [2 hearings]; 08/12/04; 02/14/05; 03/24/05; 07/07/05; 09/22/05; 09/29/05; 11/17/05; [and before Isherwood, J.]: 10/01/07; 02/28/08; 03/13/08; 03/27/08; 04/10/08); 9 hearing sessions in Kent County Superior Court ([before Vogel, J.]: 09/24/01; 1/26/02; 2/11/02; 2/25/02; 5/17/02; [and before Thompson, J.]: 3/27/06; 05/22/06; 10/12/06; 2/22/07); and Rule 12A pre-briefing memoranda, a pre-briefing conference, full oral argument before the Rhode Island Supreme Court in Griggs I, and motion practice in Griggs II. These various state court proceedings generated thousands of pages of pleadings and documents and resulted in the entry of a multitude of judgments, orders and opinions.

Defendants submit that all the findings, decisions and orders made or entered in the prior state court litigation are applicable to all plaintiffs in the context of this Rule 11 motion because Michael received notice of those proceedings and elected not to participate. By verifying under oath the allegations of the Complaint, he has

and pleadings entered in the numerous related state court proceedings, and from transcripts of the associated court hearings and depositions.[6]

A. Familial relationships.[7]

Glenn E. Griggs, now deceased, was married three times. He was divorced from his first wife, Nancy Griggs, in 1973. Four children were born of that marriage: defendants Deborah Griggs and Dan Griggs, and plaintiffs Christine Peabody and Michael Griggs. Glenn then married Patricia Griggs,[8] and fathered two more children, plaintiffs Lauren Griggs and Courtney Monica Griggs.[9] Glenn and Patricia divorced in 1996, and Glenn was then briefly married to defendant Carol Kimberly Griggs. No children were born of that marriage.

During his lifetime, Glenn established and funded a Trust that is either the sole shareholder, or controlling shareholder, of the corporate defendants (sometimes collectively referred to as the "Griggs & Browne companies," or "Companies"). The Trust designates Glenn as the sole beneficiary during his lifetime, and the successor beneficiaries upon his death. With the exception of Michael, whose relationship with the companies was terminated

---

adopted the false statements and other misrepresentations made by the remaining plaintiffs, who were parties, including the failure to disclose the nature and extent of the underlying state court proceedings, and has adopted the positions and statements of his co-plaintiffs who also verified the allegations of the Complaint, including the statements and representations attributed to Nancy and Patricia.

[6]Reference will be made to depositions and hearings conducted in state court proceedings. Deposition references are by deponent's name, date of the session and relevant page [e.g., Christine 12/06/00 at 32]. Deposition exhibits were numbered sequentially, and are referenced as "Dep.Ex. __." Probate Court Hearing Transcripts are identified as "PCTR," followed by the date and page [e.g., PCTR, 7/3/03 at 32]. Superior Court Transcripts are designated "SCTR" with the same format [e.g., SCTR, 2/11/02 at 32]. Not all these references are appended here, but all are available, as is the complete record (in electronic format), upon the Court's request.

[7]Many of the parties to the instant action share the same surname; accordingly, first names will be used. No disrespect is intended by this informality. Cf., In re Marriage of Smith, 225 Cal.App.3d 469, 475 n.1, 274 Cal.Rptr. 911, 913 n.1 (Cal.Ct.App. 1990).

[8]For no apparent reason, Patricia is referred to in the Complaint as Patrizia. We continue to identify her as Patricia for ease of reference to the prior proceedings.

[9]Throughout the state court proceedings, Monica was known as Courtney Griggs, her true name. With the filing of this Complaint, however, she (also for no apparent reason) suddenly became known by her middle name, Monica. For consistency with the Complaint, we use that moniker.

in 1999 because of his embezzlement activity, none of the plaintiffs is, or has ever been, a shareholder, officer, or director of any of the Companies.

B. Prior state court proceedings.

The are at least seven prior state court proceedings relevant to the Complaint. The first stream of litigation[10] ("Griggs I") consisted of three proceedings beginning with In re Estate of Glenn Griggs,[11] which commenced on October 10, 2000, when Lauren and Christine filed a guardianship petition seeking control over Glenn's assets (including the Companies), and over all other areas of his life, such as his personal associations, the location of his residence, and his health care matters.[12] Lauren and Christine were actively assisted in this endeavor by Monica, Patricia, and Nancy. Monica and Patricia were so involved that the Warwick Probate Court (Earle, J.) subsequently found them to be co-petitioners.[13] This litigation was funded by Gonya.[14]

After months of hearings and discovery, this guardianship petition was denied. The second proceeding, a de novo probate appeal[15] was commenced in the Kent County Superior

[10]In the state court proceedings, two distinct lines of litigation were short-handedly referred to as "Griggs I" and "Griggs II." For ease of reading and understanding, those references will be continued here.

[11]Warwick Probate Court Docket No. 2000-418.

[12]The facts alleged in the guardianship petition were sworn to under oath by Lauren and Christine (Exhibit 2).

[13]Judge Earle's finding that Patricia and Monica were de facto co-petitioners in Griggs I was made in the midst of Griggs II, after the Rhode Island Supreme Court issued its decision in Griggs I (PCTR 07/22/04 at 23-24). Indeed, Monica testified during a deposition that she was working with Lauren and Christine to have their father declared incompetent (Monica 01/29/01 at 44-45). After their appeal to the Rhode Island Supreme Court was denied in Griggs I, Judge Earle ordered Lauren, Christine, Patricia, and Monica (pursuant to R.I.G.L. §33-18-19) to pay Glenn $8,745.39 in costs (Order 07/22/04, Griggs I [Exhibit 3]). No appeal was taken, the Order is final, and Monica's and Patricia's status as being bound by Griggs I is determined. Contrary to the allegations of "Legal Fee Looting," Complaint at ¶ 304, these costs were paid to Glenn.

[14]Lauren, Christine, and Monica kept Gonya's true role hidden in this first probate proceeding by testifying falsely at their depositions in Griggs I. The fact and depth of his involvement in the state court proceedings did not become apparent until discovery in the second probate court proceeding, Griggs. II.

[15]Appeals from the Probate Court are governed by statute, R.I.G.L. §33-23-1, et seq. The function of the Superior Court in de novo probate appeals is not to review assigned errors, but to act as a de novo trial court and decide the case on the facts presented to it and on its own view of the law, without regard to a probate judge's

Court, Lauren E. Griggs and Christine A. Peabody v. Estate of Glenn E. Griggs.[16] After numerous hearings at which it was alleged that Glenn lacked decision-making abilities and was the victim of "undue influence," the appeal was dismissed. The third proceeding, a further appeal to the Rhode Island Supreme Court, was denied as well. Lauren E. Griggs, et al. v. Estate of Glenn E. Griggs, 845 A.2d 1006 (R.I. 2004). This stream of litigation is sometimes referred to in the state court proceedings and here as "Griggs I."

The second stream of litigation ("Griggs II") began on June 26, 2003, while the appeal in Griggs I was pending in the Rhode Island Supreme Court, when Dan filed an emergency petition for the appointment of a temporary limited guardian and/or guardian of the "person" of Glenn, In re Estate of Glenn E. Griggs.[17] This proceeding was triggered by an incident in which Lauren, Christine, Monica, Patricia, Nancy, and others acting in concert with them removed Glenn from his home and sequestered him at Patricia's home for a period of 11 days.[18] Dan's petition, initially seeking to have "custody" of Glenn turned over to himself and defendant David Heal ("Mr. Heal") pending further proceedings, was granted.

After entry of the Temporary Guardianship Order (Exhibit 4), plaintiffs (and others) filed an "Emergency Motion" in the Kent County Superior Court by which they sought to

---

decisions. In re estate of Paroda, 845 A.2d 1012, 1016-1017 (R.I. 2004); Malinou v. McCarthy, 200 A.2d 578, 579 (R.I. 1964). In the Superior Court, Lauren, Christine (and by implication and privity, Monica) claimed a jury trial and requested that a full guardianship be imposed over Glenn. In this de novo proceeding, they were not limited to what transpired in the Probate Court, but had the opportunity to fully present any issues and evidence to support their assertions that Glenn was subject to undue influence, his financial planning documents invalid, or to litigate any other matters relevant to the claimed need for a guardianship.

[16]Docket No. KP 01-0664.

[17]Warwick Probate Court Docket No. 2003-249.

[18]This misconduct far exceeded Glenn's removal from his own home and his sequestration at Patricia's and included, among other things, the preparation and filing of false documents with the Probate Court. During the probate proceeding, then-counsel for Lauren, Christine, Monica, Nancy and Patricia characterized the misconduct as resulting from "bad advice" from "stupid attorneys" (PCTR, 2/16/05 at 23; 08/08/04 at 13-14). Once the scope of plaintiffs' misconduct was disclosed during discovery, the guardianship petition was amended to include a request for additional protection and relief for Glenn.

have the Probate Court Order enjoined (Exhibit 5). The factual basis for the motion was allegations of alleged improprieties by certain of the individual defendants named here. The motion was denied by Mr. Justice Nugent after a chambers hearing, and was not pursued further in the Superior Court.

Ultimately, the Warwick Probate Court (Earle, J.) appointed Attorney Michael St. Pierre as the temporary limited guardian of Glenn's "person" with authority to determine who would have access to Glenn during the proceedings. Mr. St. Pierre retained that authority until Glenn's death in December 2007. Judge Earle also appointed Mr. Heal as the limited guardian of the portion of Glenn's estate subject to probate court jurisdiction (Exhibit 6).[19]

Thereafter, Christine, Monica, and Lauren each commenced a de novo probate appeal in the Kent County Superior Court,[20] alleging that Mr. Heal's appointment was not in Glenn's best interests or those of his estate (including the Companies), and that Glenn's life and wealth were controlled by Mr. Heal (SCTR 05/22/06 at 35-36). After numerous hearings, these proceedings were dismissed. In re Estate of Glenn E. Griggs, 2006 WL 372039 (R.I.Super. 12/12/06).[21] A subsequent motion to amend the judgment, or for reconsideration, was denied and dismissed. Christine and Monica appealed to the Rhode Island Supreme Court (In re Estate of Glenn E. Griggs),[22] and those appeals were also dismissed (Exhibit 7).[23] This second stream of litigation is referred to in the state court proceedings as "Griggs II."

[19]As explained below, the bulk of Glenn's assets were in his Trust, which the Probate Court in Griggs I had previously found to be a valid less restrictive alternative to a guardianship [PCTR 06/21/01 at 9].

[20]Docket Nos. KP-2005-949, KP-2005-950 and KP-2005-951, respectively. For reasons of judicial economy, the Court treated these three proceedings as one.

[21]The decision was provided to this Court as an Exhibit to the "Abbreviated Memorandum of Law In Opposition To Plaintiff's Revised Ex Parte Motion For Emergency Temporary Restraining Order" [docket entry #7], and is incorporated herein by reference.

[22]No. 07-288-A (Superior Court Nos. KP 05-949, 05-950 and 05-951).

[23]No appeal was filed on Lauren's behalf.

Two remaining issues in Griggs II are currently pending in the Warwick Probate Court. First, Lauren, Christine, Patricia, and Nancy were adjudged in contempt of various court orders, principally concerned with their conduct in removing Glenn from his home and refusing to comply with the court order to turn him over to his guardians, which essentially caused the entire Griggs II proceeding to occur. Compensatory sanctions in the form of an award to Glenn's estate of all reasonable attorneys' fees and costs proximately caused by the contemptuous conduct have been ordered (Exhibit 8).[24] Determination of the exact amount of those sanctions remains open. Second, once the sanction amount is determined, Mr. Heal will be required to file a final "Accounting" of his duties as Glenn's court appointed fiduciary (Exhibit 9). The state court decisions in Griggs I and Griggs II are all unfavorable to plaintiffs and otherwise adverse to the matters raised in the Complaint. Lauren, Christine, and Monica were represented at all times by counsel in each of the proceedings in Griggs I and Griggs II.[25] Michael received notice of each of the Probate Court proceedings in accordance with state law but elected not to participate in those, or any other state court proceedings, and cannot now complain about them.[26] His interests in the state court proceedings were also aligned with, and presented by, Lauren, Christine and Monica.

[24]An eighth related state court proceeding is implicated in the contempt adjudications. During Glenn's sequestration (resulting in Griggs II), Patricia, with assistance from Lauren, Christine and Robert Veasey (Patricia's financial advisor, and Glenn's former financial advisor), wrongfully converted to herself a life insurance policy owned by Glenn. A separate action was brought in the Kent County Superior Court to recover ownership of that policy. Glenn E. Griggs, by and through his limited guardian, David Heal v. Patricia Griggs, Docket No. KC-06-615. Judgment entered against Patricia on June 14, 2007, and ownership of the policy was returned to Glenn. Patricia did not appeal from entry of the judgment against her, but did appeal from an order lifting the stay of enforcement of the judgment. That appeal is pending. The Probate Court, as part of its contempt finding, has ordered Patricia, Lauren, and Christine to pay to Glenn's estate all reasonable attorneys' fees and costs incurred in the Superior Court proceedings relating to recovery of the policy.

[25]Gonya paid the attorneys' fees and costs for Lauren, Christine, Monica, Nancy, and Patricia in the Probate, Superior, and Supreme Court proceedings in Griggs I, and the attorneys' fees and costs charged by at least their first five lawyers in Griggs II.

[26]Notice to heirs-at-law in a guardianship proceeding is provided by mail. R.I.G.L. §33-15-17(c). As guardianship proceedings are generally viewed as "in rem" proceedings [Struck v. Cook County Public Guardian, 508 F.3d 858 (7th Cir. 2007)], a guardianship proceeding is binding on all who have notice of it.

With minor exception, each issue presented here was, or could have been, raised in the various prior state court proceedings, where there was extensive discovery and motion practice in both Probate Court matters, as well as de novo proceedings in the Superior Court, and appellate proceedings in the state Supreme Court.[27]

C. Evidence available from the state court proceedings.

1. Griggs I.

The guardianship petition filed on October 10, 2000, by Lauren, Christine (and Monica) in Griggs I alleged that Glenn: "has no idea what his assets are and is easily manipulated *** [and] is not capable of managing his person and estate. It is unclear at this time to what extent he has entrusted his estate to others***" (see, Exhibit 2). Specifically, it was claimed that Glenn:

> Presently he lives at home without any safeguards. He needs someone to arrange for adequate supervision and assistance in daily living, including meals. He needs someone to handle all of his finances, under Court supervision. [Glenn] also needs assistance in taking his medication and in making sure that his fractured foot heals properly.
>
> Id.[28]

The petition further alleged that financial planning documents, such as powers of attorney and Trusts, would not meet Glenn's needs because he was allegedly incompetent. Therefore, Lauren and Christine concluded that they should be appointed Glenn's guardians. Id.

Then-extant state law required that the guardianship petition be accompanied by a statutory form Decision Making Assessment Tool ("DMAT") completed by one of Glenn's

[27] See footnote 5.

[28] The Superior Court noted the petition contained "some pretty strong allegations" (SCTR 02/25/02 at 31-32).

"treating physician[s]." R.I.G.L. §§33-15-4(a)(3) and 33-15-47.[29] Although Lauren and Christine knew the identity and location of Glenn's then treating physician, they did not contact him (Lauren 12/07/00 at 53; Christine 12/13/00 at 105),[30] because they decided to keep their efforts a secret from Glenn. Instead, they engaged a physician who had no prior relationship with Glenn and paid him $250.00 to complete a DMAT.[31]

Glenn learned of the guardianship petition after it was filed with the Probate Court, and confronted Christine with it when she stopped by Glenn's house one day. Glenn was very upset. He told Christine that he did not need a guardian, and asked her to leave (Christine, 03/02/01 at 46-49). Adamantly opposed to the efforts to place him under guardianship, Glenn engaged as counsel Mr. Gerstein,[32] who promptly filed Motions to engage in discovery and to place under seal certain private matters, such as confidential health care information contained in the DMAT submitted with the guardianship petition, and other confidential health care and private financial information that would likely be produced during the guardianship

---

[29]Subsequent to the filing of the petitions in both Griggs I and Griggs II, the statute was amended to express a preference that the mandatory DMAT be completed by a primary care physician, but allows for submission of a DMAT prepared by a physician who had examined and treated a respondent. R.I.G.L. §§33-15-4(a)(1) and (3). In probate court parlance, the target of a guardianship petition is referred to as either the respondent or proposed ward.

[30]Although the Complaint makes reference to a Dr. Kurose (Complaint at ¶ 93-95), Lauren testified that she knew that Dr. Damle of Wakefield, Rhode Island, was Glenn's treating physician (Lauren, 12/07/00 at 53-55). Compare the allegations and comments contained in paragraphs 94-95 of the Complaint.

[31]Ms. Justice Vogel expressly found that this physician was engaged solely to assist Lauren, Christine, and their associates in pursuit of the guardianship [(SCTR 05/17/02 at 10)], a point also conceded in the probate proceedings. (PCTR 01/11/01 at 32). The physician's "examination" of Glenn was conducted in a parking lot in North Providence while Glenn was seated in an automobile and the physician knelt on the pavement. Glenn was unaware that he was being "examined" at all, let alone for a guardianship proceeding. Christine told Glenn that he was her doctor and he wanted to meet Glenn. This 15-minute "parking lot examination" consisted of a conversation and was "conducted" in the presence of Christine and Nancy, who both knew of its true purpose. (Christine 12/6/00 at 109-112). Plaintiffs, Patricia, Nancy, the physician, and his staff all agreed to keep their intent and purposes a secret from Glenn and others (Christine 3/02/01 at 32-34). The DMAT had already been filled out before the physician even met Glenn (Id., at 114).

[32]Contrary to the Complaint, Glenn was referred to Mr. Gerstein by Hubert McGuirl, a long-time friend of Glenn, and a long-time client of Mr. Gerstein. (McGuirl 12/14/00 at 31-32, 40-41; PCTR, 7/03/03 at 46). Christine also testified that she has known Mr. McGuirl for about 30 years, and that he and Glenn were close friends. (Christine 3/02/01 at 6). Compare, Complaint at ¶103.

litigation.[33] The motions were granted at the initial pre-hearing conference with the Probate Court on October 26, 2000, and an appropriate discovery and sealing Order entered (Exhibit 10).

State law also requires a probate court to appoint a statutory guardian ad litem whenever a guardianship petition is filed. R.I.G.L. §33-15-7. The statute defines the duties of the GAL, who must visit with, and inform the respondent of the fact and contents of the petition, the nature and effects of the guardianship sought, the identities of the proposed guardians, the respondent's rights under the guardianship statute, and to ascertain whether the respondent wishes to contest the proposed guardianship or guardians. The GAL is then required to submit a statutory form of report to the Probate Court.[34]

On or about November 15, 2000, the GAL in Griggs I reported to the Court, in part:

> Mr. Griggs clearly wishes to contest the petition in its entirety, including the appointment of the proposed guardians.
>
> ***
>
> During my visit with Mr. Griggs, I asked him some questions concerning his understanding of the petition before the Court. His answers made it clear that he did understand that the petitioners, if appointed guardians by the Court, would have the power to make decisions on his behalf regarding financial and health care matters and would also make any necessary decisions as to his living conditions.
>
> I also asked Mr. Griggs about his daily life. He told me he drives himself on his errands does all his own shopping for groceries and other household necessities and prepares all his own meals. I saw no evidence Mr. Griggs was neglectful in his appearance and his property seemed well kept. He knew the details of his move to his present home located at 500

[33]Discovery in probate proceedings is not a matter of right, but a matter of judicial discretion. Burford et al. v. Estate of Carolyn Skelly et al., 699 A.2d 854 (1997). Rhode Island has a comprehensive statutory scheme governing the disclosure of confidential health care information, R.I.G.L. §5-37.3-1, et seq. At the time of Griggs I, and when Griggs II was commenced, the statutory scheme made no exceptions for the disclosure of health care information in guardianship proceedings or a DMAT. The statute has since been amended to allow for limited disclosure to a probate court, petitioner, and respondent (and their attorneys) of confidential health care information contained in a proper DMAT. R.I.G.L. §5-37.3-4(b)(24).

[34]The form of the GAL report is set forth in R.I.G.L. §33-15-47.

> Nausauket Road. Warwick, RI some 2 to 3 years prior.
>
> ***
>
> During the course of my investigation, I also discovered that there are some estate planning tools in effect at this time. Edward Gerstein has indicated that Mr. Griggs has a Trust and has signed other documents, possibly different Powers of Attorney, which would quite likely make a Guardianship unwarranted. In the petition before the Court, the less restrictive alternatives to guardianship are checked inappropriate because he is incompetent. Assuming enough of the less restrictive alternatives are already in place and valid, there might well be no need for a guardianship. I have not seen the documents in question as Mr. Griggs and his attorney would prefer, for privacy reasons, not to show them to anyone unless absolutely necessary.
>
> (Exhibit 11, emphasis added).

Although Glenn indicated to the GAL that he had trouble getting out words at times, his responses to questions "were, for the most part, pretty clear," Id. Ultimately, the GAL concluded that he was uncertain whether Glenn's difficulty with two questions was the result of either a speech or a memory impairment, and concluded that he could not determine whether Glenn needed a guardian. Therefore, he recommended further medical inquiry to determine the nature and extent of Glenn's impairments, if any.[35]

The GAL report, information unearthed during discovery, health care data, and matters presented at probate court hearings dispelled the self-serving portrait of Glenn painted by the guardianship petition and its supporting DMAT. During their depositions in Griggs I, Lauren and Christine admitted that they had engaged in a course of fraud in furtherance of their guardianship objectives (see, e.g., footnote 31). Monica testified that she was an active participant and was also trying to prove Glenn incompetent. (Monica 01/29/01 at 44-45).

[35]This further medical inquiry was provided by neurologist Carlo Brogna, M.D., who examined Glenn and became his treating physician. Dr. Brogna diagnosed Glenn as suffering from primary progressive aphasia, a degenerative communication disorder, but concluded that Glenn was otherwise oriented to time, place and person, had the capacity to understand the nature and consequences of his acts, and could participate in the management of his own affairs.

In the winter of 2000, Lauren "started looking up different dementias caused by alcoholism." She "got information off the internet," used the "Diagnostic Statistical Manual [sic]," and concluded that Glenn suffered from "persisting substance induced dementia." (Lauren, 12/07/00 at 49-50).[36] Lauren, who is not qualified to make any medical diagnosis, shared her conclusions with the "group"[37] that included Patricia and Nancy, who had each told Christine and Lauren that they wanted to get more money from Glenn than they were entitled to under their respective divorce decrees (Christine 02/26/01 at 24-26).[38] Patricia also discussed this desire with Monica. (Monica 01/29/01 at 26, 28, 34). Lauren, who believed Glenn was worth a "few million. * * * [H]e owns a large company. He has a house and a car and he travels and that sort of thing, so, apparently, there's money there" (Lauren 12/07/00 at 128), was also upset that Glenn had refused to buy, register, and insure a new car for her through his businesses.

Armed with Lauren's diagnosis and their desires and beliefs, Lauren, Christine, Monica, Patricia, and Nancy were referred to attorneys Alfred Factor and Brian Goldstein by Paul Gonya, who had previously contacted Michael Griggs in an attempt to acquire an equity position in Glenn's companies. (Christine, 11/26/03 at 24, 34).[39] These attorneys represented

[36]In Patricia's divorce from Glenn, she relied heavily upon Glenn's purported alcohol and physical abuse as the cause of the breakdown of their marriage.

[37]At various times, Lauren, Christine, Monica, Patricia, and Nancy have collectively identified themselves as a "group." From time to time, and for ease of reading, they are so referenced herein.

[38]Remarkably, Lauren witnessed a purported "Alimony Agreement" signed by Glenn at a time when she believed he was incompetent (Lauren 02/23/01 at 109-110), by which Glenn agreed to give Patricia an additional $4,000.00 per month in alimony. Patricia then had the document falsely notarized.

[39]At various times, Gonya told others that he would buy the Griggs & Browne companies, preferably through a straw, that the companies were being poorly run and that he would assist plaintiffs in running the companies, and even went so far as to "shop" the companies with its competitors.

Gonya in unrelated state court litigation against Carol.[40] Gonya participated in at least the initial meeting between the group and attorneys Factor and Goldstein. The group was told to hire a doctor, and referred to the "litigation medical team" of a nurse, Sharon Murray, and a physician, John Stoukides, M.D., to secure a DMAT. Once the DMAT was in hand, the guardianship petition was filed.[41]

Although attorney Goldstein filed the guardianship petition and appeared on behalf of Lauren, Christine (and Monica) at the initial stages of the litigation, he subsequently withdrew. Plaintiffs engaged new counsel, Marvin Homonoff, whose practice focuses on probate matters.[42] Attorney Homonoff then filed a motion to appoint Lauren and Christine as Glenn's temporary guardians to act on Glenn's behalf in all matters during the pendency of the probate proceedings (Exhibit 12), a request for the production of the Trust and all other financial planning documents signed by Glenn, and a list identifying all health care providers who had provided services to Glenn since 1997 (Exhibit 13); Mr. Homonoff also issued a subpoena to a third party for Glenn's financial records for a 3-year period. Objections were filed on Glenn's behalf. As a result of hearing on November 30, 2000, an Order entered providing in part:

> 1. By agreement of the parties, and with the consent of the Court, the petition for appointment of temporary guardian shall be and is consolidated with hearing on the merits on the petition for appointment of a limited guardian/guardian.

---

[40]See, Paul Gonya, et al v. Carol Kimberly, a/k/a Carol Kimberly Griggs, Providence County Superior Court, No. PC-99-4697, Paul Gonya v. Metropolitan Life Ins. Co., et al, Providence County Superior Court No. PC-99-4822; and Sun Life Assurance Co. of Canada (U.S.) v. Conroy, 2006 WL 561500.

[41]The details of Glenn's examination by Dr. Stoukides are set forth above at footnote 31. However, between the time that Dr. Stoukides handed the pre-completed DMAT to Christine and the time that it was filed with the Warwick Probate Court, and while it was solely in the possession of plaintiffs or their then counsel, the DMAT was altered. Glenn's counsel were never able to learn who was responsible for the alteration of the DMAT.

[42]At the time, Mr. Homonoff was also the probate judge for the Town of Barrington.

2. By agreement of the parties, and with the consent of the Court, from the date of entry of this order and pending hearing on the merits on the petition for appointment of a limited guardian/guardian, the respondent [Glenn] has agreed not to make any substantial and material changes to his estate plans or financial status, unless reasonably warranted by the circumstances; provided, however, that nothing contained herein shall be construed to impair the respondent's ability to manage his financial affairs and expend his financial resources in the ordinary course, including, without limitation fees and expenses incurred by him or on his behalf in this matter. Provided further that nothing contained in the "standstill" set forth in this paragraph shall inure to the prejudice of the respondent or the petitioners, or is to be construed as an admission or acknowledgement by the respondent of any need of assistance or restriction in his ability to manage his financial affairs, and the terms or fact of this agreement shall not be admissible in any proceeding.

3. Discovery by the parties of the financial affairs of either the petitioners or respondent is hereby stayed pending further order of the Court, or written agreement of the parties.

****

6. Pending further order of the Court, or written agreement of the parties, the respondent need not respond to Request No. 1 [for the Trust and other financial planning documents], of the petitioners' request for the production of documents of on or about November 28, 2000.

****

8. On January 11, 2001, the respondent shall provide the Court, for in camera inspection, copies of any extant Trusts and Powers of Attorney, including amendments thereto. The purpose of providing these documents is for the convenience of the Court to allow it to prepare for consideration of the suitability of less restrictive alternatives to the proposed guardianship, should it become necessary to reach that issue, and nothing contained herein shall be construed as a waiver or otherwise impair the respondent's rights to contest the disclosure, if any, of these documents to the petitioners, their relevancy, or his rights to financial privacy. Pending further order of the Court the respondent shall not be required to disclose these documents, or a log thereof, to the petitioners. Should the Court subsequently determine that disclosure is appropriate, the respondent shall be provided adequate notice and opportunity to be heard prior to such disclosure being ordered.

(<u>Exhibit</u> 14).

Shortly thereafter, attorney Mark Sjoberg, whose practice also concentrates in probate litigation, entered his appearance as co-counsel for plaintiffs.

Glenn's Trust and other financial planning documents were delivered to the Probate Court (Evangelista, J.), at hearing on January 11, 2001. Judge Evangelista denied plaintiffs' discovery request for a list of Glenn's health care providers. (PCTR 1/11/01 at 37, 42).[43] The court further indicated that it wanted a DMAT to be completed by Dr. Brogna, Glenn's treating neurologist. However, in response to Glenn's argument that a compelled DMAT implicated Glenn's physician/patient privacy rights, it was agreed to continue the issue to determine whether Glenn would waive those privileges, and, if not, the court indicated that it would likely order Dr. Brogna to submit a DMAT (id., at 18, 45). At a further hearing on the DMAT issue on January 24, 2001, the conflict between Glenn's rights under the Health Care Information Act, and the proposed compelled disclosure of otherwise confidential health care information was squarely confronted (PCTR 01/24/01). Based on Glenn's arguments, the Court requested, and Glenn agreed to provide, an affidavit of Dr. Brogna for in camera inspection (Exhibit 15). At that hearing, Judge Evangelista also inquired and commented on Glenn's Trust and other (previously submitted) financial documents, and perceived those documents, along with the forthcoming affidavit of Dr. Brogna and the impending deposition Dr. Stoukides, as potentially decisive of the case.

Dr. Brogna's affidavit was submitted for in camera inspection on February 12, 2001, and the Probate Court found it thorough, detailed, and more than sufficient in addressing

[43]Under state law health care information, including the identity of health care service providers is considered confidential within the meaning of the Confidentiality of Health Care Communications and Information Act ("Health Care Information Act") R.I.G.L. §5-37-3-1, et seq. See, State v. Brown, 709 A.2d 465, 472 (R.I. 1998). Compare the allegations of the Complaint at ¶97

Glenn's cognitive abilities (PCTR 02/16/01 at 11, 14). The Court indicated an intent to disclose the affidavit to plaintiffs, but ordered that Glenn would have the opportunity to object and be heard prior to any disclosure (Exhibit 16). By agreement, the issue of the disclosure of Dr. Brogna's affidavit was deferred until after Dr. Stoukides was deposed (PCTR 02/16/01 at 15),[44] although the Court had previously stated that upon proper motion it would likely allow a deposition of Dr. Brogna (PCTR 01/11/01 at 50). No such motion was ever filed.[45]

Apparently dissatisfied with the results of the hearing on January 24, 2001, attorneys Homonoff and Sjoberg unsuccessfully moved to vacate the decision and resulting Order. In so doing, they raised the specter that the purported manipulation of Glenn could be evident in the financial planning documents reviewed in camera by the probate court.

> THE COURT: Just so you know, because you weren't involved, and I'm sure Mr. Homonoff told you, one of my concerns -- why I wanted to see the estate documents is because it was checked off on the petition that they weren't adequate.
>
> MR. SJOBERG: But you know how that happens, Judge. We've had a number of cases where the vehicle of undue influence is the power of attorney. So it's not a question of --

[44] Glenn's substantive objection to the disclosure of the affidavit was two-fold. First, the affidavit is a document created by compulsion of the Court, rather than a document created and/or maintained in the ordinary course. Second, it contained confidential health care information whose disclosure is prohibited absent compliance with the Confidentiality of Health Care Communications and Information Act, R.I.G.L. §5-37.3-1 et seq. The instant Complaint is rife with allegations of wrongdoing based on the purported failure of certain defendants to share Glenn's confidential health care information with plaintiffs. Aside from the statutory prohibition against disseminating such information, plaintiffs were not entitled to it, and did not even attempt to follow the statutory requirements for gaining access to it. Moreover, the defendants had no duty to disclose such information to plaintiffs absent a valid court order, and any such disclosure by the attorney defendants would not only run afoul of the relevant statutes, but would also be a violation of their obligations under Rule 1.6, Rules of Professional Conduct. It cannot reasonably be alleged that Glenn's counsel engaged in wrongdoing by insisting on strict compliance with Glenn's statutory rights and observing the Rules of Professional Conduct.

[45] At one point, attorney Homonoff apparently served Dr. Brogna with either a notice of deposition or deposition subpoena, but through secretarial oversight, or otherwise, did not provide notice thereof to opposing counsel. As a result, what would have been an improper private inquiry and violation of Glenn's rights, did not occur. (Exhibit 17, see also PCTR, 01/11/01 at 39-41).

THE COURT: Right. I totally agree, but I wanted to know what was out there and who drafted them and all that. Okay.

(PCTR 02/16/01 at 63-64).

Aside from the on-going legal skirmishes and judicial decisions concerning the disclosure of Glenn's health care and financial information, the deposition testimony of Lauren, Christine, and Monica in Griggs I was dramatically at variance with the description of Glenn set forth in the guardianship petition. Lauren described Glenn's daily activities in the period immediately preceding the filing of the guardianship petition to include driving to various stores to shop, such as Home Depot (where he would buy items for his house and gardens), PETCO (where he would buy items for his dog Charlie, whom Lauren testified was well-cared for by Glenn), doing yard work and gardening (such as planting flowers), going to his office at the Griggs & Browne companies, and the like (Lauren 02/06/01 at 81-83). She also testified that Glenn cooked, went out to restaurants, and vacationed with his daughter Deborah (Lauren 12/07/00 at 137-138, 160-161).

Christine testified that Glenn drove, did his own shopping, picked out his own clothes, generally appeared neat and clean, took care of his personal hygiene, made appointments days in advance (and kept them), made his own selections from menus, and ordered his food at restaurants (Christine 12/6/00 at 100-101; 12/13/00 at 28-30; 2/26/01 at 85). She also testified about conversations she had with Glenn while she was plotting with nurse Murray in furtherance of their secret guardianship efforts. Those conversations covered everyday topics such as Glenn's telling her about his going to work, shopping, cooking, golf, other ordinary daily activities and just plain chit-chat (Christine 12/06/00 at 91-92). Monica did not have much to say about Glenn because they were not particularly close and she had been away at college. She did, however, testify about Glenn's driving her to a birthday party

at Deborah's house in May 2000 (Monica 01/29/01 at 60), and of various gifts that Glenn gave to her and others (id., at 52-53, 62).

It also appeared to be the general belief among Lauren, Christine, Monica, and Patricia that Carol was manipulating Glenn (Monica 01/29/01 at 68; Lauren 02/23/01 at 48-50; Christine 12/13/00 at 43). Patricia claimed, with no factual support, that Carol was improperly taking money from Glenn and his companies, a suspicion also apparently shared by Michael (Christine 12/23/00 at 56-57, 59-60). Aside from their anecdotal testimony concerning Glenn's activities, Lauren, Christine, and to a lesser degree, Monica, also testified concerning the basis for their beliefs that Glenn was being manipulated by Carol and/or David Heal.

At or around the time of the discovery of Michael's embezzlement and his separation from Griggs & Browne, the Companies were experiencing financial difficulties. Various "benefits" that Lauren, Monica, and Christine had been receiving, such as company gas credit cards and auto repair, were curtailed, and they believed that the loss of these "benefits" was the result of the "influence" of Mr. Heal or Carol (Christine 3/02/01 at 7-8; Monica 01/29/01 at 92-93). Other isolated instances were offered to support the notion that Glenn was being manipulated, such as an error in a banking transaction involving a joint account held in the names of Glenn and Monica, that Glenn purchased a boat and then sold it when he realized it was too difficult for him to operate, and that Carol was rude to Patricia on the telephone. Lauren and Christine further testified that they believed Carol took part in running the Companies as part of the "management team," or otherwise (Lauren 02/23/01 at 52-53; Christine 12/06/00 at 47-48). As discussed below, they also testified that they had no facts to support Patricia's speculation that Carol (or Mr. Heal) was improperly using or diverting Glenn's assets.

At Carol's deposition, attorney Homonoff explored the economic and social relationship between Carol and Glenn. Carol testified that: (a) she did not have, and has never had, an equity or other interest in the companies; (b) she was the beneficiary of a life insurance policy insuring Glenn with a death benefit of $10,000 or $15,000; (c) she lent Glenn $10,000 for his purchase of his home, that was repaid; (d) she asked Glenn to remove her name from the deed on his home;[46] (e) she saw Glenn 3-4 times per week, and that he would drive to her house for breakfast (Carol 05/30/01 at 62-63).

Plaintiffs also knew that as of October 16, 2000, when he entered his appearance, Mr. Gerstein was representing Glenn in the probate proceeding, and that he was representing Carol in unrelated state court proceedings.[47] At no point during Griggs I did any of the various teams of lawyers representing Lauren, Christine, and Monica claim any impropriety or conflict in Glenn's representation by Mr. Gerstein and co-counsel Lauren Jones, or challenge Glenn's ability to pay their fees and expenses.[48]

After months of hearings and discovery, the guardianship petition in Griggs I was denied. "Based on the situation and what I've read about Mr. Griggs as far as him needing a guardian over his person right now, the Court is not convinced that he does" (PCTR 06/21/01

---

[46]Carol testified that she once asked Glenn to remove her name from the deed in the presence of attorney John Roney, who attended her deposition. The Complaint (¶454) offers a mere conclusory allegation that Carol's request was part of a scheme.

[47]Aside from Mr. Gerstein's representation of Carol in unrelated state court proceedings being a matter of public record, counsel who filed the guardianship petition on behalf of Lauren, Christine, Monica, and Patricia was representing Paul Gonya, an adverse party, in those very same unrelated state court proceedings. Mr. Gerstein did not represent or provide legal services to Carol in Griggs I or Griggs II, or in any other matters involving Glenn (Carol 05/30/01 at 36; PCTR 07/28/03 [Vol. 3] at 40-42), and Glenn's interests were not implicated in the unrelated state court proceedings between Gonya and Carol.

[48]The improper motivation in naming Mr. Gerstein as a defendant in this Complaint is evident from the failure to move to disqualify him in Griggs I or Griggs II and the appalling conduct of plaintiffs in Griggs II, as discussed more fully below. That the Complaint makes allegations of legal fee looting is particularly egregious—not only are the allegations knowingly false, but all Glenn's attorneys' fees were incurred as a result the misconduct of plaintiffs and their associates. Lauren, Christine, Patricia and Nancy currently face having to reimburse Glenn's estate a significant portion of those fees.

at 15-16). Judge Evangelista also found that a dispute existed between the conclusions of the "parking lot DMAT" and the opinions expressed by Glenn's treating physician, Dr. Brogna. The Court held that even assuming, arguendo, the integrity of the "parking lot DMAT," a guardianship of Glenn's estate was not necessary because less restrictive alternatives were available in the form of Glenn's valid and effective financial planning documents, including the Trust that plaintiffs now seek to challenge (Exhibit 18). PCTR 06/21/01 at 9:

> Even if it were determined that he were incompetent, the Court would place significant weight on the less restrictive means, the estate planning documents that Mr. Griggs set up, because I think all of us who deal with estate plans realize that those documents are set up to avoid guardianship petitions. So, at this time I'm going to deny the petition for guardianship.[49]

See also, Griggs, 845 A.2d at 1008.

On de novo appeal to the Superior Court, Lauren, and Christine challenged virtually every Order and decision of the Probate Court. Twenty-four "reasons of appeal" were stated, including objecting to the sealing of Glenn's financial planning documents to protect his right to financial privacy, the determination that those private financial planning documents provided for valid, adequate, less restrictive alternatives to a guardianship, the probate court's reliance on the affidavit of Dr. Brogna, and dismissal of the petition without a contested evidentiary hearing on the appointment of a guardian. The relief sought was the imposition of a guardianship over Glenn in the form set forth in the petition filed in the Probate Court. A jury trial was claimed. (Exhibit 19). As a de novo matter, the plaintiffs were free to present any issues, claims, and evidence relevant to their assertions of lack of capacity, undue influence, manipulation, insufficiency or invalidity of Glenn's financial planning tools

[49] The guardianship statute prohibits the appointment of a guardian, regardless of the proposed ward's competency, if less restrictive alternatives are available. R.I.G.L. §33-15-4(a)(1). As an alternative ground of denial, Judge Evangelista simply honored the plain language of the statute; she also ordered Christine and Lauren to pay the fees and costs of the GAL.

(including the Trust), misuse of resources, and any other matter relevant to the vast scope of the guardianship petition, all without regard to the probate proceedings or the decisions of the probate judge.[50]

Consistent with their efforts to gain control of Glenn's assets, Lauren and Christine sought twenty-five categories of Glenn's financial records over a four-year period, including the Trust now challenged (Exhibit 20).[51] In support of their discovery request, counsel argued "there's some undue influences we're seeking" (SCTR, 1/26/02 at 4). Ms. Justice Vogel initially rebuffed the discovery requests because she would not authorize the wholesale invasion of Glenn's financial privacy without more (SCTR, 1/26/02 at 7).[52]

Counsel then moved for "reconsideration" of Judge Vogel's ruling based on allegations by Lauren and Christine (and Monica) that they "have reason to believe that *** Mr. Griggs is under the control of his ex-wife Carol Kimberly Griggs," and submitted the joint affidavit of Lauren and Christine purportedly outlining the "facts" which gave rise to their "reason[s] to believe" that Glenn was the victim of undue influence (Exhibit 21). Counsel argued that production of the documents requested was necessary to show "some undue influence" (SCTR 11/26/01 at 4), that Glenn's "mental state is such that he is capable of being unduly influenced" (SCTR 02/11/02 at 23), and that Dr. Stoukides was engaged to craft a DMAT, in part, because of concerns about "undue influence" being exerted over Glenn by "Carol Kimberly" (SCTR 05/17/02 at 7). As support, counsel argued that Glenn put

---

[50]In re Estate of Paroda, 845 A.2d at 1016-1017.

[51]Noteworthy is that the document request did not seek any records pertaining to Glenn's cognitive abilities, health, or other medical status, but was focused entirely on financial information, particularly as Lauren, Christine, and Monica had the affidavit of Dr. Brogna submitted to the Probate Court.

[52]In their appeal to the Kent County Superior Court of the appointment of Mr. Heal as the limited guardian of Glenn's estate in Griggs II, Christine, Lauren, and Monica also sought a broad array of Glenn's financial documents in an effort to show alleged improprieties. Those efforts were likewise rebuffed, this time by Ms. Justice Thompson. In re Glenn E. Griggs, KP-2005-949, -950, and -951 (SCTR 05/22/06).

Carol's name on the deed to his home, the company attorney and accountant were fired without explanation, and Carol became a director of Glenn's companies (SCTR 02/11/02 at 4-5, 7).[53] Counsel further stated that "We have reason to believe that there's undue influence on him," to which Judge Vogel inquired "By the ex-wife [Carol]?" and to which counsel replied "Primarily by the ex-wife [Carol], yes." (Id., at 5). The motion for reconsideration was denied.

Ultimately, the Superior Court determined (as Glenn had argued in the Probate Court) that because the DMAT relied upon by Lauren and Christine was not prepared by a "treating physician," the guardianship petition was not properly before either the Probate or Superior Court (SCTR 05/17/02 at 10; Griggs, 845 A.2d at 1009). An appeal taken to the Rhode Island Supreme Court was denied. The Supreme Court held (as Glenn had argued below) that the appeal to the Superior Court from the Probate Court was not perfected because of numerous failures to comply with the probate appeal statute, R.I.G.L. §33-23-1, and found particularly fatal was the failure to transmit the challenged private financial planning documents, such as the Trust, to the Superior Court. Griggs, 845 A.2d at 1011.

2. Griggs II.

During the pendency of the Supreme Court appeal in Griggs I, and despite the prior judgments of the Probate Court and the Superior Court, Lauren, Christine, Monica, Patricia, Nancy, and others acting in concert with them (including Gonya and certain attorneys not named in the Complaint) took the law into their own hands.

[53]These allegations, already presented to a state court, are regurgitated in the Complaint at ¶¶ 66, 91, 92, 126.

On June 22, 2003, Glenn was surreptitiously removed from his home,[54] and kept hidden from other family members, business associates, his counsel, and others for 11 days at Patricia's home. During this period of sequestration, Glenn purportedly terminated his attorneys and made some rather unusual demands for financial records that were otherwise in his possession and maintained in the ordinary course at his business office. In addition, Christine and Lauren, who physically participated in this affair and knew of Glenn's whereabouts, refused to tell Dan where Glenn was or to allow Dan and others to have any contact with Glenn. These events caused Dan to commence the proceedings that became known as Griggs II by filing a petition for the appointment of a limited guardian, and a petition for the appointment of a temporary limited guardian of Glenn's "person."

Dan's petition was prepared and presented by his attorney, Michael Lepizzera. On June 26, 2003, the Warwick Probate Court entered a temporary guardianship order appointing Dan and Mr. Heal as temporary limited guardians of Glenn's person and ordering that Glenn be surrendered into their custody (see, Exhibit 4).[55] The court also scheduled further hearing for July 3, 2003.

Discovery in the probate proceedings in Griggs II disclosed the following facts and circumstances leading to Glenn's removal from his home, his sequestration at Patricia's and related matters.

In May 2003, Gonya contacted Attorney S. Joshua Macktaz (Macktaz) to engage his services in matters concerning Glenn. He then telephoned Patricia and told her to meet with

[54]Prior to this misconduct, Glenn lived at his waterfront home in Warwick with round-the-clock care. And despite their removal of Glenn from his home, the participants agreed that Glenn's home was where he wanted to, and should, reside (see, e.g., Christine 02/04/04 at 406; Nancy 03/02/04 at 127-128).

[55]The Complaint alleges that attorney Bicki participated in this hearing. This allegation is a deliberate misrepresentation as plaintiffs know that Mr. Bicki did not appear in the Probate Court on June 26, 2003, or at any other time in Griggs II, and had absolutely no role in that case (see Exhibit 5).

Macktaz and Attorney John P. Larochelle (Larochelle) (Patricia, 04/08/04 at 599). On May 19, 2003, Patricia, Lauren, and Nancy met with Larochelle and Macktaz for the first time.[56] The following day, Larochelle sent a fee agreement and retainer request to Gonya, who approved the fee agreement and told Larochelle that for "administrative purposes" Patricia would sign it. Lauren, Christine, Monica, Patricia, and Nancy all signed the fee agreement with the understanding that the fees and costs incurred would be paid by Gonya without recourse to them. Larochelle and Macktaz expected to be, and were, paid by Gonya (Patricia 03/18/04 at 97; 04/06/04 at 511; 04/08/04 at 805-806; Christine 11/26/03 at 43-44).

Further meetings with Larochelle and Macktaz occurred on May 29 and June 10, 2003 (Dep.Ex. 72 [unredacted billing records of Larochelle and Macktaz]), during which the group advised the attorneys that Glenn was incompetent and easily manipulated (Patricia 04/08/04 at 606). They also discussed their (a) beliefs that Glenn was incapable of managing his own affairs; (b) "speculations" regarding their unsubstantiated belief of financial impropriety involving Glenn's assets (Patricia 04/08/04 at 581, 583, 586-587); (c) desire to terminate Glenn's counsel [Mr. Gerstein] in the Probate, Superior Court, and then pending Supreme Court proceedings in Griggs I (Lauren 12/03/03 at 45, 47); (d) desire to take over Glenn's companies and terminate then-present management; and (e) intent to terminate Glenn's relationships with other professionals (Patricia 04/06/04 at 485-501, 523, 525; 04/08/04 at 580-587, 612).

Macktaz and Larochelle quickly devised a multifaceted plan to accomplish the objective of their "clients" to gain control of Glenn and his assets. These attorneys advised their "clients" to (a) gain physical possession of Glenn, but to be sure to have Glenn "voluntarily" leave his home in their company (Christine 02/24/04 at 529-531); (b) have Glenn

[56]Although a core member of the group at that time, Christine was apparently unable to attend this initial meeting, but did participate in subsequent meetings and conduct. Monica also attended meetings with Larochelle and Macktaz, but was unable to recall the relevant dates.

execute a new power of attorney to be drafted by Larochelle, at a time when Larochelle and Macktaz and their "clients" knew Glenn was represented by counsel, without notice to or inquiry of such counsel, and at a time when they all believed that Glenn was easily manipulated and incapable of independent decision-making (Patricia 04/08/04 at 606; Christine 01/23/04 at 336; 02/04/04 at 377; 02/24/04, at 538; Lauren 12/04/03 at 137, 212; see also, Dep.Ex. 10, 32); (c) have Glenn discharge his attorneys (the attorneys explained the procedure by which to do so (Christine, 02/24/04 at 530, 598; Lauren, 12/03/03 at 55-59); (d) terminate and replace management at Glenn's companies (again, the attorneys explained how to do so) (Patricia 04/06/04 at 485-501, 523, 525; 04/08/04 at 580-587, 612; Christine 02/24/04 at 657-658); and (e) engage a hand-selected attorney to ostensibly represent Glenn—an attorney to be chosen by Macktaz and Larochelle, and who would then consent on Glenn's behalf to the objectives of taking control of Glenn (via a guardianship) and his assets, including his companies (Christine 02/24/04 at 645-657).

Gonya found this plan exciting: "[p]ursuant to our last conversation, we are excited about your recommended course of action. As to administrative matters, please forward to Pat Griggs the retainer agreement, as she and/or the daughters will sign your engagement contract***" (Dep.Ex. 63, Letter from Gonya to Macktaz dated May 20, 2003).

Once the framework was in place and Larochelle and Macktaz had received a retainer from Gonya, Larochelle prepared a General Power of Attorney for Glenn's signature in which Lauren, Monica, and Christine were named as Glenn's agents (Dep.Ex. 10, 32). This was the instrument to be used to accomplish the termination of Glenn's relationships with professionals, the firing of management of his companies, and the take-over of his companies and other assets (Christine 02/24/04 at 430-431, 530-532, 657; Lauren 12/03/03 at 36; 02/27/04 at 382-383).

According to Larochelle's billing records, the power of attorney was drafted on June 12, 2003 (Dep.Ex. 72), and approved by Macktaz that same day:

> hey jpl [John P. Larochelle]…couple of things:
> 1. i think they agreed to christine and lauren as guardians.
> 2. should we add a sentence that all other POA's previously executed are hereby nullified?
> 3. you sent me the wrong "griggs letter". i think you meant to send me the one covering our asses about the creation of the POA?
> 4. our we still doing a medical POA?
> otherwise, very impressive…i copied it to my templates! see ya.
>
> (Macktaz to Larochelle e-mail of 06/12/03, Dep. Ex. 144 [typographical and syntax errors in original])

The next day Larochelle mailed the power of attorney to Nancy and Patricia with the correct "covering our asses" "griggs letter" (Dep.Ex. 80).[57]

In furtherance of the plan, Christine, Nancy, Lauren, and Patricia discussed which members of their group would go to Glenn's home and what tactic would be used to have it appear that he left voluntarily in their company (Christine 02/24/04 at 595-596). Nancy, Lauren, and Christine were assigned the task of luring Glenn from his home and getting him to Patricia's (where Lauren also resided) (id., at 580, 597).[58] They decided to invite Glenn to lunch (id., at 596), knowing that he would likely say yes (Nancy 03/04/04 at 209).[59] They also knew Glenn had a home-care assistant, but had no intention of allowing her to accompany

[57]Monica's name was subsequently deleted from the document because she left the country for an extended vacation in Italy.

[58]As Patricia asserted her privileges against self-incrimination when the question was posed at her deposition, it may reasonably be inferred that her motivation to gain physical control of Glenn was also based upon her desire to transfer ownership of Glenn's life insurance policy to herself (Patricia 12/22/05 at 32).

[59]A lunch invitation was the same ruse used in Griggs I to lure Glenn to the parking lot in North Providence so that he could be "examined" by Dr. Stoukides.

Glenn because her presence would interfere with their plans to take Glenn to Patricia's house (Christine 02/24/04 at 583).

On June 22, 2003, Lauren, Christine, and Nancy went to Warwick to remove Glenn from his under false pretenses, and to take him to Patricia's house where he would "stay" while the other phases of the plan were effected.[60] As anticipated, the lunch ruse was successful and Glenn got into a car with Lauren and Christine, which sped off. Nancy stayed behind and told Glenn's home-care assistant that "we've got him now," that her services were no longer needed, and that she should apply for unemployment (PCTR 08/12/04 at 62; Dep.Ex. 51 [affidavit of the home-care assistant]).[61]

With Glenn in custody, Larochelle and Macktaz moved ahead. Larochelle's billing records for June 23, 2003, indicate:

> Brainstormed relevant issues and solutions regarding Griggs & Brown (sic) related to new COO taking charge, researched Griggs & Brown (sic) business structure, telephone calls to Richard Ratcliffe***
>
> (Dep.Ex. 72.)

Shortly thereafter, Lauren and Christine caused him to execute the Power of Attorney prepared by Larochelle.[62] On instructions from Larochelle and Macktaz, Lauren, Christine, and

---

[60]On June 22, 2003, the "extraction team" arrived at Glenn's home in two cars to ask Glenn to "lunch." Arrangements were made to meet Nancy at Iggy's restaurant in Warwick, if Glenn succumbed to the "lunch" ruse. The home-care provider freely let them into the house to "visit" Glenn and agreed that they could take Glenn to lunch, conduct that plainly contradicts any notion that the home-care provider, or anyone else, was under instructions not to allow visits between the women and Glenn, as was claimed, from time to time in the Probate Court, and as is alleged in the instant Complaint.

[61]The Complaint summarily concludes that this affidavit is false (Complaint at ¶ 239), despite the fact that it is supported by the evidence adduced during the probate proceedings, and despite the fact that it was never challenged in any proceeding in Griggs II. When Nancy, Lauren, and Christine were directly confronted with the statements contained in the affidavit, they did not deny them.

[62]This power of attorney was subsequently disavowed by successor counsel for Lauren, Christine, Monica, Patricia, and Nancy because of Glenn's "condition" when he signed it, and because the power of attorney was "ill-advised" (PCTR, 04/15/05 at 22).

Patricia also had Glenn purportedly terminate his counsel by signing a letter to that effect, which was then faxed to Mr. Gerstein from a public mailbox company (Dep.Ex. 8).[63] At some point before Glenn's counsel was allegedly terminated, Patricia invited her personal accountant to her house ostensibly to meet with Glenn (Patricia 04/08/04 at 760). The purpose of the meeting was to engage the accountant once control of Glenn's companies was attained (Patricia 04/08/04 at 777). According to Patricia, the accountant declined the proposed engagement.

On June 30, 2003, Larochelle and Macktaz arranged for attorney Frank Orabona (Orabona) to "represent" Glenn. Macktaz paid Orabona $5,000 to act as "co-counsel Griggs," but Orabona's true role was to masquerade as Glenn's attorney (Dep.Ex. 72 [Larochelle's billing records for June 30, 2003: "Telephone calls to David Gentile (declining representation) and Frank Orabona (accepting representation) and brief background explanation"]; Dep.Ex. 45 [Correspondence from Macktaz to Orabona concerning the initial payment by Macktaz to Orabona of $5,000: "Enclosed please find a check for $5,000.00 representing your fee for the Griggs' matter for the dates of June 30, July 1, and July 2, 2003***"]; Dep.Ex. 46 [Orabona's letter to Macktaz acknowledging receipt of payment for services rendered on June 30, July 1, and July 2, 2003]; and Dep.Ex. 131 [Orabona's affidavit confirming receipt and negotiation of a check in payment from Macktaz marked "co-counsel Griggs" (Exhibit 23)]).[64]

With their legal team in place, on June 30, 2003, Larochelle and Macktaz also first disclosed the names of the "Griggs family members" whom they claimed to represent (Dep.Ex.

---

[63]Upon receipt of the purported termination letter, Mr. Gerstein and co-counsel, Lauren Jones, sought the advice of Rhode Island Supreme Court Disciplinary Counsel David Curtin as to their ethical obligations under the circumstances. They were advised that it would be appropriate to request an in-person meeting with Glenn to confirm the termination. Efforts to have such a meeting with Glenn (Exhibit 22) were rejected by Larochelle and Macktaz and/or their clients.

[64]Orabona also received an additional payment of $10,000 from Gonya. The evidence showed that Orabona's purported representation of Glenn was a sham, and at all times he acted as the duly authorized agent of Lauren, Christine, Monica, Patricia, Nancy, Macktaz, Larochelle, and Gonya in his capacity as "co-counsel Griggs" with Larochelle and Macktaz.

104; see also, Probate Court Decision and Contempt Order of 02/11/05, at 3).[65] As a result of that disclosure, on July 1, 2003, Mr. Lepizzera advised Larochelle of the June 26, 2003, Temporary Limited Guardianship order, faxed him a copy of it, and demanded compliance with its terms. Larochelle refused to have his clients comply with the Order and refused to disclose Glenn's whereabouts (id., and PCTR 08/12/04 at 47-48).

Instead, Macktaz contacted both Patricia and Orabona to hastily arrange a late night meeting with Orabona (Orabona 12/19/03 at 121-123; Patricia 03/19/04 at 184-185). Patricia and Lauren brought Glenn to the meeting, which was also attended by Nancy, Christine, and Deborah.[66] At that meeting, Orabona stated that standing counsel for Glenn would be terminated and that Orabona was Glenn's new attorney (Patricia 03/18/04 at 98-99; 03/19/04 at 184-185). Orabona then had Glenn sign a document to that effect. Glenn did not explain anything at all to Orabona at the meeting (or at any other time) and did not read the "Discharge and Engagement" document that Orabona had Glenn sign and that was then "witnessed" by Lauren (Christine 11/26/03 at 96, 98; Lauren 12/03/03 at 42; see also Dep.Ex. 2).

The decision that Orabona would be Glenn's attorney was made by Larochelle and Macktaz without Glenn's knowledge or consent, before Glenn was brought to Orabona's office (Nancy 03/04/04 at 174, 181, 297-298; Patricia 03/19/04 at 184-185; Christine 02/24/04 at 657). Orabona's true function was not to provide independent legal advice to Glenn, but to acquiesce in the take-over of Glenn and his companies by the group. According to Christine, the purported engagement of Orabona was part of the "plan" conjured up by Macktaz and

---

[65]The contempt decision was previously provided to this Court as an Exhibit to the Abbreviated Memorandum of Law In Opposition To Plaintiff's Revised Ex Parte Motion For Emergency Temporary Restraining Order [docket entry #7], and is incorporated herein by reference.

[66]Deborah appeared to be inebriated at this meeting (Christine 01/16/04 at 217). The Complaint apparently places great reliance on statements purportedly attributed to Deborah. However, in both Griggs I and Griggs II, Lauren, Christine, and others testified as to Deborah's untrustworthiness because of her alcohol abuse.

Larochelle (Christine 02/24/04 at 657). Orabona's role was to be hired ostensibly as Glenn's attorney, and then to agree to the appointment of Lauren and Christine as Glenn's guardians. Christine was told by Larochelle and Macktaz that Orabona would do just that (id., at 645-646).

> I don't remember the whole plan but basically what it was, was that—let me just think—and I may not say this right—that Frank Orabona would be the attorney, okay, and then Lauren and I would be the guardian. At that point, we could walk into Griggs & Browne and have a new general manager or somebody running the company.
>
> (Id., at 657).

Christine further testified that they would then be able to take over the companies because they would be acting in place of Glenn (id., at 658).[67]

On July 2, 2003, Larochelle filed an "Emergency Motion" in the Kent County Superior Court for injunctive relief against enforcement of the June 26, 2003 Temporary Guardianship Order. Orabona assisted in the presentation of that motion by pretending to represent Glenn and supporting the motion.[68] The motion was summarily denied.[69] However, Glenn was not voluntarily brought to the Probate Court for the hearing on July 3, 2003.[70] Instead, Judge Earle had to again order Glenn's appearance, and recessed the hearing to await Glenn's arrival. During the recess, Lauren, Christine, Patricia, and Gonya had Glenn

---

[67]There is some discrepancy in the evidence of whether the Power of Attorney created by Larochelle would be the basis of the takeover Glenn's companies, instead of a guardianship (see, Lauren 2/27/04 at 380).

[68]Although he was present and participated in the chambers hearing before Judge Nugent on the motion to vacate the Temporary Guardianship Order, Orabona—remarkably—testified at his deposition that he did not know what that hearing was about. (Orabona 01/10/04 at 377-379; 02/22/04 at 471-472, 495-496; 03/26/04 at 608, 612).

[69]Instead of complying with the Temporary Guardianship Order, and knowing that a hearing was scheduled in the Probate Court the next day, Christine, Lauren, and Patricia invited a reporter from the *Providence Journal* to Patricia's house on the evening of July 2, 2003, so the reporter could "interview" Glenn. The "interview" was included in a front page story that appeared in the *Providence Journal* on February 8, 2004, was less than complimentary to Glenn and caused difficulties with his businesses (Dep.Ex. 69, 69A).

[70]Christine, Lauren, and Patricia, or all of them, did, however, arrange for a *Providence Journal* reporter and photographer to be present at the hearing. Gonya was also present.

sign fraudulent documents fabricated earlier that morning by Christine and Gonya; the documents were then backdated (Christine, 01/23/04 at 268-275).[71] Before the group left the courthouse to retrieve Glenn, and before they caused him to sign those documents, the documents were shown to Larochelle and he was asked whether Christine or Gonya should have Glenn sign them. Larochelle told them that they should. By letter dated July 21, 2003, Gonya wrote to Macktaz:

> Chris [Peabody] and I wrote the documents and she typed them. I showed them to John [Larochelle] the day of the trial and asked if [Glenn] should sign them before we brought him [Glenn] to court. He said yes. I believe, I or he suggested if we didn't need them we wouldn't use them. Therefore, I thought they were attorney workproduct and therefore privileged. My mistake.
> ***
> The dates of the document are not when Glen signed the document but when they were filled in by one of the children I believe ***
>
> (Typographical, spelling, and syntax errors in original)

When Glenn was finally brought to Court on July 3, 2003 Judge Earle, with everyone's consent (see, Exhibit 4), interviewed him in camera. The Court determined that Glenn would benefit from the appointment of a temporary limited guardian of his person, and that he should be returned to his home from which he was removed on June 22, 2003. Glenn, accompanied by his home-care assistant, returned home directly from the courthouse, and remained there until his death.

At hearing on July 3, 2003, Larochelle, who was then representing Lauren, Christine, Monica, Patricia, and Nancy (and Gonya) launched into a vituperative attack on Glenn's

[71]The documents included a purported Marriage Contract between Patricia and Glenn, an Amendment to Glenn's Durable Power of Attorney replacing Mr. Heal with Christine, Lauren, and Monica as Glenn's agents, and "Instructions" to Dan that he could not use any company money in the guardianship litigation. See, Dep.Ex. 5, 6 and 9.

counsel and "his team," presumably meaning to include Mr. Heal (PCTR 07/03/03 at 58-61, 67-69).

> Mr. Larochelle: So when there's allegations of undue influence on both sides, none of them fall on Attorney Orabona. Many of them fall on Attorney Ed Gerstein. As a way of background to the case, I'll try to give you an abbreviated version. I can understand that my clients would probably rather have me, justifiably, speak here for hours about all of the things that they have been through. But my clients would allege, Your Honor, that undue influence has been wielded by Carol Griggs, who is here, also with her attorney Edward Gerstein, and that they have done it in such a way as to exclude Glenn Griggs any contact with the family, that they have systematically done some of the following very concerning things.
>
> They fired the accountant for Griggs & Brown who was the accountant for 20 years. He was fired. An accountant of their choosing was put in place. Glenn Griggs' longstanding physician was terminated and a physician of their choosing was put in his place. The financial planner of Glenn Griggs for a long time, many, many years, contacted the Griggs family and said, "Something very strange is happening. Carol Griggs is coming in with Glenn Griggs and changing these things that he has in place. She is wielding some type of influence on him. I need to have a conversation with you. Very bad things are happening. You should be very concerned." That man was then terminated by Carol Griggs and her team of people. To now turn over Glenn Griggs to that camp temporarily and say, "Temporarily, Ed Gerstein is still in charge of Glenn Griggs," and to keep it the so-called status quo is to continue to allow this man his assets, his health, his relationship with his family to be flushed down the toilet, because this decision is going to govern how the rest of this case goes.
>
> And I'd ask you to consider that I could go on ad nauseam giving other examples about the way which he was treated, but I will not. And I will rest on those three main points
>
> ****
>
> (PCTR 07/03/03 at 67-69).

Larochelle's allegations concerning Mr. Gerstein and Mr. Heal were subsequently disavowed by the group, and others, during their depositions. Christine testified that she had no information to support the allegations that Mr. Gerstein had any role in the termination of Glenn's financial advisor, physician or the accountant for the companies, and that she did not

tell Larochelle that Mr. Gerstein had any such a role. Christine also testified that she had no information to support the allegation that Mr. Gerstein, or Mr. Heal, exercised any improper influence over Glenn, or that they engaged in any improprieties concerning Glenn's assets or the assets of the companies (Christine 02/04/04 at 466, 474-475, 487-488; Exhibit 24).

Monica likewise testified that she had no information to support the allegations that Mr. Gerstein had any role in the termination of the financial advisor, physician or accountant, did not tell Larochelle that Mr. Gerstein had such a role, and that she had no information to support any allegations of financial improprieties by either Mr. Gerstein or Mr. Heal. (Monica 05/13/04 at 43-44, 61-63; Exhibit 25).[72]

Lauren did not testify to any facts, rumors or speculations that would support the allegations made by Larochelle against Mr. Gerstein concerning the financial planner, physician and accountant, and acknowledged that she had no information that to support the allegation that Mr. Gerstein was converting Glenn's assets (or those of the companies) for his own benefit, assisting anyone else to do so, or that he even had access to Glenn's assets. (Lauren 12/3/03 at 84; 2/27/04 at 349, 374; Exhibit 26).

Patricia denied that Mr. Gerstein had any role in the termination of the accountant or change of physician, as Mr. Gerstein was not even Glenn's lawyer at the time.[73] She testified that she had no information to support the allegation that Mr. Gerstein had any role in the change of Glenn's financial advisor, and that she did not tell Larochelle or Macktaz that Mr.

---

[72]Larochelle and Macktaz withdrew as counsel on September 24, 2003, ostensibly because Patricia, Lauren, and Christine had failed to inform the attorneys that they had caused Glenn to change ownership of a life insurance policy to Patricia during the period of sequestration. None of the four teams of lawyers who subsequently represented Lauren, Christine, Monica, Patricia, and Nancy pursued these specious allegations about Mr. Gerstein, sought to disqualify him, or raised any other claims of conflict or impropriety by him in any of the proceedings in Griggs II.

[73]Interestingly, Patricia testified that the accountant, Vincent Vinci, was "heartsick" over what Michael had done and felt personally "betrayed" by Michael because of Michael's kickback scheme (Patricia 3/19/04 at 119-120). Compare, the Complaint at ¶120 where plaintiffs allege that Mr. Vinci did not know of Michael's wrongdoing.

Gerstein had any role in the "three main points" raised by Larochelle at hearing on July 3, 2003. Patricia also testified that she had no evidence of any financial improprieties by Mr. Gerstein or Mr. Heal, and that none of the myriad of lawyers who represented the group ever told them that they had evidence of any such alleged impropriety. In fact, Patricia made plain that Larochelle never claimed to have any evidence to support the allegations made by him on July 3, 2003, concerning Mr. Gerstein or Mr. Heal (Patricia 3/18/04 at 77; 4/5/04 at 308-309, 351; 4/6/04 at 419-439; Exhibit 27).

Nancy similarly offered no support for Larochelle's allegations. She had no information that Mr. Gerstein was involved in the "three main" points raised by Larochelle, or any other improprieties concerning Glenn. She did, however, express a belief that Mr. Gerstein could not act in Glenn's best interest because Mr. Gerstein is from Little Compton (Nancy 3/4/04 at 253).

Larochelle also intentionally failed to disclose that he and Macktaz chose, arranged for, and paid Orabona (from funds provided by Gonya) to seemingly represent Glenn. Instead, Larochelle made misrepresentations of material fact to the Court concerning the alleged circumstances of Glenn's "engagement" of Orabona and termination of Mr. Gerstein:

> Mr. Larochelle: ***My second point regarding just that point of just the attorney determination is that I expect you're going to hear Frank Orabona stand up and say that he met with Glenn Griggs, he had a conversation with Glenn Griggs, that Glenn Griggs asked him to be his attorney and told him that he did not want Ed Gerstein to be his attorney.
>
> ***
>
> Also, I believe that Attorney Orabona is going to say that he had a cogent conversation with him [Glenn] and he [Glenn] made a knowing and intelligent decision to do that [hire Orabona]. So to say now that Attorney Orabona, after having gone through these conversations with [Glenn], having taken the steps that an officer of the court would have to take in order to come to that decision a few days ago and make a decision as an officer of this court that this person is making a knowing and voluntary decision ***And in its face you will say that Frank Orabona is

> either lying to you now when he says that he [Glenn] made a cogent decision, that he is being untruthful to the Court about his representations that [Glenn], at that time knew what he was doing***
>
> (PCTR 07/03/03 at 65-67).

Orabona also sought to further the interests of Larochelle's "clients" with his own misrepresentations of material fact concerning the circumstances under which he was allegedly engaged, the scope of this sham engagement, and Glenn's purported termination of standing counsel.

> ***on July 1st, he [Glenn] voluntarily came to my office, explained to me the situation and asked me to represent him *** [Glenn] then located me, contacted me, came to my office on July 1st *** [and signed a document] appointing me his attorney for all legal matters.
>
> (Id., at 21-22).

Later in the hearing, and after a lengthy chambers conference in which Orabona claimed ignorance of the appeal in Griggs I then pending in the Supreme Court, he again addressed the Court:

> [h]e [Glenn] came into my office, sat down. He told me that he wanted me to represent him in his probate matters. The form that I had used said all legal matters, but it was actually for the probate thing that he wanted me to represent him in. We had a discharge and appointment sheet typed up. I read it to him and he read it along with me and hand-signed it and said that he wanted me to represent him in this case.
>
> (Id., at 69-70).

Then, in response to a direct inquiry by the Court, Orabona represented that

> [h]e [Glenn] did speak in complete sentences for the most part. But it is my understanding that he has some type of speech impediment [and that] I believe that somebody from his family, one of his daughters, gave him a ride over. Although I didn't

see them driving the car, but one of his daughters came into the office with him.

(Id., at 70-71).

Orabona also claimed that he was "not positive how I was selected" to represent Glenn (id., at 71).

All the evidence adduced in court and at the various depositions demonstrated the falsity of the representations made by Larochelle and Orabona and the participation of Lauren, Christine and the others in the attempt to deceive the Probate Court:

Q. Can you tell me if Glenn selected Frank Orabona to be his lawyer?
A. No, he did not.
Q. And, in fact, you were one of the persons that selected Frank Orabona to be Glenn's attorney, correct?
A. Yes.
Q. And Lauren selected Mr. Orabona to be Glenn's attorney?
A. That's right.
Q. And Christine?
A. Yes.
Q. And Nancy?
A. Yes.
Q. And Debbie?
A. Yes.[74]
Q. And John Larochelle?
A. Yes.
Q. And Josh Macktaz?
A. Yes.

(Patricia 04/08/04 at 612, 768-769)

Q. When you had the meeting with Mr. Orabona at his office, what was told to Mr. Orabona about why Mr. Gerstein was being replaced?
A. I believe that Josh [Macktaz] and John [Larochelle] had already talked to him because we just got a call that Frank Orabona was the choice for a lawyer for --for dad, for Glenn, and that he was willing to meet with us on that particular night

[74]Deborah's testimony was that she did not participate in the decision to engage Orabona, but that the decision was already made when Christine picked her up at 9 p.m. on the evening of July 1, 2003, and that she did not expect or want to go to Orabona's office.

> and so I --I don't think we got into any detailed conversation about why. It was already decided or had already been discussed by the lawyers.
> Q. So when you say you got a call from Josh and John that Mr. Orabona was the choice of lawyer representing Glenn, you mean their choice?
> A. Yes.
> Q. Their being Josh and John's choice?
> A. Yes.
>
> (Patricia 03/19/04 at 184-185)
>
> Q. During this meeting with Mr. Orabona, did your father explain to Mr. Orabona the fact that a guardianship proceeding had been brought against him by Dan Griggs?
> A. No.
> Q. Did your father explain to Mr. Orabona any of the legal problems that your father was having at that time?
> A. No.
> Q. Did your father explain anything at all to Mr. Orabona?
> A. No.
>
> (Lauren 12/03/03 at 42).

At hearing on July 3, 2003, the court expressed considerable concern and reservation about the alleged discharge Mr. Gerstein as Glenn's counsel, and the purported engagement of Orabona (PCTR 7/03/03 at 75-76), and scheduled a "representation hearing" for July 28, 2003, to determine Glenn's counsel. The court also appointed attorney Michael St. Pierre as the temporary limited guardian of Glenn's "person" with the authority to determine where Glenn would live, and with whom he could associate.[75] In addition, Mr. St. Pierre was authorized to obtain Glenn's medical information. However, as the issue of Glenn's representation was then unsettled, the Order that entered specifically provides that it was without prejudice to Glenn's rights (see, Exhibit 4).

The next two probate hearings were largely devoted to discovery-related matters surrounding Glenn's representation. During this interim period, Larochelle also filed a

motion to have Lauren and Christine, rather than Dan and Mr. Heal, appointed as Glenn's guardians.[76]

An evidentiary hearing on the representation issue was conducted on July 28, 2003 (PCTR 07/28/03 [Vol. 2]). Prior to the hearing, Attorney St. Pierre, in his capacity as temporary limited guardian of the person, advised the Court that Glenn had sufficiently recovered since his return to his home on July 3, 2003, to participate in the selection of his counsel (PCTR 07/28/03 [Vol. 1] at 13). To accommodate Glenn's participation (under the ADA), the proceeding was conducted in Glenn's home. After hearing directly from Glenn, the Court determined that Glenn expressed a clear preference that Mr. Gerstein continue to represent him (Exhibit 28). Orabona's sham representation was then terminated. No appeal from, or other challenge was made to, Orabona's termination or Mr. Gerstein's continuation as Glenn's attorney.

Once the representation issue was resolved, the first matter to be addressed was the fact that no DMAT was filed with Dan's petition because of the exigencies presented by Dan at hearing on June 26, 2003. The next four probate court hearings were primarily devoted to this issue [PCTR 08/13/03, 08/21/03, 09/18/03, and 09/24/03 (in part)], including extensive argument as to whether a DMAT was a jurisdictional prerequisite in a guardianship proceeding, the role of a DMAT in contested guardianships,[77] and the conflict between the Health Care Information Act (which prohibits disclosure of health care information, absent compliance with the statutory requisites), and the guardianship statute's requirement that a

---

[75]The baseless attack on Mr. Heal was, at least in part, responsible for the appointment of Attorney St. Pierre.

[76]Successor counsel filed a "Notice To Join Petition For Limited Guardianship or Guardianship" seeking to have Lauren and Christine appointed as Glenn's guardians. When that was denied, counsel withdrew the motion filed by Larochelle.

[77]In a contested guardianship proceeding, the Rules of Evidence apply, R.I.G.L. §33-15-5, and a DMAT would be hearsay.

DMAT (which necessarily contains confidential health care information) be filed with each petition.

Judge Earle found that there was an "irreconcilable conflict, in my mind at least, between Chapter 37.3 of Title 5 of the Confidentiality of Health Care Communications and Information Act and the provisions of Chapter 15 of Title 33, the Guardianship Statutes, specifically 33-15-4" (PCTR 08/23/03 at 16). While the issues were being hashed out, Mr. St. Pierre sent Dr. Brogna a letter requesting that Dr. Brogna complete a DMAT and forward it directly to Judge Earle, with the understanding that the DMAT would be held, but not reviewed, pending resolution of the issues. The DMAT was received by the Court on September 18, 2003 (PCTR 09/18/03 at 2-4), and resolved by order entered on October 10, 2003, when all counsel agreed that the DMAT would be reviewed by Judge Earle in camera, and thereafter maintained under seal (Exhibit 29).[78]

With the representation and DMAT issues resolved, the case proceeded on its merits. Lauren, Christine, Monica, Patricia, and Nancy had previously been ordered, in part, to produce copies of any documents signed by Glenn during his 11-day "stay" at Patricia's home, and to represent that all such documents were, in fact, produced (Exhibit 30). In response, Larochelle produced the documents fabricated and backdated by Lauren, Christine, Patricia, and Gonya on July 3, 2003, during the court recess before Glenn arrived.[79] Despite Larochelle's knowledge of the documents' provenance, he did not disclose that fact to the Court or counsel. The "Change in Ownership" form for the insurance policy that Patricia, Christine, and Lauren caused Glenn to sign while he was in their "custody" was also not

[78]Compare the allegations of the Complaint at ¶ 290.

[79]The documents were filed under the guise of "Heirs at Law Answer To Demand For Disclosure."

produced.[80] At hearing on September 24, 2003, fully aware of the falsity of the documents produced by Larochelle, and fully aware of the existence and non-production of the "Change of Ownership" form for the life insurance policy, Macktaz represented to the Court and counsel that the documents previously produced by Larochelle also encompassed the response of Patricia and Nancy to the disclosure order (Exhibit 31).[81] Larochelle and Macktaz then withdrew from the case [PCTR 09/18/03; 09/24/03 (open) and (sealed)].

The misconduct of Lauren and Christine, and others acting in concert with them made discovery an arduous, expensive, and lengthy process. Discovery obstructions spanned from the mundane, such as the failure to appear for depositions or to comply with subpoenae duces tecum, to the more serious, such as deceptive, misleading, and false deposition testimony, outright defiance of Court orders, and the filing of frivolous motions for protective orders (e.g., Statement of Counsel re Lauren's deposition, 10/03/03; Statement of Counsel re Christine's deposition, 10/14/03; see also, Lauren's invocation of her privileges against self-incrimination in response to the question whether her deposition testimony was truthful [Lauren 12/27/05 at 35]; and PCTR 10/10/03; 10/30/03; 12/9/03). Lauren and Christine were adjudged in contempt for many of these incidents and other obstructionist conduct (Exhibit 32; PCTR 12/09/03). One sanction imposed was a waiver of the attorney-client privilege with

[80] At hearing on September 24, 2003, Macktaz referred to Glenn's "stay" as one of being in the "custody" of his clients (PCTR, 09/24/03 at 33). See also, Contempt Decision and Order 02/11/05 at 6, fn. 3.

[81] During the depositions in Griggs II it was admitted that the purpose of the falsified documents was to gain control over Glenn's assets. This is also described in the Superior Court decision that dismissed the appeal of the appointment of defendant David Heal as the limited guardian of Glenn's estate in Griggs II. In re Estate of Glenn E. Griggs, 2006 WL 3720309 (R.I.Super. 12/12/06). In the related proceedings to recover ownership of the life insurance policy (see footnote 24), Patricia admitted that during Glenn's sequestration she believed that he was incompetent and lacked the ability to make decisions concerning his financial affairs—a belief that she attributed to Christine and Lauren as well. This, however, did not stop Patricia, with help from Christine and Lauren, from converting the insurance policy at a time that Glenn was under the protection of the Probate Court, and when they were in disobedience of the Temporary Guardianship Order.

certain former counsel based, in part, on the ubiquitous involvement of Gonya in the probate proceedings:

> I consider as well the fact that Paul Gonya's involvement in communications among your clients and the attorneys who represented them or who purported to represent them also acts as a breaking point, if you will, with regard to the privileged nature of the communications.
>
> (PCTR 12/9/03 at 48).[82]

Lauren, Christine, Patricia, and Nancy were also adjudged in contempt for their deliberate defiance of the Temporary Guardianship Order of June 26, 2003,[83] and the Probate Court has determined that they are liable for compensatory sanctions, including all attorneys fees and costs incurred as a result of the "representation issue" involving Orabona, all discovery abuses (including, but not limited to, those encompassed by the contempt Order of 12/24/03), all attorneys' fees and costs incurred in the Superior Court litigation to recover ownership of the life insurance policy from Patricia, and all attorneys' fees and costs incurred in investigating, preparing, and prosecuting the contempt adjudications (see, Exhibit 9). Determination of the specific amount of these compensatory sanctions is presently pending in the Probate Court.

Once the scope of the misconduct was uncovered, a petition to appoint Mr. Heal as a temporary limited guardian was filed on Glenn's behalf. The authority sought for Mr. Heal, whom Glenn had previously designated in his Trust as his fiduciary, was restricted to requiring his co-signature on any document Glenn signed purporting to create an obligation,

[82] An appeal was filed from the imposition of this sanction, and then withdrawn with prejudice when the parties agreed on entry of a Consent Order in the Probate Court recognizing the waiver of the attorney-client privilege between certain of the plaintiffs, Patricia and Nancy, and Larochelle and Macktaz. As such, the adjudication of contempt and sanction waiver of privilege is final.

[83] Monica was in Italy at the time and arguably unable to comply with the Order, so a contempt adjudication was not sought against her.

transfer an asset, or authorize another to act on Glenn's behalf. Mr. Heal's appointment and the grant of restricted authority were in direct response to, and to prevent a recurrence of, the events occurring during Glenn's 11-day sequestration when he was deceived or forced into the execution of documents.

At hearing on April 15, 2004, the Probate Court expressed concern "about the events of last spring being repeated" (PCTR 04/15/04 at 20). The court inquired of then-counsel for Lauren, Christine, Monica, Patricia, and Nancy whether he had any substantive objections to the appointment of Mr. Heal. Having attended all of his clients' depositions (and the partially completed deposition of Deborah), having heard their testimony concerning Mr. Heal, Mr. Gerstein, Carol and others, and having had the opportunity to make inquiry into any matters of his choosing, counsel responded "I don't have any evidence of anything against Mr. Heal" (id., at 23).[84] Mr. Heal was then appointed as requested (Exhibit 33).

On September 29, 2005, Mr. Heal was appointed limited guardian of so much of Glenn's estate as was then within the jurisdiction of the Probate Court. The scope and authority of the limited guardianship was defined with specificity, and excluded Glenn's assets, rights, and obligations embraced by Glenn's inter vivos Trust that Judge Evangelista had previously found as valid and effective less restrictive alternatives to a guardianship.

Christine, Lauren, and Monica then filed three separate, but interwoven, de novo appeals to the Superior Court of Mr. Heal's appointment as limited guardian, asserting that the appointment was not in the best interests of Glenn or his estate.[85] Once again, they sought extensive discovery of Glenn's finances, including his Trust and private financial documents,

[84]As to Mr. Gerstein, counsel stated "I have no evidence whatsoever that counsel is engaged in any kind of inappropriate behavior and I've never made that allegation" (id., at 9). This attorney also had met with and subsequently attempted to enter his appearance in the probate proceedings on behalf of Deborah.

[85]The appeals also alleged three other issues concerning the appointment of Mr. Heal not here material.

bank records, and payments to counsel, doctors, and others. (Exhibit 34). Objections to the discovery request were filed on behalf of both Glenn and Mr. Heal.

A lengthy discovery hearing was conducted on May 22, 2006, at which then-counsel for Lauren and then-counsel for Monica argued that the financial information was relevant and necessary to support their position concerning the suitability of Mr. Heal to act as Glenn's fiduciary. They argued that, at trial, an in-depth factual inquiry of all of the circumstances was necessary: "We have been here close to an hour, Judge, and you asked and received a general picture, not complete, of what has been going on in the entire history of the case of Glenn Griggs. I would submit, Judge, the more you go with that, the deeper you go with that. You certainly have the right to go as deep as you want. You will see it's a fact driven scenario" (SCTR 05/22/06 at 30). The Court rejected several of the arguments, and continued the matter for further hearing and motion practice.

Glenn then moved to dismiss, or in the alternative, for summary judgment. Substantive memoranda were submitted by the parties. Oral argument was presented on October 12, 2006. On December 12, 2006, the Superior Court (Thompson, J.), issued a written decision dismissing the appeals, noting:

> The determination of what is or is not in the "best interests" of a person who stands before a court requires the exercise of sound judicial discretion and necessarily involves a fact-based inquiry. *See e.g. In re Kayla N.*, 900 A.2d 1202(R.I. 2006). Rhode Island has a settled judicial tradition of engaging in an examination of *all* relevant circumstances when determining what is in a person's "best interests," particularly when that person is impaired or otherwise incapable of making his or her own decisions because of age or infirmity.
>
> In re Estate of Glenn E. Griggs, 2006 WL 3720309

Judgment then entered against Lauren, Christine, and Monica. Their subsequent motions to amend the judgment, or in the alternative for reconsideration were denied. Appeals to the Rhode Island Supreme Court by Christine and Monica were dismissed (see, Exhibit 8).[86]

From July 3, 2003 until Glenn's death on December 27, 2007, Attorney Michael St. Pierre, in his capacity as temporary limited guardian of the person, had the authority to determine who would be permitted to visit with Glenn. Mr. St. Pierre rightfully did not view his responsibilities as an obligation to be proactive and seek out plaintiffs, or other family members to visit with Glenn, particularly as the plaintiffs were Glenn's adult children (PCTR 11/17/05 at 51-52). Rather, when plaintiffs, or others, requested visitation with Glenn, Mr. St. Pierre would balance Glenn's desires about the visits, the health and maintenance care that Glenn was receiving at home, and Glenn's health, doctors appointments, and similar matters.[87] For substantial periods of time, none of the plaintiffs requested visits with Glenn. At other times, requests for visits were sporadic, and, at times Mr. St. Pierre supervised some visits. Counsel for plaintiffs, and plaintiffs themselves, often communicated directly with Mr. St. Pierre concerning visits without the involvement of counsel for Dan or Glenn. Apparently, at times, in the exercise of his discretion, Mr. St. Pierre denied or restricted visits.

The visitation issue also was before the Court. At hearing on April 14, 2004, with then-counsel for Lauren, Christine, and Monica (and Patricia and Nancy) present, Mr. St. Pierre provided a report on the issue of visitation in which he advised the court of his meetings with Glenn outside the presence of Mr. Gerstein, Mr. Heal, or Carol, and of Glenn's continued unwillingness to visit with his children (PCTR 04/15/03 at 35-36). Then-counsel

[86]Lauren did not appeal to the Supreme Court.

[87]For lack of a better description, a private nursing home was set up for Glenn within his home. He had round-the-clock third-party care-givers, visiting nurses, therapists, and a fixed schedule. Glenn also had out-of-the-home appointments.

for Deborah, and then-counsel for Lauren, Christine, and Monica raised the issue of their clients' visiting with Glenn, and acknowledged that it was a matter for discussion between Mr. St. Pierre and them. The Court made plain that if satisfactory arrangements could not be reached with Mr. St. Pierre, those attorneys were free to bring a motion to address the performance of Mr. St. Pierre's duties (id., at 68-69).[88]

In February 2005, Mr. St. Pierre advised Mr. Gerstein (and presumably others) that he would allow unsupervised visits with Glenn commencing shortly. Mr. Gerstein's response was not an objection to the visits, but an inquiry as to the parameters of the visits, such as who had what authority if a visit was not going well, was too long, or Glenn was not feeling well (PCTR, 2/14/05 at 6). As Mr. St. Pierre and Mr. Gerstein were unable to communicate by telephone prior to the scheduled start of the unsupervised visits, a motion was filed requesting that some parameters be set (Exhibit 35). The court heard the motion expeditiously, and Mr. St. Pierre acknowledged that the issues raised at hearing on the record and in the presence of then-counsel for Lauren, Christine, and Monica, were "good concerns" and he clarified the terms of the proposed visits (id., at 31-32).

The issue of visits was again presented at hearing on November 17, 2005, at which time then separate counsel for Lauren, Christine, and Monica had each filed motions for visitation. At hearing, Mr. St. Pierre recommended that visits be allowed for Lauren and Monica, but not Christine because Glenn did not want to see her. No objections were lodged on Glenn's behalf, but some ground rules were sought because of the care that Glenn was receiving in his home and the prior misconduct of the group (PCTR 11/17/05 at 61-62). Again, the court made plain that the issue of visits was within the authority of Mr. St. Pierre

[88]At hearing, counsel for Lauren, Christine, and Monica also claimed that Carol was "schooling" Glenn about certain family members.

and the motions were withdrawn. Mr. St. Pierre, with the agreement of counsel for Lauren and Monica and Lauren and Monica themselves, adopted the suggestions advanced at hearing by Mr. Gerstein to facilitate the visits, and Mr. St. Pierre added some other rules of his own making (Exhibit 36).

After a joint visit between Lauren, Monica and Glenn that had a negative impact on Glenn, Mr. St. Pierre advised then-counsel for Lauren and Monica in writing of additional restrictions concerning permissible conduct during the visits. This letter triggered yet another visitation motion, and a formal response by Mr. St. Pierre (Exhibit 37).[89] The matter was heard on July 6, 2006, at which time then-counsel for Lauren acknowledged that Mr. St. Pierre was the "gatekeeper" and that matters of visitation were in his discretion (PCTR 07/06/06 at 11. The Court denied the motions ruling that it had no authority to compel visitation between adult children and an adult parent (id., at 21), and that a motion to remove Mr. St. Pierre should be filed if anyone was unsatisfied with his performance of his duties. (id., at 23-24).

The evidence available before the Complaint was filed is clear and overwhelming that plaintiffs' interactions with Glenn were under the judicially appointed auspices of Mr. St. Pierre, that these issues were addressed by their respective counsel and Mr. St. Pierre, and that plaintiffs, through counsel or otherwise, were free to file motions and seek a judicial determination of the performance by Mr. St. Pierre of his duties. They did not.[90]

---

[89]The motions resulted, in part, from a letter dated May 31, 2006, sent by Mr. St. Pierre to counsel for Lauren, Christine, and Monica concerning a visit with Glenn by Lauren and Monica. The Complaint offers that letter as the linchpin of its Title III claim and proof that the visits were being recorded (Complaint at ¶¶ 292-294). However, Mr. St. Pierre filed a written response to the visitation motions (Exhibit 38), and unambiguously set forth that the information set forth in his letter resulted from conversations that he had with Glenn's caregivers after the contentious visit.

[90]The Complaint also alleges that Glenn was placed in an assisted living facility and that only Dan knew where he was (Complaint at ¶237). Had Mr. Reilly engaged in pre-filing diligence, he would have learned that not only is this allegation false, but that Lauren and Christine visited with Glenn there several times.

At various times throughout Griggs II, successor counsel for Lauren, Christine, Monica, and others, stated that the "plan" conjured by Larochelle and Macktaz that Gonya found "exciting," and that was executed by Lauren, Christine, Patricia, and Nancy, and in which Monica participated, was a "stupid plan that no attorney in their right mind would come up with" (PCTR 07/29/04 [Vol. 1] at 14), results from "some really bad advice and their willingness to follow that bad advice" (PCTR, 02/14/05 at 23), and that "all the bad acts of my clients was undertaken on advice of counsel with pushing of documents from counsel and those guys are going to have to pay the price eventually***" (PCTR 02/14/05 at 21, emphasis added). By their specious Complaint, plaintiffs and their current counsel have apparently abandoned the notion of recourse against their attorneys who created the morass known as Griggs II, and instead by misrepresentation and deception inappropriately seek redress against others, including opposing litigation counsel for matters that were presented to, and decided by, the state courts in adversarial proceedings.

ARGUMENT - THE REQUIREMENTS OF RULE 11

By presenting a pleading, counsel certifies that the pleading is not presented for an improper purpose; that its claims are warranted under existing law or that there is a reasonable argument for a change in the law; and that its factual contentions have evidentiary support or will likely have it after discovery. F.R.Civ.P. 11(b). The basis for sanctions for violating the rule is a requirement that counsel act with due diligence in making the representations embodied in the complaint. Due diligence has come to be interpreted as a reasonable investigation of the facts and the law by counsel prior to the presentation of the pleading. Finally, Rule 11 applies not only to counsel, but to clients as well.

In this case plaintiffs' and their counsel's disregard of the due diligence requirements of Rule 11 is unconscionable. This matter is not dissimilar to the leading litigation abuse case

of Lancellotti v. Fay, 909 F.2d 15 (1st Cir. 1990). Plaintiffs' counsel's negligent, reckless or deliberate failure to examine the prior state court proceedings and discovery information, particularly including depositions of his own clients and transcripts of court hearings, contained in court files and in the files of his numerous predecessor counsel, and known to at least three of the plaintiffs from their own participation in the depositions and previous court proceedings, constitutes a complete absence of any reasonable inquiry.[91] See, e.g., Ultra-Temp Corp. v. Advanced Vacuum Systems, Inc., 189 F.R.D. 17, 25 (D.Mass. 1999), and 194 F.R.D. 378 (D.Mass. 2000).

It was well known to plaintiffs and their counsel that there was no evidentiary basis to support the claims in the Complaint. This violation is particularly troublesome because no reasonable argument can be made by the plaintiffs that evidentiary support would become available after discovery because they themselves either participated in discovery proceedings concerning all the issues raised in the Complaint and admitted that they had no evidentiary support for the claims they are now making, and discovered no evidence during those proceedings, or deliberately chose to conduct no discovery in certain cases. Furthermore, a reasonable inquiry into the prior proceedings in the context of the extant law demonstrates that the allegations of the Complaint are not warranted under existing law, nor is there a reasonable argument for a change in the law.[92]

---

[91] See, e.g., Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1280-1281 (3d Cir. 1994).

[92] In addition to Rule 11, plaintiffs' counsel has violated Rules of Professional Conduct 3.1, 3.3, 4.4, 8.1 and 8.4 by deliberately failing to provide this Court, either in the Complaint or at the TRO conference, with any of the information identifying the prior and current state court proceedings implicating all the issues raised in the Complaint. See, e.g., In re Ronco, Inc., 838 F.2d 212, 218 (7th Cir. 1988); In re Kouterick, 167 B.R. 353 (D.N.J. 1994); In re Schuessler, 386 B.R. 458 (S.D.N.Y. 2008). Furthermore, counsel has made misrepresentations of fact in the Complaint when he knew or reasonably should have known, at the very least from deposition testimony of his own clients, and the orders and rulings of the various state courts, that there was no evidence to support those allegations and/or that those allegations were false. See, e.g., Farino v. Advest, Inc., 111 F.R.D. 345 (E.D.N.Y. 1986); Levine v. F.D.I.C., 2 F.3d 476, 479 (2d Cir. 1993). See also, Taylor v. Wagner, 117 F.R.D. 121, 122-123 (N.D.Ill. 1987).

Because the actions of plaintiffs and their counsel clearly violated Rule 11 (and, at least as to counsel, the enumerated Rules of Professional Conduct), demand was made in writing on July 2, 2008, that plaintiffs' counsel immediately dismiss this Complaint with prejudice at least as to Mr. Gerstein and (then-defendant Mr. Bicki), and that he move this court for leave to withdraw the Complaint and have it either stricken from the Court's files and the ECF system, or have it sealed. See footnote 1. Unfortunately, this warning to mitigate the damage to the reputations of Attorneys Gerstein and Bicki went unheeded.

I. Improper Purpose.

Plaintiffs and their counsel have engaged in an improper purpose in filing the Complaint. Bringing this action following and during long standing state court proceedings[93] concerning the same matters, simply because plaintiffs are dissatisfied with their lack of success in the state courts or because the motivations of others have been frustrated, and the accusations of RICO violations against two respected attorneys in an improper effort to forum shop and procure by abuse of process results plaintiffs were unable to obtain from three Probate Court Judges, two Superior Court Judges and two panels of the Rhode Island Supreme Court, requires sanctions similar to those meted out by the District Court in Fusco v. Medeiros, 965 F.Supp. 230 (D.R.I. 1996). This conduct is not dissimilar to that of the plaintiff in Deep v. Boies, 493 F.Supp.2d 88 (D.Me. 2007), and should be treated accordingly.

The defendants note that in finding violations of Rule 11, courts have determined that embraced within the "improper purpose" prohibition of Rule 11(b)(1) are such matters as bringing complaints in contravention of the Rooker-Feldman doctrine or other principles that bar re-litigation of matters disposed of elsewhere. Likewise, filing complaints barred by the

[93]The state court proceedings are still pending, and the instant litigation also constitutes an improper attempt to interfere with continuing state court actions. See, e.g., ITI Internet Services, Inc. v. Solana Capital Partners, Inc., 2007 WL 666593, *5 (W.D.Wash. 02/27/07).

statute of limitations has been held to warrant Rule 11 sanctions. These considerations apply here.[94]

II. Claims Not Legally Warranted.[95]

The responsibility to make a reasonable inquiry applies to each and every cause of action in the Complaint. Each claim must be evaluated separately for Rule 11 compliance, and the fact that some claims may not entail violations of the Rule does not save the others. See, Bay State Towing Co. v. Barge American 21, 899 F.2d 129, 133 (1st Cir. 1990); Dodd Insurance Services, Inc. v. Royal Insurance Company of America, 935 F.2d 1152, 1158 (10th Cir. 1991); Frantz v. United States Powerlifting Federation, 836 F.2d 1063, 1067 (7th Cir. 1987). Finally, even if the Court found some of the claims meritorious, the Rule 11 violation remains. Teamsters Local No. 579 v. B & M Transit, Inc., 882 F.2d 274, 280-281 (7th Cir. 1989).

In addition to numerous errors and violations of the pleading rules, many of the allegations are for matters that are either outside the jurisdiction of the federal court[96], do not implicate interests to which the plaintiffs have any right[97], are not supported even in the Complaint by adequate factual assertions, let alone evidence, and are clearly frivolous.[98] See,

[94]See, e.g., Marley v. Wright, 137 F.R.D. 359, 364 (W.D.Okla. 1991) (prefiling investigation includes determining if affirmative defenses bar case). The arguments relating to the Rooker-Feldman issues, res judicata, statute of limitations, scandalous pleading, and others will be described and briefed in greater detail in Defendants' Motion to Dismiss Pursuant to F.R.Civ.P. 12(b), which will be filed with the Court by the responsive pleading deadline. While those arguments are not made here, the matters are referenced sufficiently to put plaintiffs' counsel on notice of sanctionable conduct.

[95]Defendants also submit that since all the state claims depend upon this court's exercise of pendent jurisdiction, and the federal claims are improperly before the court, the state law claims are also not legally warranted.

[96]See, e.g., Marshall v. Marshall, 547 U.S. 293 (2006).

[97]See, e.g., Zareas v. Bared-San Martin, 209 Fed.Appx. 1 (1st Cir. 2006).

[98]See, e.g., Plante v. Fleet National Bank, 978 F.Supp. 59 (D.R.I. 1997).

e.g., Bolivar v. Pocklington, 975 F.2d 28, 32-33 (1st Cir. 1992).[99] Plaintiffs' counsel should have been aware of this.

A. Jurisdictional Bars and Defenses Generally.

1. Rooker-Feldman.

Because the plaintiffs' claims are essentially attempts to review or re-litigate state court proceedings, they are barred by both prongs of the Rooker-Feldman doctrine. As this is a known jurisdictional impediment to prosecuting the claims brought in this Complaint, attempting to circumvent the jurisdictional bar constitutes an improper purpose in initiating this action, and subjects the filer to sanctions under Rule 11. See, e.g., Jordaan v. Hall, 275 F.Supp.2d 778, 790 (N.D.Tex. 2003); Lal v. Borough of Kennett Square, 935 F.Supp. 570, 576 (E.D.Pa. 1996).

That Rooker-Feldman bars the plaintiffs' claims here is plain. See, Narragansett Indian Tribe of Rhode Island v. Banfield, 294 F.Supp.2d 169 (D.R.I. 2003). See also, Cesario v. Bernquist, 2006 WL 587598, *3 (D.R.I. 03/10/06). These decisions were readily available to plaintiffs' counsel.

Also important here is Judge Smith's determination in Banfield that Rooker-Feldman applied despite the fact that the plaintiff there was "technically not a party to the state court litigation." Banfield, 294 F.Supp.2d at 174, n. 5. This is applicable to Michael Griggs' status as a plaintiff here but his not having been a party to the state court litigation for the same reason Judge Smith applied Rooker-Feldman to the plaintiff in Banfield, i.e., because the lawsuit is nothing more than a direct attack on the state court judgments.[100]

---

[99]Judge Posner's warning to attorneys in the Seventh Circuit is apropos. See Dreis & Krump Manufacturing Co. v. International Association of Machinists and Aerospace Workers, District No. 8, 802 F.2d 247, 255-256 (7th Cir. 1986).

[100]There are also other reasons why Michael Griggs' claims are not properly before the court (e.g., the statute of limitations bar to the RICO claims), of which he and his counsel were or should have been aware.

2. Res Judicata and Collateral Estoppel.

The doctrine of res judicata "makes a prior judgment in a civil action between the same parties conclusive with regard to any issues that were litigated in the prior action, or, that could have been presented and litigated therein." El Gabri v. Lekas, 681 A.2d 271, 275 (R.I. 1996); See also, Garganta v. Mobile Village, Inc., 730 A.2d 1, 4-5 (R.I. 1999). The doctrine "serves as an absolute bar to a second cause of action where there exists identity of parties, identity of issues, and finality of judgment in an earlier action." Gaudreau v. Blasbalg, 618 A.2d 1272, 1275 (R.I. 1993) (internal quotation marks omitted). The doctrine of res judicata precludes a party from re-litigating an issue even though that same party is "prepared in a second action to present evidence or grounds or theories of the case not presented . . . in the first action, or to seek remedies or forms of relief not demanded in that action." El Gabri, 681 A.2d at 276. Federal courts apply state law in making these determinations. Cahoon v. Shelton, 2008 WL 64518, *2 (D.R.I. 01/04/08). The central claims made here have been litigated in the state courts and decided adversely to the plaintiffs or were all subject to a reasonable opportunity to be litigated.

A federal court must give a state court judgment "the same preclusive effect as would be given that judgment under the law of the state in which the judgment was entered*** That a suit raises a federal question does not alter this requirement." Geiger v. Foley Hoag LLP Retirement Plan, 521 F.3d 60, 66 (1st Cir. 2008); Hopkins v. Rhode Island, 491 F.Supp.2d 266, 274 (D.R.I. 2007).

To the extent that res judicata is applicable here even in the context of a subset of the conditions under which Rooker-Feldman would bar plaintiffs' action, it may stand independently as a ground for dismissal. See, e.g., Morey v. State of Rhode Island, 359 F.Supp.2d 71, 78-79 (D.R.I. 2005). These are long-standing principal of jurisdictional

jurisprudence, making a Rule 11 sanction appropriate. See also, McLaughlin v. Bradlee, 803 F.2d 1197, 1205 (D.C.Cir. 1986) ("when preclusion doctrine clearly forecloses consideration of the merits, the groundlessness of the litigation or the bad faith in which it was brought may become especially apparent."); Patterson v. Aiken, 851 F.2d 386, 387 (11th Cir. 1988) (pro se " 'rehash' of claims made in former litigation" warranted Rule 11 sanctions).

3. Litigation Privilege.

As to the attorney defendant, Mr. Gerstein, the litigation privilege provides immunity from the claims made insofar as they allege actions taken or statements made by either of them in or related to litigation proceedings in the state courts. The allegations of the Complaint as they relate to both attorney defendants are based on conduct undertaken during the course of the state court proceedings described above. While the Complaint deliberately avoids description of the massive scope of the underlying state court litigation, the allegations nevertheless relate to actions taken by these defendants in their capacity as litigation counsel. Vieira v. Meredith, 123 A.2d 743 (R.I. 1956); Kissell v. Dunn, 793 F.Supp. 389, 392-393 (D.R.I. 1992); Bartlett v. American Power Conversion, 2006 WL 2709404, *8 (D.R.I. 09/20/06). The litigation privilege essentially immunizes this conduct from plaintiffs' claims, and their counsel should have known that. See also, e.g., Allia v. Target Corp., 2008 WL 1732964, *8-9 (D.N.J. 04/10/08), and cases cited therein.

B. Federal Claims.

1. The RICO Claims.

The allegations of civil RICO violations, particularly as against Mr. Bicki and Mr. Gerstein, are especially troubling. The standards for these assertions are high and plaintiffs' counsel conducted no reasonable inquiry of either the facts or the law that would suggest even a remote familiarity with what is required for allegation or proof of a private civil RICO case.

See, e.g., Cullen v. Darvin, 132 B.R. 211, 215-217 (D.Mass. 1991). The First Circuit is troubled by such accusations in the Rule 11 context because of the serious consequences of being accused of racketeering. See, e.g., Ryan v. Clemente, 901 F.2d 177, 180-181 (1st Cir. 1990). As Judge Selya pointed out in Miranda v. Ponce Federal Bank, 948 F.2d 41, 44 (1st Cir. 1991):

> . . . in cases alleging civil RICO violations, particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or vexatious treatment of defendants. *See, e.g., Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990); *see also Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir. 1982) (elucidating a similar principle in respect to civil rights suits), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). Civil RICO is an unusually potent weapon-the litigation equivalent of a thermonuclear device. The very pendency of a RICO suit can be stigmatizing and its consummation can be costly; a prevailing plaintiff, for example, stands to receive treble damages and attorneys' fees.

Attorneys carry an even heavier burden of responsibility to conduct prefiling investigations in cases of civil RICO complaints. See, Chapman & Cole v. Itel Container International, 865 F.2d 676, 685 (5th Cir.), cert.denied, 493 U.S. 872 (1989).

This Complaint contains all the elements considered inappropriate by the First Circuit:

> the complaint must be anchored in a bed of facts, not allowed to float freely on a sea of bombast. . . . That is to say, a court assessing a claim's sufficiency has no obligation to take matters on blind faith; "[d]espite the highly deferential reading which we accord a litigant's complaint under Rule 12(b)(6), we need not credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation." . . . [internal citations omitted].

Miranda v. Ponce Federal Bank, 948 F.2d at 44. The complaint also fails to adhere to the First Circuit's standards for civil RICO cases, and it is impossible for any attorney to file a civil RICO complaint in this Court and legitimately claim he is not familiar with the First Circuit's requirements.[101]

[101]The baseless RICO claims brought here are reminiscent of the case dismissed and for which Rule 11 sanctions were imposed in Hoatson v. New York Archdiocese, 2007 WL 431098 (S.D.N.Y. 02/08/07).

a. Proximate Cause.

A basic tenet of RICO practice is that plaintiff must be an injured party, and the injury must flow from the pattern of racketeering activity. Other than conclusory allegations that this is so, sprinkled throughout the Complaint, plaintiffs have not sufficiently pled that defendants' unlawful acts were the proximate cause of their injuries (if any), as required by Supreme Court precedent. See, Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 267-268 (1992). Plaintiffs' counsel is expected to be familiar with this basic premise of civil RICO litigation.

b. Independent Enterprise.

The Complaint also does not clearly identify or define the enterprise, another essential element of any RICO action. The internal inconsistencies in the Complaint make it impossible to determine the enterprise, or its conduct, or to distinguish it from some or all of the defendants. Performing this task correctly in a civil RICO complaint is another basic requirement of RICO pleading and practice. As plaintiff's counsel should know, there must be a distinction between the enterprise and the defendants [Doyle v. Hasbro, Inc., 103 F.3d 186, 190-193 (1st Cir. 1996)], and between the enterprise and the racketeering activity. Jenkins v. Mullen, 2006 WL 909483, *3 (D.R.I. 04/07/06).

c. Fraud Pleading Under Rule 9(b).

Furthermore, any complaint charging RICO violations based on fraud must meet the specificity requirements of Rule 9(b), as well as the "plain" and "concise" pleading standards of Rule 8. It is obvious to any reader that this Complaint meets neither. The Complaint is grossly deficient, and since the law on this particular subject is so well established, there can be no palatable excuse for asserting RICO allegations against these defendants (particularly

the two attorney defendants). Filing this RICO claim was objectively unreasonable and therefore sanctionable. See, Fred A. Smith Lumber Co. v. Edidin, 845 F.2d at 754.

All the plaintiffs' fraud claims suffer from a failure to be pled with the specificity required by F.R.Civ.P. 9(b). Fraud pleading standards were recently reiterated in Mear v. Sun Life Assurance Company of Canada, 2008 WL 245217, *3-4 (1st Cir. 01/24/08). Practically every material or substantive allegation in the Complaint, including the fraud-related claims, are made upon information and belief. It is well-known that "information and belief" pleading does not meet the strictures of Rule 9(b) unless the assertion is made that the facts that would ordinarily satisfy the specificity requirement are unavailable because they are solely in the possession of the defendants. Dowling v. Narragansett Capital Corporation, 735 F.Supp. 1105, 1111-1112 (D.R.I. 1990). In those cases, the complaint must contain a statement of facts upon which the "information and belief" is based (i.e., the source of the information and the reason it is believed), as well as a statement as to what efforts were made to obtain the necessary facts from those who have them. This complaint contains neither. This precise conduct has been held to be embraced by Rule 11's requirement of "reasonable precomplaint inquiry." See, Bankers Trust Co. v. Old Republic Insurance Co., 959 F.2d 677, 683-684 (7th Cir. 1992). The alleged predicate acts of mail fraud and wire fraud are pled as unspecifically as it is possible to plead anything. All the RICO-related counts in the Complaint suffer from these deficiencies, particularly because they incorporate by reference deficient pleadings from other areas of the Complaint as well as from each other. In terms of Rule 9(b), the complaint is so ludicrously deficient that it is unamenable to response. This clearly was known or should have been known to plaintiffs' counsel.

d. Predicate Acts.

There are numerous allegations of predicate acts offered to support the RICO offenses. While all of them are specious, at least one of them, the Hobbs Act extortion claim, is not only scandalous, but also legally unavailable to the plaintiffs, and their counsel should have known this. The Complaint alleges that the defendants violated the Hobbs Act's prohibition against extortion "under color of official right." None of the defendants acted—and had no capacity to act—under color of official right. The plaintiffs knew or should have known that these allegations do not, under any circumstances, make out Hobbs Act violations.

Additionally, plaintiffs' counsel knew or should have known that the claims of state law extortion could not be sufficiently pled as predicate acts in this case since this allegation, even if true, does not make out a threat to injure the "person, reputation, property or financial condition" of the plaintiffs or any of them. The viability of a criminal statute as a predicate for a civil RICO claim is limited to offenses of which the civil RICO defendant "could be convicted" if criminally charged. See, Gibbs v. SLM Corp., 336 F.Supp.2d 1, 17 (D.Mass. 2004), citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 488 (1985). Moreover, there have not been sufficient allegations of conduct on the part of any defendant to comprise a pattern of racketeering activity even if the allegations had any merit.

e. Statute of Limitations.

Specifically with respect to the RICO allegations, which form the thrust of the Complaint (and provide the principal basis for federal jurisdiction) and contain the most damaging and egregious accusations, an examination of the prior state court proceedings would have disclosed immediately that on July 3, 2003, all the allegations underlying the RICO claims alleged here were detailed by plaintiffs' then-counsel at a hearing in the Warwick Probate Court. As a result, and with the additional information known since the

inception of the Griggs litigation in 2000, plaintiffs and their counsel knew or should have known that even the misguided basis for this litigation existed, if at all, sometime between 5 and 8 years ago. Plaintiffs' counsel should also know that private federal civil RICO actions have a 4-year statute of limitations running from the date that the "injury" was or should have been discovered [Rotella v. Wood, 528 U.S. 549 (2000); The Lares Group II v. Tobin, 221 F.3d 41, 43 (1st Cir. 2000)], and that this RICO action was time-barred before it was filed. This conduct, in and of itself, is grounds for Rule 11 sanctions. See, Estate of Barrett v. United States, 337 F.Supp.2d 370, 374-377 (D.Mass. 2004). See also, The Cancer Foundation, Inc. v. Cerberus Capital Management, L.P., 2008 WL 927989, *5-9 (N.D.Ill. 04/04/08); Eshanuddin v. Wolpoff & Abramson, 2007 WL 543052, *3 (W.D.Pa. 02/16/07); Verdon v. Consolidated Rail Corp., 828 F.Supp. 1129, 1141-1142 (S.D.N.Y. 1993); Norris v. Grosvenor Marketing, Ltd., 803 F.2d 1281, 1287 (2d Cir. 1986).

2. The Title III Claims.

The Complaint also alleges violations of 18 U.S.C. §2510, et seq. As is true of the Complaint generally, these counts suffer from serious deficiencies, all of which were or should have been known to the plaintiffs well before the Complaint was filed, including that the defendants who are alleged to be liable are not identified.

The pleading of these counts is totally deficient in that their allegations incorporate by reference other paragraphs containing allegations made with no temporal reference and "upon information and belief" and, like all the other "information and belief" allegations, barren of any statement of the source of the information or any reason to believe it. These statements give no substance to the allegations that the caretaker saw "what appeared to be cameras", and

if anything indicate that there are no devices operating.[102] The claims of Title III violations are entirely specious and plaintiffs' counsel would have known that had he conducted the required prefiling investigation into the facts and the law.

a. Expectation of Privacy.

The "oral communications" do not meet the statutory definition[103] because there was no reasonable expectation of privacy in them, since any such expectation would have been objectively unreasonable under the circumstances present here. It is clear that a mere visitor has no reasonable expectation of privacy in the host's home. See, United States v. Torres, 162 F.3d 6, 10 (1st Cir. 1998). See also, United States v. Battle, 400 F.Supp.2d 355, 358 (D.Mass. 2005).

b. Interception.

A second statutory element not met in this pleading is that conversations were intercepted by means of an electronic or other device. See, United States v. Veilleux, 846 F.Supp. 149, 153 (D.N.H. 1994), citing United States v. McLeod, 493 F.2d 1186, 1188 (7th Cir. 1974). The plaintiffs allege as support for their recording claim that Attorney St. Pierre curtailed their visits based on his (unlawful) review of the recordings of their visits, which he (improperly) deemed detrimental to Glenn. Attorney St. Pierre has advised counsel that he received this information from the caregivers, who observed and overheard the visits personally, and it was on that basis that he curtailed the visits. A pre-complaint interview with Attorney St. Pierre, or even a simple review of papers that he filed in the Probate Court, would certainly have made this plain and thus avoided this claim. The failure to interview

[102]As the allegations progressed, what "appeared to be cameras" morphed itself into actually being cameras, video recorders, camcorders and listening devices.

[103]The statute provides that an "oral communication" is "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. §2510(2).

Attorney St. Pierre, especially given his position as the court-appointed guardian of Glenn's person for five years, cannot be considered anything but intentional.

c. Statute of Limitations.

The material available from the prior proceedings which should have been the subject of a prefiling inquiry would have disclosed that the plaintiffs could have discovered this alleged violation of the their rights well before the expiration of the two-year statute of limitations provided for by the statute, which runs from the date on which the intercepted party first had a reasonable opportunity to discover the injury. See, Sparshott v. Feld Entertainment, Inc., 311 F.3d 425, 429-431 (D.C.Cir. 2002). In this case, that time was prior to June of 2006. For example, in paragraph 294, plaintiffs allege that "on May 31, 2006, [Attorney] St. Pierre wrote to lawyers then representing Lauren and Monica (Courtney), admonishing that they had taken pictures of their father and tried to discuss 'possible visits of ex-wives'." The plaintiffs cite this very incident as the evidence that their conversations were intercepted. They were obviously aware of the incident when their then-counsel received Mr. St. Pierre's letter. Clearly, they then had a reasonable opportunity to discover whether there were any conversations "intercepted." In fact, the very incident which the plaintiffs complain about involving Attorney St. Pierre's allegedly improper access to the events they say were recorded was the subject of a hearing in the Probate Court in 2006. But since the plaintiffs assiduously avoid (throughout the Complaint) making any reference to the actual proceedings that occurred over the eight years of the underlying state court litigation, the Court would have no way of knowing that there was a reasonable opportunity to "discover" this alleged intrusion and make this claim (even if they had standing) long before now.

C. State Law Claims.

All the state law claims appear to be attempts to assert what is essentially a claim for loss of consortium. A major theme resonating throughout the complaint is that the defendants collectively conspired to isolate plaintiffs from their father causing them to lose his society and companionship. It is undisputed that plaintiffs were all adult children at all relevant times hereto. Since plaintiffs have no right to pursue a loss of society claim against any of the defendants, as Rhode Island recognizes no such claim for emancipated, adult children [see R.I.G.L. § 9-1-41(b) ("[a]n unemancipated minor is entitled to recover damages for the loss of parental society and companionship caused by tortious injury to his or her parent.")],[104] the claim is frivolous, subjecting the filer to sanction. See, e.g., Nyer v. Winterthur International, 290 F.3d 456, 461-462 (1st Cir. 2002). See also, Silva v. Witschen, 19 F.3d 725 (1st Cir. 1994); Mariani v. Doctors Associates, Inc., 983 F.2d 5 (1st Cir. 1993).

In addition, aside from the fact that jurisdiction in this Court rests on the foundation of the improper federal RICO and Title III claims, the allegations of state law violations suffer from many of the same defects as the federal claims.

1. State RICO Violations.

In addition to the incorporation by reference of other defective portions of the Complaint [e.g., allegations that do not pass muster under Rule 9(b); no evidence to support the claim; existing evidence known to be to the contrary], this count (Count VI) does not definitively identify the enterprise, and does not properly plead proximate cause of any injury or operation of or investment in a specific enterprise. Plaintiffs and their counsel should have known that this claim is facially defective and improperly brought before the court.

[104]Even assuming the validity of such a claim, the allegations raised in the Complaint in support of the purported loss of consortium would be timed barred by the applicable one (1) or three (3) year statute of limitation referenced in subsection (d) of R.I.G.L. §9-1-41.

2. State Privacy Claims.

The claims made in Counts VII and VIII (violations of the Rhode Island right to privacy statute) are specious in that they depend entirely on an expectation of privacy that did not exist or was unreasonable under the circumstances. Furthermore, the statutory requirements established for these claims have not been sufficiently pled and cannot be met. In fact, the pleading itself contravenes the requirements of the statute. In addition, the Complaint fails to identify which defendant is allegedly responsible for these alleged violations. These claims have no foundation in the law and are improperly brought.

3. Tortious Interference With Expectation Of Inheritance.

There is no state law cause of action for the claim made in Count IX. Under the present circumstances, plaintiffs do not enjoy an independent right to bring a claim against Mr. Heal and the other defendants for interference with their expectation of an inheritance from Glenn's estate. See Umsted v. Umsted, 446 F.3d 17 (1st Cir. 2006) (applying Rhode Island law). Therefore, alleging a cause of action for "tortious interference with expectancy of inheritance" is frivolous. Once again, this something that plaintiffs' counsel should have known and which should have prevented him from bringing this claim.

4. Breach of Fiduciary Duty.

This claim (Count X), alleging that the individual defendants breached a fiduciary obligation to Glenn and the corporate defendants, is so obviously baseless that it almost defies argument. The allegations themselves, entirely apart from their patent falsity, scurrilous accusations of criminal conduct, lack of specificity (in a fraud context), and other defects, definitively establish that the plaintiffs have no standing to bring a claim, even if one existed.

5. Invalidation Of Real Estate Deed.

Count XI seeks to invalidate the deed in which Glenn added Carol as a joint tenant on certain real estate. This claim must be determined according to state law [Butner v. United States, 440 U.S. 48, 55 (1979) (property interests are created and defined by state law)] and more properly belongs in the state court absent appropriate federal jurisdiction (e.g., diversity) which is not present here. In addition, as was the case with Count X, plaintiffs have no standing to raise this claim even in the state court.[105]

6. Conversion—Rhode Island Law.

This claim (Count XII) makes essentially the same allegations as those in Count XI but casts them in the form of conversion. Not only do plaintiffs lack standing to pursue this claim, even in the proper forum, this claim incorporates by reference the allegations of Count XI and those of Count XVI, and thereby assumes the defects of those counts, including their inherent lack of standing.

7. Invalidation of Will and Codicil.

As in the cases of the other state law claims, plaintiffs cannot seek, in this Court, to invalidate Glenn's will (as demanded in Count XIII). The probate of a will is entirely a matter of state law and is not subject to federal jurisdiction, even if the claims were meritorious. Marshall v. Marshall, 547 U.S. at 311-312 (2006). This claim is so baseless as to require sanction under Rule 11.

8. Invalidation of Trust.

The claim made in Count XIV to invalidate Glenn's trust is as frivolous as that made in the previous count for invalidation of the will. The matters relating to the validity of the

[105]In addition, this count incorporates by reference the allegations of Count XVI (Exploitation), in which none of the plaintiffs has standing.

trust are determinable exclusively by state law, and in the present case, there is not the diversity jurisdiction that would enable this Court to apply that law. As the other grounds for federal jurisdiction are insufficient, this claim is not properly before the Court. Moreover, res judicata, collateral estoppel and Rooker-Feldman bar plaintiffs from seeking this relief.

9. Abuse of Process.

The allegations made in Count XV are specious and do not meet the state law requirements for an abuse of process claim. Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1090-1091 (R.I. 2004). They allege injuries for which plaintiffs have no standing to seek relief. They are barred by the litigation privilege and precluded by Rooker-Feldman. They are scandalous and offered in a public document solely to harass and defame. They were made with knowledge that there was no evidence to support them. Particularly with respect to the attorney defendants, they are, aside from the federal RICO allegations, the most egregious and disturbing in the Complaint. They are also similarly more appropriately sanctionable.

10. Exploitation.

Count XVI alleges something called "Exploitation." To the extent that this represents a cause of action, plaintiffs have no standing to pursue it. It is apparently derived from a statute that is enforceable only by the State of Rhode Island. The convoluted nature of the pleading makes it difficult to decipher, but what is clear is that it is another specious and frivolous claim, improperly brought in this Court for an illicit purpose, and bringing it requires sanction.

11. Common Law Conspiracy.

Like the "exploitation" claim made in Count XVI, the common law conspiracy claim made in Count XVII does not satisfy the state law requirements to assert a "civil conspiracy." The allegations do not make a claim of civil conspiracy, and do not even allege a conspiracy

to commit any unlawful act by lawful means, or lawful act by unlawful means, but rather one to purportedly "conceal" offenses, as well as a conspiracy to conceal the exploitation referred to in the preceding count. Plaintiffs have no standing to bring this claim, and even if they did, there is no specificity in the allegations as to how or to what extent they were harmed, nor any sufficient allegation of proximate cause. These allegations, barred by applicable statutes of limitations, represent yet another example of scandalous and vituperative pleading designed solely to intimidate and harass, and is therefore sanctionable.

12. Declaratory Relief.

The claims for declaratory relief in Count XVIII are alleged to be based on federal jurisdiction but seek only declaration of state law rights. Even if this count presented a valid claim upon which the plaintiffs were entitled to any relief, the claim should have been made in a state proceeding, not in this court, and that is apparent from the pleading of the count itself. This claims should never have been brought in this court.

13. Injunctive Relief.

These claims are specious for a variety of reasons. First, it is doubtful that plaintiffs are entitled to injunctive relief as private parties in a federal civil RICO case [see, Lincoln House, Inc. v. Dupre, 903 F.2d 845, 848 (1st Cir. 1990)], and the RICO allegations form the primary basis for federal jurisdiction. Second, plaintiffs have abandoned their claim for a preliminary injunction. Finally, of course, plaintiffs would not be entitled to any injunctive relief as they cannot establish that they have any likelihood of success on the merits of their claims. All this was known to plaintiffs and their counsel at the time the complaint was filed and the request for the TRO was made. This was clearly established when the Court denied out of hand the request for a restraining order after it became apparent at the TRO conference that plaintiffs had no grounds for such relief, could not show irreparable harm or any other

impending doom, and counsel was unable to articulate what relief he sought or for what reason.[106]

14. Notice of Attachment/Order Of Lis Pendens.

The Complaint give notice (to no one in particular) that plaintiffs will file a Notice of Lis Pendens on the property in Warwick owned by Carol (formerly owned jointly by Carol and Glenn). This notice comprises a threat to take legal action that is improper and baseless, and will result in a slander of the title to the property. Threatening to use legal process in an illegal or improper manner is sanctionable conduct.

III. Conclusion

Pursuant to Rule 11 jurisprudence, plaintiffs and their counsel are charged with the knowledge of the prior state court litigation; more importantly, however, they are also charged with knowledge of the discovery material unearthed during the eight years of that litigation preceding the filing of this complaint. Included in this discovery is sworn testimony from three of the plaintiffs—Lauren Griggs, Monica Griggs, and Christine Peabody—as well as Nancy Griggs (who provided the affidavit that was used in the unsuccessful attempt to secure injunctive relief) and Patricia Griggs (to whom many of the allegations against several of the defendants are attributed and sworn to by the verification of the plaintiffs), that none of these individuals has any evidence of any kind whatsoever to support any of the scurrilous allegations made in the Complaint against Mr. Gerstein, Mr. Bicki and Mr. Heal. See, e.g.,

[106]The Court may recall that the affidavit filed in support of the TRO alleged the impending occurrence of an injurious event on a date certain that had already passed at the time of the conference. This incident is an appropriate example of the speciousness of counsel's actions. The affidavit filed in support of the "Emergency" request for a TRO is dated June 21, 2008; but the emergency motion is not dated until June 26. It alleges that the "injurious event" that must be enjoined will occur the following day, on June 27. However, the affidavit also states that the information that the event would occur on June 27 was provided to the affiant on June 13, more than a week before the affidavit was signed, and two weeks before the emergency motion was filed. As the Court knows, the TRO conference was not held until June 30. Clearly, there was never an "emergency", nor was there ever a basis in fact for requesting a restraining order from this Court. That entire exercise was a sham.

D'Aquino v. Citicorp/Diner's Club, Inc., 139 F.R.D. 357, 361 (N.D.Ill., E.D. 1991); see also, Divot Golf Corporation v. Citizens Bank of Massachusetts, 2003 WL 61287, *1, 4 (D.Mass. 01/08/03).

Additionally, the plaintiffs and their counsel knew or should have known, by even a cursory review of the discovery material, that Mr. Bicki's relationship to the case as counsel for Deborah Griggs ended nearly five years ago when he was replaced as counsel by Attorney Jeffrey Pine. Moreover, plaintiffs and their counsel knew or should have known that there is no information in any of the discovery material from the underlying cases in which it is alleged here that Mr. Bicki acted improperly, that supports any of those contentions made in the complaint.

Plaintiffs' counsel is deemed to be familiar with the Rules of Civil Procedure, particularly that Rule 11 provides that by presenting a pleading of this nature to the Court, he has certified to certain explicit representations made after an inquiry "reasonable under the circumstances." There is no question that counsel was under an absolute duty to conduct an investigation of both law and fact before presenting this Complaint. He and his clients are charged with the knowledge of all the previous and underlying legal proceedings, particularly since all the information that will form the basis of the evidence to be presented at the hearing on the within motion comes from deposition testimony of three of the plaintiffs (Lauren, Christine and Monica), at least two other individuals in privity with them and with whom plaintiffs' counsel has spoken (Nancy and Patricia), pleadings filed and statements made in open court by the plaintiffs' prior counsel, and rulings, orders, judgments and statements made by several judges of the Probate and Superior Courts. Simply stated, plaintiffs and their counsel performed no examination of either the law or the facts that could even remotely pass the test of "reasonable inquiry" and are therefore subject to sanction. See, Northwest Bypass

Group v. U.S. Army Corps of Engineers, 2008 WL 2230771 (D.N.H. 2008). See also, Harris v. Southeastern Pennsylvania Transportation Authority, 2005 WL 1899501, *1-5 (E.D.Pa. 08/08/05); Mohammed v. Union Carbide Corp., 606 F.Supp. 252, 259-262 (D.Mich. 1985).

Respectfully submitted,
Edward L. Gerstein
By His Attorney,

*/s/Anthony M. Traini*
Anthony M. Traini (#4793)
56 Pine Street – Suite 200
Providence, RI 02903-2819
Tel. (401) 621-4700
Fax (401) 621-5888
E-mail:amt@atrainilaw.com

David Heal, individually and in his capacity as the Trustee of Glenn E. Griggs Trust,
By and through his attorneys,

*/s/ Michael J. Lepizzera*
Lepizzera & Laprocina Counselors at Law, Ltd.
Michael J. Lepizzera, Jr. #4995
301 Metro Center Blvd. Suite 102
Warwick, Rhode Island 02886
Tel: (401) 739-7397
Fax: (401) 384-6950
Email: mlepizzera@leplap.com

CERTIFICATE OF SERVICE

Pursuant to F.R.Civ.P. 11, a copy of this pleading was served via hand delivery upon Plaintiff's counsel on August 1, 2008 but not filed at that time with the court. It has this 12th day of September, 2008 been served on all parties to receive notice via the ECF system, and served on unrepresented parties by mail.

*/s/ Anthony M. Traini*
Anthony M. Traini